K&L GATES LLP
1601 K Street, NW
Washington, DC 20006
TELEPHONE 202-778-9000

Stephen G. Topetzes (Admitted *pro hac vice*)
  stephen.topetzes@klgates.com
Nicole A. Baker (Admitted *pro hac vice*)
  nicole.baker@klgates.com

QUARLES & BRADY LLP
Firm State Bar No. 00443101
One South Church Avenue
Suite 1700
Tucson, AZ 85701-1621
TELEPHONE 520-770-8700

Shannon L. Giles (#018786)
  sgiles@quarles.com

*Counsel for Defendants Davis Selected Advisers, L.P. and Davis Distributors, LLC*

UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA

| | |
|---|---|
| DONALD TURNER, on behalf of the DAVIS NEW YORK VENTURE FUND<br><br>Plaintiff,<br><br>-against-<br><br>DAVIS SELECTED ADVISERS, L.P. and DAVIS DISTRIBUTORS, LLC,<br><br>Defendants. | NO. CV-08-421-TUC-JMR<br><br>**DEFENDANTS' MOTION TO DISMISS**<br><br>ORAL ARGUMENT REQUESTED |

Defendants Davis Selected Advisers, L.P. ("Davis Advisers") and Davis Distributors, LLC ("Davis Distributors") respectfully move the Court, pursuant to Rules 8 and 12(b)(6) of the Federal Rules of Civil Procedure, to dismiss the Complaint and submit the following Memorandum of Points and Authorities in Support of their Motion.

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. PRELIMINARY STATEMENT

In the Complaint, plaintiff seeks to reassert allegations and repackage generalized attacks on the mutual fund industry that routinely have been dismissed by courts at the initial pleadings stage. Consistent with applicable precedent, this Court should reject this effort and dismiss the Complaint as defective.

Plaintiff claims to be a security holder of "Class A shares" of the Davis New York Venture Fund ("Fund").[1] (Compl. ¶ 18.) Defendant Davis Advisers serves as the investment adviser to the Fund and manages its assets. (Compl. ¶¶ 32-33.) Defendant Davis Distributors, a registered broker-dealer and a subsidiary of Davis Advisers, serves as the Fund's principal underwriter and is the entity that distributes shares of the Fund through agreements with selling brokers. (Compl. ¶ 35.)

Plaintiff alleges that, between July 24, 2007 and July 24, 2008, defendants charged the Fund "excessive and disproportionate fees" in violation of their fiduciary duties to the Fund. (Compl. ¶ 3.) Plaintiff further contends that "the huge increase in the size of the Fund over the past few years has materially and disproportionately benefited" defendants. (Compl. ¶ 11.)

The Complaint focuses on fees paid by the Fund to Defendant Davis Distributors under a plan adopted by the Fund pursuant to Rule 12b-1 under the Investment Company Act of 1940 ("ICA"). Plaintiff contends that the payment of such 12b-1 fees by the Fund for post-sale shareholder services is *per se* inappropriate and a violation of the ICA. This claim, which is based largely on non-Fund-specific and non-defendant-specific allegations, or assertions regarding the overall state of the mutual fund industry, is

---

[1] Davis New York Venture Fund is one of four series currently offered by Davis New York Venture Fund, Inc., an open-end investment company that may issue multiple series. (Compl. ¶ 17.)

defective on its face. Regulators and numerous courts repeatedly have stated that the payment of 12b-1 fees for post-sale services is non-problematic. Moreover, plaintiff utterly has failed to assert facts that could give rise to a finding that Davis Distributors breached any duty to the Fund, as provided under Section 36(b) of the ICA. It is not sufficient for plaintiff to allege merely that fees paid by the Fund were "excessive;" plaintiff also must allege facts that could establish such excessiveness and a related breach of duty by defendants. The Complaint is devoid of such allegations. Finally, plaintiff's related claim against Davis Advisers for so-called "control person" liability under Section 48(a) of the ICA must fail because there is no private right of action under that statute.

## II. SUMMARY OF ARGUMENT

Plaintiff purports to assert two claims:

- First, plaintiff brings a claim under Section 36(b) of the ICA against Davis Distributors; and

- Second, plaintiff alleges a "control person" liability claim under Section 48(a) of the ICA against Davis Advisers.

Each of these claims suffers from deficiencies that compel dismissal of the Complaint.

<u>First</u>, the Complaint fails to state a claim under Section 36(b) of the ICA because it consists of either negative characterizations of plainly permissible conduct or generalized allegations of improper conduct unsupported by any defendant-specific assertions of fact. The United States Securities and Exchange Commission ("SEC") has authorized mutual funds to pay distribution fees and service fees pursuant to Rule 12b-1, subject to consideration and approval of the mutual funds' independent directors. Contrary to plaintiff's apparent contention, the law is clear that mutual funds are permitted to pay distribution fees to compensate distributors for expenses incurred in connection with past sales, and that funds also are permitted to pay service fees to distributors in connection

with continuing maintenance of shareholder accounts.  *See, e.g.*, *ING Principal Prot. Funds Derivative Litig.*, 369 F. Supp. 2d 163, 169 (D. Mass. 2005); *Yameen v. Eaton Vance Distribs., Inc.*, 394 F. Supp. 2d 350, 355 (D. Mass. 2005).

Second, as provided in *Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*, 694 F.2d 923, 928-930 (2d Cir. 1982), *cert. denied*, 537 U.S. 1088 (1983) and a long string of subsequent decisions, the law is clear with respect to what a plaintiff must allege to state a claim under Section 36(b) of the ICA.  Plaintiff must allege *specific facts* sufficient to establish that a fee was "so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's-length bargaining." *Id.* at 928.  Plaintiff has failed to meet that standard.

Third, plaintiff's allegations against Davis Advisers under Section 48(a) of the ICA should be dismissed because there is no express or implied private right of action under that statute.  The absence of "rights-creating" language in Section 48(a) reflects a lack of Congressional intent to create a private right of action. *See e.g., Alexander v. Sandoval*, 532 U.S. 275 (2001).  Further, the express provision of one method of enforcing Section 48(a) – a provision authorizing the SEC to bring claims for a violation of the section – and the express provision of a private right of action under another section of the ICA (*i.e.*, Section 36(b)) indicates that Congress determined not to create such a private right. *Bellikoff v. Eaton Vance Corp.*, 481 F. 3d 110, 116 (2d Cir. 2007) (*citing Sandoval*, 532 U.S. at 290).

**III.   BACKGROUND**

    **A.   Regulatory Framework**

It is well-settled that mutual fund assets may be used to facilitate the distribution of fund shares.  ICA Rule 12b-1 permits investment companies to compensate underwriters, dealers, and sales personnel in connection with the distribution and marketing of a mutual

fund's shares. 17 C.F.R. §270.12b-1. Payment of such fees, known as "12b-1 fees" or "distribution fees," is authorized and regulated by rules approved by the SEC and NASD (n/k/a the "Financial Industry Regulatory Authority" or "FINRA").[2]

Funds may pay for distribution fees "up front" or spread them out over a period of several years. *See e.g.*, *Pfeiffer v. Bjurman, Barry & Assocs.*, Civ. No. 03-9741, 2004 U.S. Dist. LEXIS 16924, at *4 (S.D.N.Y. Aug. 27, 2004), *motion for summary judgment decided on other grounds*, Civ. No. 03-9741, 2006 U.S. Dist. LEXIS 7862 (S.D.N.Y. Mar. 3, 2006); *ING Principal Prot. Funds Derivative Litig.*, 369 F. Supp. 2d 163, 167 (D. Mass. 2005). Stated differently, mutual funds may address sales-related expenses by deducting a front-end sales load from the offering price of mutual fund shares, or they may deduct an asset-based sales charge that is paid to the distributor of the fund shares.[3] Such fees are expressly authorized by Rule 12b-1 to compensate the distributor for

---

[2] NASD Rules are relevant to this analysis because Defendant Davis Distributors is "a broker-dealer and a member of the [NASD]." (Compl. ¶ 38.)

[3] *See* Payment of Asset-Backed Sales Loads by Registered Open-End Management Investment Companies, Investment Company Act Release No. 16,431, 53 Fed. Reg. 23258, at 23277 (June 13, 1988). As noted in the Division of Investment Management, SEC, Report on Mutual Fund Fees and Expenses, Dec. 2000, *available at* http://www.sec.gov/news/studies/feestudy.htm#P1137_160078:

> [T]oday, many funds adopt a rule 12b-1 plan as a substitute for or supplement to sales charges or as an ongoing method of paying for marketing and distribution arrangements.
>
> The mutual fund industry utilizes a number of marketing and distribution practices that did not exist when Rule 12b-1 was adopted. For example, . . . many funds offer their shares in multiple classes -- an organizational structure that permits investors to choose whether to pay for fund distribution and marketing costs up-front (via front-end sales charge), over time from their fund investment (via 12b-1 fee), when they redeem (via deferred sales charge), or in some combination of the above. Rule 12b-1 plans are integral to these arrangements - they are the means by which the brokers that sell fund shares under these arrangements are paid.

distribution expenses, including "advertising, compensation of brokers, dealers and sales personnel, the printing and mailing of prospectuses to other than current shareholders, and the printing and mailing of sales literature," among other things. (Compl. ¶ 75.)

Section 22(b) of the ICA grants NASD exclusive authority, subject to SEC oversight, to regulate fees that mutual funds may charge to shareholders pursuant to Rule 12b-1.[4] *See* Proposed Rule Change by NASD Relating to the Limitation of Asset-Based Sales Charges as Imposed by Investment Companies, Exchange Act Release No. 30,897, 57 Fed. Reg. 30985, 30989 (July 7, 1992) [hereinafter "SEC Release 30,897"]. NASD Rule 2830 governs permissible sales charges for distribution of investment company shares. "Sales charges" are defined as "all charges or fees that are paid to finance sales or sales promotion expenses." NASD Rule 2830(b)(8). An "asset-based sales charge" is defined as "a sales charge that is deducted from the net assets of an investment company and does not include a service fee." NASD Rule 2830(b)(8)(A). Rule 2830 limits asset-based sales charges to .75% per year of the average annual net assets of the fund plus interest. NASD Rule 2830(d)(2)(E).

As registered investment companies, mutual funds also are permitted to charge service fees. Such fees, defined as "payments by an investment company for personal service and/or the maintenance of shareholder accounts," may not exceed .25% of the average annual net asset value of the fund. NASD Rules 2830(d)(5); 2830(b)(9). Service fees are intended to "compensate members for shareholder liaison services they provide, such as, responding to customer inquiries and providing information on their investments." Questions and Answers About New NASD Rules Governing Investment Company Sales Charges, NASD Notice to Members 93-12, *available at*

---

[4] Section 22(b) notes that "[i]f any provision of this subsection is in conflict with any provision of any law of the United States in effect on the date this subsection takes effect, the provisions of this subsection shall prevail." 15 U.S.C. § 80a-22(b)(3).

http://finra.complinet.com/en/display/display.html?rbid=2403&element_id=1627. The SEC has stated that a .25% service fee "should be adequate . . . to provide compensation for continued service to mutual fund shareholder accounts." *See* SEC Release No. 30,897, 57 Fed. Reg. 30985, at 30990 (July 7, 1992).

Finally, SEC Rule 17d-3 permits funds to enter into written agreements with their affiliates who serve as the principal underwriter of fund shares (*e.g.*, Davis Distributors) to permit the funds to make payments to the affiliates in connection with the distribution of shares. 17 C.F.R. § 270.17d-3. Mutual fund directors may implement a written "fee structure" concerning such payments pursuant to Rule 12b-1 if there is a "reasonable likelihood that the plan will benefit the company and its shareholders." 17 C.F.R. 270.12b-1(e).

**B.    The Fund's Plans of Distribution**

The Fund has Plans of Distribution under which it pays distribution fees and service fees to Davis Distributors. (Compl. ¶ 35.) The Plans authorize a service fee equal to .25% of assets on Class A, Class B, Class C and Class R shares. (Compl. ¶ 68.) Class A shares also incorporate an initial sales charge into the purchase price. (Compl. ¶ 30.) The total distribution fee is 1.00% for Class B and C shares and .75% for Class R shares (including the .25% service fee).[5] (Compl. ¶ 71.) The Fund's Plans of Distribution are reviewed substantively and approved on an annual basis by the Fund's Board of Directors in accordance with Rule 12b-1. (Compl. ¶ 53.)

**IV.   ARGUMENT**

"A district court should grant a motion to dismiss if plaintiffs have not pled 'enough facts to state a claim of relief that is plausible on its face.'" *Williams v. Gerber*

---

[5]   Shareholders who do not pay a front-end sales load and who sell or redeem their shares within a few years of purchasing generally also pay a "contingent deferred sales charge" upon redemption. *See* NASD Rule 2830(d)(6)(A).

7

*Prods. Co.*, 523 F.3d 934, 938 (9th Cir. 2008) (*quoting Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1974 (2007)). "'[C]onclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss for failure to state a claim.'" *Siemers v. Wells Fargo & Co.*, No. C 05-04518 WHA, 2006 U.S. Dist. LEXIS 81097, at *10-11 (N.D. Cal. Oct. 24, 2006) (*quoting Epstein v. Wash. Energy Co.*, 83 F.3d 1136, 1140 (9th Cir. 1996)).

### A. The Distribution Payments Identified in the Complaint are Expressly Authorized by Section 22(b) of the Investment Company Act and the Rules Promulgated Thereunder

Section 36(b) cannot be used to challenge the distribution payments and service fees paid by the Fund. Such payments are regulated comprehensively by the SEC and NASD. Plaintiff has not alleged, and cannot allege, that the fees paid by the Fund do not comply with applicable securities rules and regulations.

Section 22(b) of the ICA represents Congress' effort to delegate to NASD, subject to SEC oversight, responsibility for regulating the sales charges applied to mutual fund shares. Interpreting Section 22(b), the SEC has found that:

> The ability of the NASD, through its Rules, to regulate comprehensively mutual fund fees received by members [*i.e.*, broker-dealers] is fully consistent with the statutory mandate of section 22(b) of the [ICA] that gives the NASD authority to prohibit excessive sales loads, and with protection of investors and the promotion of just and equitable principles of trade pursuant to section 15A(b)(6) of the Act . . . Given the specific mandate of section 22(b) of the [ICA] and the requirement of just and equitable principles of trade embodied in section 15A(b)(6) of the Act, the Commission is of the view that the NASD has authority to adopt rules that ensure overall reasonableness of sales fees received by members.

SEC Release 30,897, 57 Fed. Reg. 30985, 30989 (July 7, 1992).

As described above, NASD issued, and the SEC subsequently approved, Rule 2830. In approving Rule 2830, the SEC found that the Rule "carries out the NASD's congressional mandate to prevent excessive sales charges on mutual fund shares." SEC

Release 30,897, 57 Fed. Reg. 30985, 30989 (July 7, 1992). The SEC also stated that it believes the rule "appropriately balances the need to ensure that the NASD's rules allow broker-dealers, sales personnel, and underwriters to receive reasonable compensation, against the need to ensure that investors are charged reasonable sales loads." *Id.*

Even assuming, *arguendo*, the truth of plaintiff's allegations, the Complaint describes payments by the Fund – *e.g.*, a .25% service fee on the Class A shares allegedly held by plaintiff (Compl. ¶ 68) – that comply with the relevant NASD rule and that regulators have stated may be used for post-sale services. This reality underscores the legal insufficiency of plaintiff's allegations and is fatal to his claims.

### B. The Complaint Fails to Satisfy the Relevant Pleading Standard Under Section 36(b) of the Investment Company Act

Section 36(b) of the ICA imposes a fiduciary duty upon mutual fund investment advisors, officers, directors, board members, and principal underwriters "who owe general fiduciary duties to mutual fund shareholders." *Yameen v. Eaton Vance Distribs., Inc.*, 394 F. Supp. 350, 354 (D. Mass. 2005). Section 36(b) provides that those individuals and entities "shall be deemed to have a fiduciary duty with respect to the receipt of compensation for services, or of payments of a material nature, paid by such registered investment company, or by the security holders thereof, to such investment adviser or any affiliated person of such investment adviser." 15 U.S.C. § 80a-36(b).

#### 1. Distribution and Service Fees May be Used to Compensate Distributors for Post-Sale Services

A fee is considered "excessive" under Section 36(b) if it is "so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's-length bargaining." *Gartenberg v. Merrill Lynch Asset Mgmt.,*

*Inc.*, 694 F.2d 923, 928 (2d Cir. 1982), *cert. denied*, 537 U.S. 1088 (1983).[6] In assessing claims under Section 36(b), courts generally consider six factors: (1) the nature and quality of the services provided to the shareholders; (2) the profitability of the mutual fund to the defendants; (3) any "fall-out" benefits received; (4) the economies of scale achieved by the mutual fund and whether such savings were passed on to the shareholders; (5) comparative fee structures with other funds; and (6) the independence and conscientiousness of the mutual fund's outside trustees. *Id.* at 929-930; *Krinsk v. Fund Asset Mgmt. Inc.*, 875 F.2d 404, 409 (2d Cir. 1989), *cert. denied*, 493 U.S. 919 (1989). These factors commonly are known as the "*Gartenberg* factors."[7]

Plaintiff, however, claims that the *Gartenberg* pleading standard does "not apply to that portion of the 12b-1 fees paid by the Fund to service current shareholders since the payment of those fees are *per se* excessive and disproportionate and a violation of Section 12." (Compl. ¶ 85 n.4.) More specifically, plaintiff asserts that it is unlawful to use distribution fees to finance activities such as post-shareholder services and that they are

---

[6] *See also Krantz v. Prudential Inv. Fund Mgmt. LLC*, 305 F.3d 140, 143 (3d Cir. 2002) (determining that "dismissal for failure to state a claim with respect to excessive compensation was appropriate since Plaintiff failed to allege any facts indicating that the fees received were disproportionate to services rendered"); *Strigliabotti, v. Franklin Resources, Inc.,* No. C 04-008831 SI, 2005 U.S. LEXIS 9625, at *9 (N.D. Cal. Mar. 7, 2005).

[7] Plaintiff claims that, "[a]ssuming arguendo that some or all of 12b-1 fees assessed against Fund shareholders were for an activity which is primarily intended to result in the sale of shares issued by the Fund . . . the factors identified in Rule 12b-1 (Investment Company Act Release No. 11,414) are applicable . . ." (Compl. ¶ 86.) However, the Rule Release specifically states that "[i]n order to avoid the appearance of either unduly constricting the directors' decision making process or of creating a mechanical checklist, the Commission has decided to delete the list of factors from [earlier Rule proposals relating to] rule 12b-1." Bearing of Distribution Expenses by Mutual Funds, Investment Company Act Release No. 11,414, 1980 SEC LEXIS 444 (Oct. 28, 1980) [45 Fed Red. 73898]. Indeed, plaintiff concedes that "the Commission has decided not to require directors to consider any particular factors . . . " (Compl. ¶ 87 n.5) Accordingly, plaintiff's allegations relating to the applicability of various factors identified in Release No. 11,414 lack merit.

*per se* excessive, because they are not "primarily intended to result in the sale of shares." *Id.*[8]

Plaintiff's assertions are unavailing. As noted above, distributors are permitted to "recover certain sales-related expenses previously paid out when distributing the fund's shares. Compensation for past distribution services are considered payments made 'in connection with' the distribution of a fund's shares." *ING Principal Prot. Funds Derivative Litig.*, 369 F. Supp. 2d 163, 169 (D. Mass. 2005). *See also Yameen v. Eaton Vance Distribs., Inc.,* 394 F. Supp. 2d 350, 354 (D. Mass. 2005) (wherein the court concurred "with the view that [Rule 12b-1] also allows mutual funds to choose between paying distribution and service charges up front and spreading them out over a period of several years"); *Pfeiffer v. Bjurman, Barry & Assocs.*, Civ. No. 03-9741, 2004 U.S. Dist. LEXIS 16924, at *4 (S.D.N.Y. Aug. 27, 2004), *motion for summary judgment decided on other grounds*, Civ. No. 03-9741, 2006 U.S. Dist. LEXIS 7862 (S.D.N.Y. Mar. 3, 2006) (noting "[a] fund with a Rule 12b-1 fee thus permits shareholders to pay for sales-related and other expenses over time, rather than immediately on purchase").

---

[8] Plaintiff also alleges that Davis Distributors improperly used distribution fees to assist it in "maintaining a mutual fund 'supermarket' on its website," which was not "primarily intended to result in the sale of Fund shares . . . ." (Compl. ¶ 10.) However, plaintiff's assertion is unfounded. The SEC has declared that "Rule 12b-1 has funded important and meaningful services for fund investors, has helped to facilitate the reduction in front end sales loads over time and has enable significant *distribution related* innovations including *fund supermarkets*." Andrew Donohue, Director, Division of Investment Management, U.S. Securities and Exchange Commission, Speech by the SEC Staff: Remarks before the ICI 2007 Securities Law Developments Conference (Dec. 6, 2007) *available at* http://www.sec.gov/news/speech/2007/spch120607ajd.htm (emphasis added). Moreover, "whether or not a payment is for . . . distribution purposes has been determined by the [SEC] to be a question of fact to be decided by the fund's board of directors." Shareholder Services Group, Inc., SEC No-Action Letter, 1992 SEC No-Act. LEXIS 891, at *10 (Aug. 12, 1992). Both the SEC and the Fund's Board of Directors have determined that any distribution payments made in connection with a "mutual fund supermarket" enable distribution of the shares of the Fund. Plaintiff's allegations are unfounded.

As discussed above, funds also are permitted to pay service fees to distributors in connection with their provision of ongoing services to shareholders. The SEC has determined that service fees "should be adequate . . . to provide compensation for continued service to mutual fund shareholder accounts." *See* SEC Release No. 30,897, 57 Fed. Reg. 30985, at 30990 (July 7, 1992). *See also Yameen v. Eaton Vance Distribs., Inc.*, 394 F. Supp. 2d 350, 355 n.4 (D. Mass. 2005) (court finds that "such fees support the sales efforts of the company by assuring that there will be follow-up account maintenance for purchasing shareholders"); *Pfeiffer v. Bjurman, Barry & Assocs.*, Civ. No. 03-9741, 2004 U.S. Dist. LEXIS 16924, at *16-17 (S.D.N.Y. Aug. 26, 2004), *motion for summary judgment decided on other grounds*, Civ. No. 9741, 2006 U.S. Dist. LEXIS 7862 (S.D.N.Y. Mar. 3, 2006) (holding that "the fees charged for ongoing personal shareholder services may be assessed indefinitely and are not subject to a lifetime cap").

In fact, mutual funds may continue to pay Rule 12b-1 fees after they close to new investors, even though the fees may not be used primarily for the purposes of present distribution. *See In re Goldman Sachs Mut. Funds Fee Litig.*, No. 04 Civ. 2567, 2006 U.S. Dist. LEXIS 1542, at *35-36 (S.D.N.Y. Jan. 17, 2006) (dismissing plaintiff's breach of fiduciary duty claim under Section 36(b) despite plaintiff's allegations that the fund's distribution fee and service fee were excessive because those expenses are *de minimus* in a closed fund; the court noted that "NASD Rule 2830(d)(2) permits a closed fund to continue charging 12b-1 fees so long as they do not exceed a specified cap"); *Yameen v. Eaton Vance Distribs., Inc.*, 394 F. Supp. 2d 350, 357 (D. Mass. 2005). Accordingly, plaintiff's generalized attack on the mutual fund industry convention pursuant to which funds – with regulatory approval – pay distribution fees or service charges to compensate distributors for past distribution efforts does not state a cause of action under Section 36(b) of the ICA.

### 2. Plaintiff has failed to allege any specific facts showing that distribution fees paid by the Fund are excessive

Plaintiff fails to allege facts sufficient to demonstrate that the distribution fees paid by the Fund are so disproportionately large that they bear no reasonable relationship to the services rendered, as provided in *Gartenberg*. Indeed, plaintiff has not alleged any particular facts bearing on the relationship between the distribution fees charged by Davis Distributors and the services rendered.[9] Complaints will be dismissed where they rely on generalities about deficiencies in the securities industry. *See Dumond v. Massachusetts Fin. Servs. Co.*, Civil Action No. 04-11458-GAO, 2006 U.S. Dist. LEXIS 1933, at *12 (D. Mass. Jan. 19, 2006); *In re Am. Funds Fees Litigs.*, No. CV 04-5593 GAF, 2005 U.S. Dist LEXIS 41884, at *16 (C.D. Cal. Dec. 16, 2005) ("the Court notes that plaintiffs must allege *specific facts* regarding the disproportionately high nature of the fees in question") (emphasis added).

### 3. Plaintiff fails to plead adequately facts relating to any of the *Gartenberg* factors that could lead the Court to determine that the distribution fees are excessive

The allegations contained in the Complaint do not support a finding that Davis Distributors violated Section 36(b). Plaintiff's allegations relate to four of the *Gartenberg* factors:[10] (1) the profitability of the relationship with the Fund; (2) economies of scale achieved by the Fund and whether such savings were passed on to the shareholders; (3) comparative fee structures with other funds; and (4) the independence and

---

[9] Section 36(b) concerns only "the negotiation and enforcement of payment arrangements between investment advisers and funds, not whether investment advisers acted improperly in the use of the funds." *In re Eaton Vance Mut. Funds Fee Litig.*, 380 F. Supp. 2d 222, 237 (S.D.N.Y. 2005). *See also In re Davis Selected Mut. Funds Litig.*, No. 04 Civ. 4186, 2005 U.S. Dist. LEXIS 23203, at *9 (S.D.N.Y. Oct. 11, 2005).

[10] The Complaint does not contain any allegations concerning the nature and quality of the services provided to the Fund. The Complaint also is devoid of any references to "fall-out" benefits allegedly received by Davis Distributors.

conscientiousness of the Fund's outside directors. None of plaintiff's allegations is sufficient to state a claim.

### a. The profitability of the relationship with the Fund

Plaintiff alleges that Davis Distributors earned a profit in the form of distribution fees that it retained after the defendants "collect[ed] enough money from the Fund's 12b-1 fee to pay off the commission earned by the selling broker-dealer at the time of sale." (Compl. ¶ 101.)[11] However, any reference to fees is "irrelevant to a showing of profitability without some allegation of the corresponding costs incurred in operating [or distributing] the funds." *Amron v. Morgan Stanley Inv. Advisors, Inc.*, 464 F.3d 338, 344-345 (2d Cir. 2006) (discussing *Krinsk*, 875 F.2d at 410, in which the court stated that the district court's treatment of distribution fees was "a wash, offset by the cost of payments to the personnel").

The Complaint does not contain any allegations regarding the amount of Davis Distributors' actual operating costs. Moreover, plaintiff fails to allege any facts relating to Davis Distributors' net income, or the percentage of any profits that relates to the distribution fees. Plaintiff alleges only that Davis Distributors "retains for its own account a portion of the 12b-1 fees from all classes of the Fund's shares." (Compl. ¶ 73.) These general allegations do not state a claim for relief. *See In re Salomon Smith Barney Mut. Fund Fees Litig.*, 528 F. Supp. 2d 332, 338 (S.D.N.Y. 2007) (determining that plaintiffs failed to satisfy the *Gartenberg* factor relating to "profitability of the fund" to the defendants because it was "not clear . . . what percentage of these profits stems from the

---

[11] Although the plaintiff does not allege that Davis Advisers violated Section 36(b), plaintiff asserts that Davis Advisers "reaped a materially larger advisory fee merely based upon the increase in the size of the Fund . . ." (Compl. ¶ 149.) Such an allegation is defective for the same reasons as those identified with respect to plaintiff's claim against Davis Distributors.

12b-1 and other fees charged by the Funds in 2003 as reported in the Complaint, . . ., and there is no allegation concerning the funds' operating costs").

### b. Economies of scale

Courts have determined that the "concept of 'economies of scale' assumes that as a mutual fund increases in size, its operational costs decrease proportionally. If a fund realizes economies of scale, its willingness to let the shareholders participate in the resulting benefits becomes a factor in evaluating the reasonableness" of the fees. *Kalish v. Franklin Advisers, Inc.*, 742 F. Supp. 1222, 1237 (S.D.N.Y. 1990). In order to demonstrate economies of scale, the plaintiff bears "the burden of proving that the per unit cost of performing fund transactions decreased as the number of transactions increased." *Krinsk v. Fund Asset Mgmt., Inc.*, 875 F.2d 404, 411 (2d Cir. 1989) *cert. denied* 493 U.S. 919 (1989).

"Economies of scale allegations are insufficient where there are no allegations of the costs." *In re Salomon Smith Barney Mut. Fund Fees Litig.*, 528 F. Supp. 2d 332, 338-339 (S.D.N.Y. Dec. 3, 2007). Further, "[m]ere assertions that fees increased with the size of the [f]unds are not enough to establish that the benefits from economies of scale were not passed on to investors." *In re Goldman Sachs Mut. Funds Fee Litig.*, No. 04 Civ. 2567, 2006 U.S. Dist. LEXIS 1542, at *34 (S.D.N.Y. Jan. 17, 2006). *See also Krinsk v. Fund Asset Mgmt., Inc.*, 875 F.2d 404, 411 (2d Cir. 1989), *cert. denied*, 493 U.S. 919 (1989) (holding that "the fact that 'expenses . . . declined at a time when the Fund size grew . . . does not establish that such decline was necessarily due to economies of scale'"). Here, the Complaint contains *no* allegations regarding the amount of costs incurred by Davis Distributors relative to the Fund.

Plaintiff acknowledges that the shareholders realized some economies of scale in the form of breakpoints but suggests that defendants did not adequately share economies of scale with the shareholders. However, plaintiff does not "identify what amount of cost savings would have been appropriate, or why the amounts shared fall outside the range that could have been negotiated at arm's length." *Gallus, v. Ameriprise Fin, Inc.*, 497 F. Supp. 2d 974, 982 (D. Minn. 2007) (holding that plaintiffs' claims, which were based on similar allegations, could not withstand summary judgment based on the economies of scale element of the *Gartenberg* pleading standard). These deficiencies are fatal to his claims.

### c.  Comparative fee structures with other funds

Plaintiff alleges generally that the Fund's Directors should have considered "market price," when determining the appropriate amount of distribution fees.[12] (Compl. ¶ 172.) At the same time, in apparent recognition of the fact that the Fund pays distribution fees that are entirely commensurate with the industry standard and applicable rules, plaintiff strains to allege that "if essentially all mutual funds are charging an unreasonable amount for their 12b-1 fee, then all the funds look reasonable." (Compl. ¶ 172.) Plaintiff also contends that the "correct comparison is not to the 12b-1 fee percentage charged by other similar funds . . ." *Id.*

It appears that plaintiff may believe that all mutual fund distribution fees are excessive. In any event, he has failed to allege facts sufficient to establish – with respect

---

[12] The *Gartenberg* court *disagreed* with the lower court's holding that "the principal factor to be considered in evaluating a fee's fairness is the price charged by other similar advisers to funds managed by them;" further, the *Gartenberg* court found that the ''market price" of an advisory fee did *not* act "as a standard to test [its] fairness" *Gartenberg v. Merrill Lynch Asset Mgmt.*, 694 F.2d 923, 929 (2d Cir. 1982), *cert. denied*, 461 U.S. 906 (1983) (quoting Judge Pollack's opinion, 528 F. Supp. at 1049, 1067-1068).

to comparative fee structures or otherwise – that Davis Distributors violated Section 36(b).

### d. Independence and conscientiousness of the Fund's outside directors

Plaintiff's allegations regarding the independence and conscientiousness of the Fund's Directors (Compl. ¶¶ 44-45, 158-165) also are insufficient to establish a claim under Section 36(b). Regardless of the number of Board meetings held per year, plaintiff has not alleged any facts relating to the preparations undertaken by the Directors in advance of each meeting of the Board of Directors. Moreover, the Complaint does not speak to any preparatory materials received by the Directors in advance of the meetings, and it does not discuss each Director's review and analysis of any such materials, or whether the Board was advised by independent and experienced mutual fund counsel regarding matters related to the Fund's Plans of Distribution. In addition, the Complaint contains merely summary allegations regarding the actions that the Board of Directors "must have" undertaken during Board meetings. (Compl. ¶ 163.)

Courts routinely have rejected such conclusory allegations and dismissed cases in which plaintiffs have challenged directors' independence because of the way in which the directors were selected, or because they had a financial interest in serving on a board of directors. *See In re Davis Selected Mut. Funds Litig.*, No. 04 Civ. 4186, 2005 U.S. Dist. LEXIS 23203, at *13 (S.D.N.Y. Oct. 11, 2005) (directors may be independent where they were appointed by an investment adviser; approved the challenged conduct; or had a financial interest in sitting on a board of directors and increasing the size of the relevant mutual fund); *Scalisi v. Fund Asset Mgmt, L.P.*, 380 F.3d 133, 141 (2d Cir. 2004) (directors may be independent where they were appointed by the fund's investment advisor; served on many fund boards; and received large salaries); *In re Franklin Mut.*

*Funds Fee Litig.*, 388 F. Supp. 2d 451, 470 (D.N.J. 2005) (directors may be independent where they were appointed by the investment advisor; served on several boards of directors; and received "substantial compensation").[13] The same result is warranted in this case. Plaintiff has failed to allege any specific facts related to the Fund's independent directors that would support a claim under Section 36(b).

Therefore, plaintiff has failed to satisfy the relevant pleading standard under Section 36(b) of the ICA, and his First Claim for Relief should be dismissed with prejudice.

    **C.**    **There is No Private Right of Action Under Section 48(a) of the Investment Company Act**

Plaintiff's claim under Section 48(a) of the ICA should be dismissed because there is no private right of action under that statute. In *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001), the Supreme Court held that "[c]ongressional intent is the keystone as to whether a federal private of action exists for a federal statute." *Bellikoff v. Eaton Vance Corp.*, 481 F.3d 110, 116 (2d Cir. 2007). The ICA does not explicitly provide a private right of action for violations of Section 48(a) of the ICA; therefore, the Court should not presume that Congress intended to create one. *Id*.

---

[13] Should the Court determine to evaluate the distribution fees in accordance with the pleading standard recently enunciated by the United States Court of Appeals for the Seventh Circuit in *Jones v. Harris*, rather than the *Gartenberg* standard, plaintiff's allegations similarly would fail to state a claim for relief under Section 36(b) of the ICA. No. 07-1624, 527 F.3d 627 (7th Cir. 2008), *reh'g denied en banc*, No. 07-1624, 2008 U.S. App. LEXIS 16857 (7th Cir. Aug. 8, 2008). The *Jones* court held that "[t]he trustees [or directors] (and in the end investors, who vote with their feet and dollars), rather than a judge or jury, determine how much advisory services are worth." *Id*. at 632. "Judicial price-setting does not accompany fiduciary duties. Section 36(b) does not call for a departure from this norm." *Id.* at 633. Here, as set forth above, plaintiff has not alleged adequately that the Fund's Directors failed to review and approve the Plans of Distribution annually in accordance with their fiduciary duties. Thus, plaintiff has failed to satisfy either the *Gartenberg* or the *Jones* pleading standards.

There also is no implied private right of action under Section 48(a) of the ICA. First, the express provision of one method of enforcing Section 48(a) suggests that Congress intended to preclude other means of enforcement. *Bellikoff*, 481 F.3d at 116 (*citing Sandoval*, 532 U.S. at 290). Section 42 of the ICA "explicitly provides for enforcement of all ICA provisions by the SEC." *Id.* Further, the express provision of a private right of action to enforce one section of the ICA (*i.e.*, Section 36(b)) suggests that Congress intentionally omitted any private rights to enforce other sections. *Id. See also Forsythe v. Sun Life Fin., Inc.*, 417 F. Supp. 2d 100, 106 (D. Mass. 2006) (*citing Sandoval*, 532 U.S. at 290). Second, statutes that "focus on the persons or conduct to be regulated and not on the persons to be protected by the regulation create 'no implication of an intent to confer rights on a particular class of persons.'" *Id.* (*quoting Sandoval* 532 U.S. at 289). Section 48(a) concentrates "only on the persons regulated by the statute, rather than a class of persons benefited by the regulation," which precludes finding an implied right of action. *Forsythe*, 417 F. Supp. 2d at 107. The absence of "rights-creating" language indicates a lack of Congressional intent to create a private right of action.

As there is neither an express nor an implied right of action under Section 48(a) of the ICA,[14] Plaintiff's Second Claim for Relief should be dismissed with prejudice.

---

[14] *See also In re Franklin Mut. Funds Fee Litig.*, 478 F. Supp. 2d 677, 688 (D.N.J. 2007) (noting that "numerous other courts have found that no private right of action exists under § 48(a)"); *In re Am. Mut. Funds Fee Litig.*, No. CV 04-5593 GAF, 2007 U.S. Dist. LEXIS 8276, at *23-24 (C.D. Cal. Jan. 18, 2007) (stating that "District Courts, taking direction from *Alexander v. Sandoval*, . . . , have uniformly held that *Section 48(a)* establishes no private right of action") (internal citation omitted).

## V. CONCLUSION

For the foregoing reasons, the Complaint should be dismissed in its entirety with prejudice.

                                                Respectfully submitted,

/s/ Stephen G. Topetzes
Stephen G. Topetzes, Esq.
Nicole A. Baker, Esq.
K&L GATES LLP
1601 K Street, NW
Washington, D.C. 20006

- and –

Shannon L. Giles
Quarles & Brady LLP
One South Church Avenue
Suite 1700
Tucson, AZ 85701

*Counsel for Defendants Davis Selected Advisers, L.P. and Davis Investments, LLC, Davis Distributors, LLC*

Date: October 6, 2008