1   Francis J. Balint, Jr.  (007669)
2   BONNETT FAIRBOURN FRIEDMAN
     & BALINT, P.C.
3   2901 North Central Avenue, Suite 1000
    Phoenix, Arizona 85012
4   Telephone:  602/274-1100
    Facsimile:  602/274-1199
5   *Local Counsel for Plaintiffs*
6
7   Daniel W. Krasner  (*Admitted Pro Hac Vice*)
    Krasner@whafh.com
8   Robert B. Weintraub  (*Admitted Pro Hac Vice*)
    Weintraub@whafh.com
9   WOLF HALDENSTEIN ADLER
       FREEMAN & HERZ LLP
10  270 Madison Avenue
11  New York, New York 10016
    Telephone:  212/545-4600
12  Facsimile:  212/545-4653
13  *Lead Counsel for Plaintiff on behalf of*
    *the Davis New York Venture Fund*
14
15
16                  UNITED STATES DISTRICT COURT
17                       DISTRICT OF ARIZONA
                          TUCSON DIVISION
18

| | |
|---|---|
| 19  Donald Turner, on behalf of the Davis New York Venture Fund, | NO. 4:08-cv-00421-JMR |
| 20 | **PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS** |
| 21                  Plaintiff, | |
| 22           vs. | |
| 23  Davis Selected Advisers, L.P. and Davis Distributors, LLC, | |
| 24 | |
|              Defendants. | |
| 25 | |

26
27
28

# **TABLE OF CONTENTS**

**PAGE NOS.**

TABLE OF AUTHORITIES ................................................................................................ ii

I.       PRELIMINARY STATEMENT ........................................................................... - 1 -

II.      CASE SUMMARY ............................................................................................... - 1 -

III.     ARGUMENT ......................................................................................................... - 4 -

    A.    Plaintiff Has Sufficiently Pled Defendants' Violations of Rule 12b-1,
         Giving Rise to Liability under Section 36(b) of the ICA ................................... - 4 -

    B.    ICA Section 36(b) Applies to Violations of ICA Section 12 and
         Rule 12b-1 ....................................................................................................... - 6 -

    C.    A 12b-1 Fee May Violate Section 36(b) Without Regard to *Gartenberg* ........... - 8 -

    D.    The Complaint's Allegations Are Adequate under *Gartenberg* ....................... - 11 -

        1.    The *Gartenberg* Test Is Not a Pleading Standard, But a Standard
            for Summary Judgment and Trial ................................................................. - 12 -

        2.    The Nature and Quality of the Services Provided ......................................... - 13 -

        3.    Defendants' 12b-1 and Advisory Fees Totaled More Than $1 Billion
            Over 3 Years ................................................................................................ - 14 -

        4.    There Were No Economies of Scale; If There Were Any Economies
            of Scale, They Either Did Not Benefit the Fund or Were Not Material ...... - 15 -

        5.    Comparing the Fund's Fee Structure with that of Other Similar Funds
            Illustrates the Lack of Price Competition ..................................................... - 17 -

        6.    The Fund's Directors Were Not Independent or Conscientious ................... - 18 -

        7.    The SEC's Rule 12b-1 Criteria Further Support the Complaint's
            *Gartenberg* Analysis ................................................................................... - 20 -

    E.    The Section 48(a) Claim Should Not Be Dismissed ........................................ - 21 -

IV.      CONCLUSION .................................................................................................. - 23 -

i

1

2

**TABLE OF AUTHORITIES**

3

<u>CASES</u>                                                                                       <u>PAGE NOS.</u>

4

5

*Alexander v. Sandoval,*

6
     532 U.S. 275 (2001) ................................................................. 21

7

*Amron v. Morgan Stanley Investment Advisors, Inc.,*

8
     464 F.3d 338 (2d Cir. 2006) ..................................................... 15

9

*Dumond v. Massachusetts Financial Services, Co.,*
     Civil Action No. 04-11458-GAO, 2006 U.S. Dist. LEXIS 1933

10
     (D. Mass. Jan. 19, 2006) ........................................................... 15

11

*Erickson v. Pardus,*

12
     127 S. Ct. 2197 (2007)............................................................... 4

13

*Forsythe v. Sun Life Financial, Inc.,*

14
     417 F. Supp. 2d 100 (D. Mass. 2006)...................................... 12

15

*Gallus v. Ameriprise Financial, Inc.,*

16
     497 F. Supp. 2d 974 (D. Minn. 2007) ..................................... 15

17

*Gartenberg v. Merrill Lynch Asset Management., Inc.,*

18
     694 F.2d 923 (2d Cir. 1982), *cert. denied*, 461 U.S. 906 (1983) ..................... *passim*

19

*Goldman Sachs Mutual Funds Fee Litigation,*

20
     No. 04-Civ. 2567,

21
     2006 U.S. Dist. LEXIS 1542 (S.D.N.Y. Jan. 17, 2006) ......................................... 10

22

*Green v. Fund Asset Management L.P.,*

23
     19 F. Supp. 2d 227 (D.N.J. 1998)....................................... 8, 11

24

*Green v. Nuveen Advisory Corp.,*

25
     186 F.R.D. 486 (N.D. Ill. 1999) ............................................... 7

26

*ING Principal Protection Funds Derivative Litigation,*

27
     369 F. Supp. 2d 163 (D. Mass. 2005)...................................... 10

28

*In re American Funds Fee Litigation*,
    No. 04-5593, 2005 U.S. Dist. LEXIS 41884
    (C.D. Cal. Dec. 16, 2005) ................................................................................. 15

*In re Davis Selected Mutual Funds Litigation*,
    No. 04 Civ. 4186, 2005 U.S. Dist. LEXIS 23203
    (S.D.N.Y. Oct. 11, 2005) ................................................................................. 19

*In re Dreyfus Mutual Funds Fee Litigation*,
    428 F. Supp. 2d 342 (W.D. Pa. 2005),
    *judgment on the pleadings in defendants' favor on other grounds*,
    428 F. Supp. 2d 357 (W.D. Pa. 2006) ..................................................... 22, 23

*In re Evergreen Mutual Funds Fee Litigation*,
    423 F. Supp. 2d 249 (S.D.N.Y. 2006) .............................................................. 22

*In re Franklin Mutual Funds Fee Litigation*,
    388 F. Supp. 2d 451(D.N.J. 2005) ............................................................. 19, 22

*In re Salomon Smith Barney Mutual Fund Fee Litigation*,
    528 F. Supp. 2d 332 (S.D.N.Y. 2007) .............................................................. 10

*Jones v. Harris*,
    527 F.3d 627 (7th Cir. 2008) ............................................................................ 19

*Krinsk v. Asset Fund Management*,
    715 F. Supp. 472, 485 (S.D.N.Y. 1988),
    *aff'd*, 875 F.2d 404 (2d Cir. 1989).............................................................. 7, 8

*Meyer v. Oppenheimer Management Corp. ("Meyer I")*,
    764 F.2d 76 (2d Cir. 1985) ............................................................................ 6, 7

*Meyer v. Oppenheimer Management Corp.*,
    895 F.2d 861 (2d Cir. 1990) ............................................................................... 7

*Millenco L.P. v. meVC Advisors, Inc.*,
    No. 02-142-JJF,
    2002 U.S. Dist. LEXIS 19512 (D. Del. Aug. 21, 2002)........................................ 12

*Pfeiffer v. Bjurman, Barry & Associates*,
    03 Civ. 9741, 2004 U.S. Dist. LEXIS 16924
    (S.D.N.Y. Aug. 27, 2004).............................................................................*passim*

iii

*Rohrbaugh v. Investment Company Institute*,
   Civ. No. 00-1237, 2002 U.S. Dist. LEXIS 13401
   (D.D.C. July 2, 2002) ..................................................................... 8

*Scalisi v. Fund Asset Management L.P.*,
   380 F.3d 133 (2d Cir. 2004) ...................................................... 19

*Siemers v. Wells Fargo & Co.*,
   No. C 05-04518 WHA,
   2006 U.S. Dist LEXIS 60858 (N.D. Cal. Aug. 14, 2006) .................... 7, 12

*Strigliabotti v. Franklin Resources, Inc.*,
   No. C 04-00883,
   2005 U.S. Dist. LEXIS 9625 (N.D. Cal. Mar. 7, 2005) ........................ 7

*Strougo v. Scudder*,
   964 F. Supp. 783 (S.D.N.Y. 1997),
   dismissed on other grounds, 27 F. Supp. 2d 442 (S.D.N.Y. 1998),
   vacated in part & remanded, 282 F.3d 162 (2d Cir. 2002)....................... 21

*Wicks v. Putnam Investment Management, LLP*,
   03 Civ. 10988-GAO,
   2005 U.S. Dist. LEXIS 4892 (D. Mass. Mar. 28, 2005) ......................... 12

*Yameen v. Eaton Vance Distributors, Inc.*,
   394 F. Supp. 2d 350 (D. Mass. 2005)................................................ 10


**STATUTES AND RULES**

Investment Company Act of 1940
   15 U.S.C. § 80a-12(b) ("Section 12(b)")............................................. 4, 8
   15 U.S.C. § 80a-33(b) ("Section 34(b)")............................................. 22
   15 U.S.C. § 80a-35(a) ("Section 36(a)") ............................................ 22
   15 U.S.C. § 80a-35(b) ("Section 36(b)")...................................... *passim*
   15 U.S.C. § 80a-46(b) ("Section 47(b)")........................................... 2, 23
   15 U.S.C. § 80a-47(a) ("Section 48(a)") ......................................4, 21-23

NASD Rule 2830 ............................................................................ 6

SEC Rule 12b-1, 17 C.F.R. § 270.12b-1 .................................... *passim*

iv

1

2 ## **<u>OTHER AUTHORITIES</u>**

3
4
U.S. Gen. Accounting Office, Mutual Fund Fees: Additional Disclosure
  Could Encourage Price Competition, Rpt. No. GGD-00-126 (June 2000) .................... 14

5
6
7
Payment of Asset-Based Sales Loads by Registered Open-End
Management Investment Companies, Investment Company Act
Release No. 16431, 53 Fed. Reg. 23,258 (proposed June 21, 1988) .............................. 2, 7

8
9
Bearing of Distribution Expenses by Mutual Funds, Final Rule, Securities Act
Release No. 6254, Investment Company Release No. 11414 (Oct. 28, 1980) ................. 20

10
11
SEC Report, Public Policy Implications of Investment Company Growth, H.R. Rep. No.
2337, 89th Cong., 2d Sess. 144 (1966) ................................................................................ 6

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# I.    PRELIMINARY STATEMENT

Plaintiff respectfully submits this memorandum of points and authorities in opposition to the motion of defendants Davis Selected Advisers, L.P. ("DSA") and Davis Distributors, LLC ("DD") (collectively "defendants") to dismiss the Complaint.  For the reasons stated below, defendants' motion should be denied.

# II.    CASE SUMMARY

This action is brought by Donald Turner, a shareholder of the Davis New York Venture Fund (the "Fund") on behalf of the Fund.  The Fund is one of the mutual funds in the Davis Funds family of funds, one of the nation's largest fund families.  The defendants are the investment adviser (DSA) and distributor (DD) of the Fund.

The Complaint alleges that beginning prior to July 28, 2007 and continuing through the present, defendants charged the Fund fees under SEC Rule 12b-1[1] that were unauthorized by the Rule, excessive and disproportionate.  In its fiscal year 2007 alone, the 12b-1 fees paid by the Fund to defendants were more than $180 *million*.  This amount was in addition to the investment advisory fee paid for the same year by the Fund to defendants of approximately $211 *million*.  In fact, in its three most recent fiscal years, 2006-2008, the Fund paid to defendants more than $1.1 *billion*, at least $509 *million* in 12b-1 fees and $600 *million* in advisory fees.  Complaint ("Compl.") ¶¶ 136-38, 143-45. (The appropriateness of the investment advisory fees is not at issue in this action.)  As the Complaint alleges, much of the 12b-1 fees were for services outside what is permitted to be charged for under Rule 12b-1 and, thus, were *ab initio* impermissible and, thus, inherently "excessive" under Section 36(b).  Moreover, to the extent that these fees were within the ambit of the rule, and despite the enormous payments by the Fund to

---

[1] Rule 12b-1, promulgated by the SEC pursuant to the Investment Company Act of 1940 ("ICA"), prohibits mutual funds from directly or indirectly distributing or marketing their own shares unless certain specified conditions set forth in Rule 12b-1 are met, including a limitation on non-advisory fees to those "primarily intended" to result in the sale of mutual fund shares.

1   defendants, there were no economies of scale or, if there were any economies, only the

2   defendants and not the Fund and its shareholders benefitted from them.  The Complaint

3   alleges that by charging these unauthorized and excessive 12b-1 fees, defendants violated

4   their fiduciary duties under Section 36(b) of the ICA.  Plaintiff seeks to recover

5   (beginning from July 28, 2007), for and on behalf of the Fund, hundreds of millions of

6   dollars in 12b-1 fees and rescission of the 12b-1 plans under ICA § 47(b).

7           Plaintiff's claims are governed by Rule 8 of the Federal Rules of Civil Procedure,

8   which requires mere notice pleading.  In the face of that principle, defendants' motion to

9   dismiss erects various "straw man" arguments, none of which have merit.

10          First, in an attempt to circumvent plaintiff's analysis and the supporting case and

11  regulatory law, defendants concoct a non-existent regulatory framework, seeking to

12  transform generalities (that the NASD can set maximum 12b-1 fees) into a legal

13  conclusion that so long as the 12b-1 fee charged is no more than the regulatory cap then

14  the fee is *per se* <u>lawful</u>.  Not only do defendants lack support for this contention, but SEC

15  releases and one of the cases cited by defendants themselves expressly reject the *per se*

16  lawful argument.  Even if the percentage 12b-1 fee charged is below the regulatory cap,

17  there is no safe harbor.  See *Pfeiffer v. Bjurman, Barry & Assocs.*, 2004 U.S. Dist. LEXIS

18  16924 (S.D.N.Y. Aug. 27, 2004), ICA Release 16431, *infra*.

19          Second, defendants incorrectly pigeonhole plaintiff's contention that certain

20  aspects of defendants' 12b-1 fees fall so clearly outside what the plain language of Rule

21  12b-1 permits as to be inherently excessive – that is, unauthorized by the text of the rule

22  (which itself is but a narrow exception to the previous complete statutory bar) – and thus

23  obviate the need for an elaborate analysis of whether the fees were excessive and

24  disproportionate under *Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*, 694 F.2d 923 (2d

25  Cir. 1982), *cert. denied*, 461 U.S. 906 (1983).  Defendants attack this threshold

26  definitional argument as an impermissible end-run around the so-called *Gartenberg*

27  factors for Section 36(b) cases.  However, the cases defendants rely on that decline to

28  adopt *per se* rules on the facts before those courts are inapposite, as none directly involve

- 2 -

1   the threshold question raised here as to whether the Fund's charges for post-sale, routine

2   account services that broker-dealers are already obligated to provide fall into the narrow

3   Rule 12b-1 sales-related exception.

4        By statutory mandate, 12b-1 fees can only be used to "finance activities" that are

5   "primarily intended to result in the sale of [Fund] shares."  On their face, post-sale

6   shareholder services such as routine account maintenance tasks are not "primarily

7   intended to result in the sale of [Fund] shares" because the sale has already occurred.  If

8   anything, the use of 12b-1 fees to pay for post-sale services, by the plain reading of the

9   statute, would violate the regulatory scheme.

10       Here, as the Complaint alleges, the 12b-1 fees paid for operational and account

11  maintenance activities that the broker-dealer was already legally obligated to provide at

12  the broker-dealer's own expense.  Since Rule 12b-1 requires that there be "a reasonable

13  likelihood that the [fees] will benefit the [Fund] and its shareholders," that could not be

14  the case where the broker-dealer was legally obligated to provide the service at its own

15  expense and did not have to be induced to provide that service in return for a payment.

16  This suggests that the fees were outside of the narrow scope of Rule 12b-1 and inherently

17  excessive, without even reaching the *Gartenberg* test.  Where activities financed by

18  12b-1 fees (including, but not limited to, post-sale shareholder services) are not

19  "primarily intended to result in the sale of [Fund] shares," then a fund has strayed beyond

20  what the rule permits, and a Court should never have to reach the *Gartenberg* test.

21       Third, even if some or all of the 12b-1 fees (whether post- or pre-sale) are deemed

22  to be "primarily intended" to result in the sale of Fund shares and are to be scrutinized

23  under a balancing test, they do not pass muster under *Gartenberg*.  Contrary to

24  defendants' claim, the Complaint analyzes all of the applicable *Gartenberg* factors,

25  showing how the Rule 12b-1 fees assessed here are not permitted by the Rule.[2]  (To be

26

27  ---

[2] Defendants incorrectly argue that plaintiff alleges only generalized attacks on the mutual
fund industry, in the process ignoring scores of (to use defendants' phrases) "fund-
specific" and "defendant-specific" allegations concerning their conduct.  See *passim infra*.

28

- 3 -

sure, the so-called *Gartenberg* test is not even a threshold pleading standard on a Rule 12 dismissal motion, but the elements of proof for summary judgment or trial.  See *infra* at 12.  In addition, the Fund breached its fiduciary duties because its Board of Directors failed to give the legally required consideration for its annual approval to continue the Fund's 12b-1 plans, considering each plan for only a few minutes (Compl. ¶¶ 165-76) and failed to negotiate lower 12b-1 fees with broker-dealers. *Id*. ¶¶ 177-82, 191.

Moreover, in addition to the *Gartenberg* factors, which were developed and used exclusively in that decision to analyze investment advisory fees, Rule 12b-1 itself separately identifies nine factors that the SEC states "would normally be relevant to a determination of whether to use fund assets for distribution."  Defendants' use of Rule 12b-1 fees is impermissible under those criteria as well.  Regardless of whether the SEC's factors or the *Gartenberg* factors are applied, the outcome is the same under either test, and the Complaint readily shows that defendants' conduct violates ICA Section 36(b).  Compl. ¶ 183 n.11.

Finally, defendants assert that the "control person" claim under ICA Section 48(a) fails as a matter of law.  For the reasons set forth below, this is incorrect under what plaintiff submits respectfully is better reasoned case law when a primary claim under Section 36(b) is properly alleged.

## III.   ARGUMENT

### A.   Plaintiff Has Sufficiently Pled Defendants' Violations of Rule 12b-1, Giving Rise to Liability under Section 36(b) of the ICA

The claims herein are governed by Rule 8 of the Federal Rules of Civil Procedure, which requires merely "a short and plain statement of the claim showing that the pleader is entitled to relief." *Erickson v. Pardus*, 127 S. Ct. 2197, 2200 (2007).  Plaintiff's well-pled violations of SEC Rule 12b-1, which give rise to defendants' liability under ICA Section 36(b), clearly pass muster under this test.

Before the SEC's adoption of Rule 12b-1 in 1980, it was unlawful under Section 12(b) of the ICA for a mutual fund to "to act as a distributor of securities of which it

1   [wa]s the issuer."  This prohibition was premised on the inherent conflicts in the

2   operation of a mutual fund.  Compl. ¶¶ 58-59.  The SEC had recognized these conflicts,

3   stating that "[m]utual funds are unique . . . in that they are 'organized and operated by

4   people whose primary loyalty and pecuniary interest lie outside the enterprise.'"  *Id.* ¶ 54.

5        In 1978, the SEC announced an "advance notice of proposed rulemaking"

6   concerning whether mutual funds should be permitted to use shareholder "assets to pay

7   expenses incurred in connection with the distribution of their shares."  The SEC proposed

8   the Rule 12b-1 exception for a number of reasons:  net redemptions and lack of growth in

9   the mutual fund industry,[3]  and the desire to increase sales of mutual fund shares to

10  achieve perceived benefits to investors, including that there might be economies of scale

11  as the size of funds increased.

12       Rule 12b-1(a)(1) states in relevant part that, "it shall be unlawful for any registered

13  open-end management investment company … to act as a distributor of securities of

14  which it is the issuer, except through an underwriter."  Subsection (2) provides a limited

15  exception "if [the company] engages directly or indirectly in financing any activity which

16  is ***primarily intended to result in the sale of shares issued by such company,*** including,

17  but not necessarily limited to, advertising, compensation of underwriters, dealers, and

18  sales personnel, the printing and mailing of prospectuses to other than current

19  shareholders, and the printing and mailing of sales literature."  (Emphasis added.)

20       Subsection (e) of Rule 12b-1 provides that the approval or continuation of a 12b-1

21  plan is subject to the fiduciary duties set forth in ICA Section 36(b).  Section 36(b) of the

22  ICA states, in part, that "the investment adviser of a registered investment company shall

23  be deemed to have a fiduciary duty with respect to the receipt of compensation for

24  services, or of payments of a material nature, paid by such registered investment

25

26  [3] At the time Rule 12b-1 was adopted in 1980, the mutual fund industry had experienced
    net redemptions from 1973 – 1979, inclusive, in equity, hybrid and bond mutual funds.  In
27  1972, the industry had $60 billion in assets, and in 1979 it had $49 billion in assets, in
    equity, hybrid and bond funds.  Compl. ¶¶ 63-65.
28

1  company, or by the security holders thereof, to such investment adviser or any affiliated

2  person of such investment adviser."  The provision further states explicitly that a security

3  holder of such registered investment company may bring an action on behalf of such

4  company, against such investment adviser, or any affiliated person of such investment

5  adviser, for breach of fiduciary duty in respect of such compensation.

6       As shown below, the Complaint clearly states a claim under Section 36(b) for the

7  defendants' 12b-1 fees.

8  **B.     ICA Section 36(b) Applies to Violations of ICA Section 12 and Rule 12b-1**

9       Defendants gloss over the express limitations on the use of 12b-1 fees and argue

10 (Mem. at 8-9) that, in essence, such distribution payments are *per se* lawful and cannot be

11 challenged under Section 36(b) of the ICA because they do not exceed the regulatory fee

12 cap.  In so arguing, defendants mischaracterize various regulatory pronouncements.

13 Accordingly, defendants' argument is completely erroneous.

14      None of the statutory or regulatory regimes cited by defendants states or even

15 suggests that all sales charges within these cap limits are lawful *per se* under Rule 12b-1.

16 ICA Section 22 merely establishes the general authority of the NASD to propose rules

17 concerning the price paid by captive underwriters to their issuers for the mutual fund

18 shares.  SEC Release 30,897 concerns an amendment to NASD Rule 26 which imposes a

19 maximum sales charge on fund shares.  Similarly, NASD Rule 2830 addresses fee caps

20 for broker-dealers generally.

21      Indeed, the SEC and the Courts have expressly rejected defendants' contention

22 and have broadly interpreted the scope of Section 36(b).  It is applicable when one of the

23 statutorily designated recipients benefits from a breach of fiduciary duty.  *E.g.*, *Meyer v.*

24 *Oppenheimer Mgmt. Corp. ("Meyer I")*, 764 F.2d 76, 82 (2d Cir. 1985), *citing* SEC

25 Report, Public Policy Implications of Investment Company Growth, H.R. Rep. No. 2337,

26 89th Cong., 2d Sess. 144 (1966).  Significantly, in the context of defendants' lawful *per*

27 *se* argument, in proposing Rule 12b-1, the SEC emphasized that the Rule was not

28 intended "to reduce or limit in any way" the fiduciary duties imposed by section 36(b).

*Meyer I*, at 82-83, *citing* Bearing of Distribution Expenses by Mutual Funds, Investment Company Act Release No. 10,252 [1978 Transfer Binder] Fed. Sec. L. Rep. (CCH) P 81,603, at 80,415.  *See also Green v. Nuveen Advisory Corp.*, 186 F.R.D. 486, 491 (N.D. Ill. 1999).  NASD rules are subject to the requirements of Rule 12b-1, which does not establish a safe harbor from § 36(b) liability.  ICA Release 16431 at 40 n.128.

Moreover, in a case defendants themselves cite, *Pfeiffer*, 2004 U.S. Dist. LEXIS 16924 at *17-*18, the court denied the motion to dismiss the ICA 36(b) claim, specifically rejecting defendants' *per se* reasonable analysis:

> The defendants heavily rely on the argument that, because the Plan caps its *Rule 12b-1* fees at 0.25% of the Fund's average daily net assets . . . the maximum asset-based charge allowed by the SEC -the fees are *per se* reasonable.  The defendants cite no case law for this proposition.  Should the plaintiff succeed in showing that the fees were excessive when measured against the services rendered, the defendant will not be able to defeat that showing by arguing that they could have charged even more.

In other words, the case law demonstrates that defendants' argument is woven out of whole cloth because a 12b-1 fee must be measured against the services rendered (whether in an inherently excessive or *Gartenberg* context) and can be unlawful even if below the fee cap.  In every case cited below in the remainder of this subsection where the motion to dismiss the §36(b) claim was denied, the challenged 12b-1 fee did not exceed the regulatory cap.

Many courts have expressly held that Section 36(b) applies to violations of Section 12 and Rule 12b-1 of the ICA, such as the inherently excessive fee claims alleged here.  *Meyer v. Oppenheimer Mgmt. Corp.*, 895 F.2d 861, 866 (2d Cir. 1990); *Meyer I*, 764 F.2d at 82-83 (reversing dismissal of section 36(b) claim); *Siemers v. Wells Fargo & Co.*, 2006 U.S. Dist. LEXIS 60858, at *48-*61 (N.D. Cal. Aug. 14, 2006) (motion to dismiss denied on merits, granted on procedural grounds); *Strigliabotti v. Franklin Res.*, *Inc.*, 2005 U.S. Dist. LEXIS 9625, at *20 (N.D. Cal. Mar. 7, 2005); *Pfeiffer*, 2004 U.S. Dist. LEXIS 16924 at *12 (same); *Krinsk v. Asset Fund Mgmt.*, 715 F. Supp. 472, 485

1   (S.D.N.Y. 1988), *aff'd*, 875 F.2d 404 (2d Cir. 1989) (bench trial).  See many other cases

2   cited *infra* under *Gartenberg* analysis.

3          Thus, defendants' *per se* reasonable argument is unsupported by the regulatory

4   scheme and case law and should be rejected.

5   **C.     A 12b-1 Fee May Violate Section 36(b) Without Regard to *Gartenberg***

6          Prior to the SEC's adoption of Rule 12b-1 in 1980, it was unlawful under Section

7   12(b) of the ICA for a mutual fund "to act as a distributor of securities of which it [wa]s

8   an issuer."  Compl. ¶ 58.  In response to a stock market downturn in the 1970s, which

9   resulted in the net redemption of mutual funds, Rule 12b-1 was adopted for the limited

10  purpose of "financing any activity which is ***primarily intended*** to result in the sale of

11  shares issued by such company."   Thus, it logically follows that the use of shareholder

12  funds to finance any activity not "primarily intended" to result in the sale of Fund shares

13  would be outside the parameter of the lawful use of shareholder funds.  Such use,

14  financing an activity not primarily related to the sale of fund shares, would be

15  unauthorized or "excessive" as a matter of law, and would not be subject to the

16  *Gartenberg* analysis, which is a fact-based balancing test applicable only to the

17  statutorily permitted fees.

18         Courts have acknowledged that excessiveness under the *Gartenberg* balancing test

19  is not the only remediable violation of Section 36(b), but that other more hard and fast

20  violations are actionable.  For example, in *Green v. Fund Asset Mgmt., L.P.*, 19 F. Supp.

21  2d 227 (D.N.J. 1998), the court denied a motion to dismiss a Section 36(b) claim where,

22  without considering the *Gartenberg* factors, the fee arrangement was rife with conflicts

23  of interest.  The court noted, "Section 36(b) of the ICA is not expressly limited to

24  situations in which the advisory fees received by an investment advisor were excessive,

25  disproportionate or otherwise unreasonable.  The statute encompasses the receipt of fees

26  by an investment advisor in violation of the adviser's fiduciary duty."  *Id.* at 234

27  (citations omitted).  *See also Rohrbaugh v. Inv. Company Inst.*, 2002 U.S. Dist. LEXIS

28  13401, at *31-*32 (D.D.C. July 2, 2002) ("a section 36(b) claim must either involve a

1   challenge to excessive advisory fees *per se* or to conduct that results in excessive

2   advisory fees").  Hence, there can be a violation of Section 36(b) not only because of

3   excessive fees under *Gartenberg*, but also because they are not permitted in the first

4   instance since they are not "primarily intended to result in the sale of [Fund] shares".

5          The language of Rule 12b-1 itself confirms this analysis.  The Rule expressly

6   identifies one example of an activity that a 12b-1 fee cannot be used to finance: it

7   includes among a list of permitted activities that are primarily intended to result in the

8   sale of fund shares the "mailing of prospectuses ***to other than current shareholders***"

9   (Rule 12b-1(a)(2)), making it clear that charging such fees for a mailing to existing

10  shareholders is not permitted.  Defendants cannot seriously contend that if a mutual fund

11  paid 12b-1 fees to a broker-dealer or underwriter for it to mail prospectuses to current

12  shareholders, then financing that activity would not be expressly unauthorized by the

13  rule; but, that it instead would be evaluated under the *Gartenberg* factors.  Defendants'

14  analysis would make every fund service activity "primarily intended to result in the sale

15  of [Fund] shares."

16         Here, scores of millions of dollars in 12b-1 fees have been used to pay for post-

17  sale shareholder services that cannot be "primarily intended to result in the sale of [Fund]

18  shares."  Account maintenance services such as regular account statements do not

19  highlight one security (they list all) or even relate to any particular security in the account

20  (but, instead, relate to all), thus eliminating any reason for defendants to use Fund assets

21  to pay for such services.  Further, the broker-dealer would provide them in any event,

22  irrespective of whether any mutual fund paid for the activities, because it is legally

23  obligated to do so.  Compl. ¶¶ 10, 82, 84-85.  The Fund and its shareholders do not

24  benefit from the Fund's payment of 12b-1 fees for post-sale shareholder services – only

25  defendants benefit.

26         Defendants mischaracterize plaintiff's threshold definitional argument, contending

27  that plaintiff simply asserts it is a *per se* violation of section 36(b) when 12b-1 payments

28  are used to recover certain sales-related expenses previously paid out when distributing a

1    fund's shares.  Mem. at 11.   That is incorrect.  What plaintiff asserts is that the Fund's

2    12b-1 fees for shareholder services on their face stray beyond the narrowly crafted

3    permitted exception contained in Rule 12b-1 and, thus, are by definition "excessive."

4        Moreover, defendants also mischaracterize the case law, which they incorrectly

5    insist holds that there can never be a definitional violation of section 36(b) absent

6    examination of the *Gartenberg* factors.  The courts that have declined to apply a *per se*

7    rule, however, did so because of a failure, specific to each case, to allege facts to make

8    out a *per se* violation; not because there could be no actionable violation outside of the

9    economic *Gartenberg* factors.

10       In particular, four decisions cited by defendants (Mem. at 11-12) are wholly

11   inapposite -- *Yameen v. Eaton Vance Distribs., Inc.*, 394 F. Supp. 2d 350, 358 (D. Mass.

12   2005), *ING Principal Prot. Funds Derivative Litig.*, 369 F. Supp. 2d 163, 168-9 (D.

13   Mass. 2005), *Pfeiffer*, 2004 U.S. Dist. LEXIS 16924 at *4, and *Goldman Sachs Mut.*

14   *Funds Fee Litig.*, 2006 U.S. Dist. LEXIS 1542, at *36 (S.D.N.Y. Jan. 17, 2006).  Each

15   holds only that distribution fees taken from a closed fund were not *per se* unlawful

16   simply because the fees were used to pay deferred sales charges incurred while the fund

17   was open and the plaintiffs did not refute that the funds in question would cease

18   payments after they had fully compensated distributors for previous sales.  In *Yameen,*

19   *ING* and *Goldman Sachs*, the plaintiffs failed to allege that defendants continued to take

20   12b-1 fees from the closed funds after they had been completely reimbursed for their

21   earlier sales-related expenses.  In those cases, the pleading of a specific economic fact

22   that was not protected by the 12b-1 exception to the prohibition on distribution spending

23   would have stated a claim.  (In *Pfeiffer*, the plaintiff did not argue that defendants'

24   conduct was *per se* unlawful.)  Here, plaintiff alleges that the 12b-1 fees are outside of

25   the carve-out and that they were unauthorized because they were spent on non-

26   distribution services.

27       Similarly, defendants cite *In re Salomon Smith Barney Mut. Fund Fee Litig.*, 528

28   F. Supp. 2d 332, 338 (S.D.N.Y. 2007), but that decision held only that where a *per se*

- 10 -

1    claim is not sufficiently alleged, then the *Gartenberg* economic test is applied.  The

2    S*alomon* court held that "where the improper use of fees is not 'excessive per se,'" the

3    test is basically an economic one, 528 F. Supp. 2d at 338, meaning there could be

4    circumstances where a *per se* claim would be sufficiently alleged.  Unlike here, there was

5    no claim in *Salomon* that the fees in question were expressly outside what was permitted

6    by the ICA or any SEC rule.

7         In any event, despite defendants' creating this straw man issue, we respectfully

8    suggest that there is nothing for this Court to decide on a motion to dismiss with respect

9    to a threshold definitional claim because it would still require development of the factual

10   record to demonstrate its existence.  "Determining whether this kind of fee arrangement

11   constitutes a per se breach of fiduciary duty requires an exploration of the economic

12   realities of such funds and market circumstances and practices . . . [which] cannot be

13   made on the pleadings."  *Green*, 19 F. Supp. 2d at 235 (denying motion to dismiss).

14   **D.      The Complaint's Allegations Are Adequate under *Gartenberg***

15        Even if the fees in question were not inherently barred by Rule 12b-1, they do not

16   meet the *Gartenberg* criteria and are excessive and disproportionate.  The "*Gartenberg*

17   factors," discussed in detail below, are:  (1) the nature and quality of the services

18   provided by the advisers to the shareholders; (2) the profitability of the mutual fund to the

19   adviser-manager; (3) "fall-out" benefits; (4) the economies of scale achieved by the

20   mutual fund and whether such savings were passed on to the shareholders; (5)

21   comparative fee structures with other similar funds; and (6) the independence and

22   conscientiousness of the mutual fund's outside directors.  694 F.2d at 928-29.

23        Defendants' assertion that the Complaint contains essentially no factual

24   allegations whatsoever on the *Gartenberg* factors, but just conclusory statements, is flatly

25   incorrect.  The Complaint addresses all of these factors expressly (or, in the case of fall-

26   out benefits, in broad substance).  The facts detailed herein – the nature and quality of the

27   services provided to the Fund in relation to the statutory limits on financing and the legal

28   obligations of the broker-dealers; the *billions* of dollars in 12b-1 fees and advisory fees

1   paid to defendants; the size of the Fund (the 25th largest in the nation while charging the

2   ninth largest 12b-1 fee), with over $41 billion in assets (as of mid-2007), and the lack of

3   economies of scale or of economies that have been passed along to the Fund and its

4   shareholders; the lack of price competition with other funds, and the failure of the Fund's

5   board of directors to give material consideration to the annual reapproval requirement and

6   to obtain price concessions from broker-dealers concerning payments for commissions

7   and services – all strongly support the conclusion that the motion to dismiss should be

8   denied.  This is so because even if all of defendants financing activities are "primarily

9   intended" to sell Fund shares, the 12b-1 plans benefitted only defendants by increasing

10  their advisory fees and have not produced any benefits for the Fund or its shareholders.

11          **1.      The *Gartenberg* Test Is Not a Pleading Standard, But a Standard for
                      Summary Judgment and Trial**

12          The factual detail set forth in the Complaint is more than adequate under

13  *Gartenberg*.  The case law is clear that the short and plain statement of the claim under

14  Rule 8 does not require that each and every *Gartenberg* factor be addressed at all, let

15  alone addressed in detail.  Significantly, defendants ignore that the *Gartenberg* decision

16  itself was the appeal of a judgment entered after a non-jury trial.  694 F.2d at 925, 929-

17  31.  *E.g.*, *Wicks v. Putnam Inv. Mgmt., LLP*, 2005 U.S. Dist. LEXIS 4892, at *12-13 (D.

18  Mass. Mar. 28, 2005) ("I agree with the plaintiffs that *Gartenberg* -- should it be the

19  appropriate standard--does not establish a heightened pleading requirement for *§ 36(b)*

20  excessive fee claims"); *Pfeiffer,* 2004 U.S. Dist. LEXIS 16924 at *15, *18, (it "is

21  unnecessary for the plaintiff to set forth evidentiary details to support this allegation, or to

22  support those elements of the *Gartenberg* test that may apply to promotion, distribution

23  and service fees"); *Millenco L.P. v. meVC Advisors, Inc.*, 2002 U.S. Dist. LEXIS 19512,

24  at *9 n.3 (D. Del. Aug. 21, 2002) (same); *see Siemers,* 2006 U.S. Dist LEXIS 60858 at

25  *51-52; *Forsythe v. Sun Life Fin., Inc.,* 417 F. Supp. 2d 100, 113-16 (D. Mass. 2006).

26

27

28

                                              - 12 -

1      **2.**      **The Nature and Quality of the Services Provided**

Defendants incorrectly contend that the Complaint does not address this element of the *Gartenberg* analysis.  The Complaint alleges that, for a substantial number of years, defendants have charged the Fund and its shareholders hundreds of millions of dollars in both yearly 12b-1 and advisory fees.  The Fund charges the maximum amount permitted by law for shareholder services, whether pre-sale or post-sale – 0.25% – which is the same percentage charged by a majority of funds.  Compl. ¶¶ 68, 72, 76, 172.  This reflexive adoption of the maximum fee permitted illustrates that despite the immense size of the Fund, defendants did not seek to and did not obtain any benefits for the Fund and its shareholders, such as a reduction in the amount paid to broker-dealers to finance services nor a limitation on the types of activities to be financed by the 12b-1 fees.

Defendants have admitted that a material portion of the Fund's hundreds of millions of dollars in 12b-1 fees paid to defendants are used to finance post-sale shareholder services.  Compl. ¶ 96.  But, this portion of the 12b-1 fee finances activities that the broker-dealer was legally obligated to provide to account holders at the broker-dealer's own expense.  Compl. ¶¶ 10, 76, 82, 84-85, 96-97.  The broker-dealer did not have to be induced to provide that service in return for a payment.

All mutual funds are in the same position vis-à-vis a broker-dealer with respect to provision of these services, meaning a broker-dealer would be legally obligated to provide these services for all its clients who owned a mutual fund, regardless of which mutual fund the client owned.  There would be no reason for a mutual fund to pay the broker-dealer for these services.  Moreover, the average account size of an account in the Fund is less than $25,000.  Compl. ¶ 29.  Common sense suggests that such small accounts do not need substantial expenditures on shareholder services.

The Fund also charges the maximum 12b-1 fee for commissions, 0.75%, the same percentage charged by most funds.  Similar to its arrangement on shareholder services, defendants did not obtain from the broker-dealers any limitation on commissions.  *Id*. ¶¶ 71, 168-73, 182.

Thus, defendants made no attempt to compete on the basis of fees.  Instead, defendants accepted the fees and coverage sought by the broker-dealers without even attempting to negotiate a better deal for the Fund and its shareholders.  Complaint ¶¶ 169-70.  *See* Mutual Fund Fees:  Additional Disclosure Could Encourage Price Competition, General Accounting Office, Rpt. No. GGD-00-126 at 62 (June 2000).  Accordingly, under the express language of Rule 12b-1, there cannot be "a reasonable likelihood that the [12b-1 fees] will benefit the [Fund] and its shareholders" under these circumstances.

**3.      Defendants' 12b-1 and Advisory Fees Totaled More Than $1 Billion Over 3 Years**

In its fiscal year 2006, the 12b-1 fees paid by the Fund were approximately $155 *million* and the advisory fees paid were approximately $166 *million*, for a total for 2006 of approximately $321 *million*.  In its 2007 fiscal year, the 12b-1 fees paid by the Fund were at least $180 *million* and the advisory fees paid were approximately $211 *million*, for a total for 2007 of at least $391 *million*.  Although complete figures were not available for its 2008 fiscal year at the time the action was commenced, 12b-1 fees were approximately $174 *million* and advisory fees were approximately $223 *million*, for a total for 2008 of $397 *million*.  In addition, there are cumulative carryover payments of amounts owed by the Fund to the defendant Distributor which total over $900 *million*.  Compl. ¶¶ 143-45; Fund Statement of Additional Information at 41, 46, dated Dec. 1, 2008.  Thus, in just the last three fiscal years, the Fund paid more than $1.1 *billion* combined in 12b-1 fees and advisory fees, of which at least $509 *million* was 12b-1 fees, despite the fact that much of this amount was for post-sale shareholder services and/or services which the broker-dealer already was legally obligated to provide.

It is also noteworthy that in 2007 alone, the Davis Funds family of funds in total paid defendants more than *$250 million* in 12b-1 fees (even though certain types of expenses such as advertising (in some circumstances) and account maintenance are not dependent on which particular Davis Funds mutual fund one owns).  *See* Compl. ¶¶ 7, 25. Both on their face, and in conjunction with defendants' failure to create or pass on

economies of scale to the Fund and its shareholders, these incredibly large amounts raise factual issues about whether the 12b-1 fees were excessive and disproportionate.

In a haphazard manner, defendants cite a number of cases for the proposition that plaintiff has not sufficiently detailed the nature and quality of the services provided or connected the extraordinarily large size of the fees to why they were excessive and disproportionate. Mem. at 13-14. The cases cited by defendants all are inapposite because in none of them did the complaint contain the specificity of the allegations here. *E.g., Amron v. Morgan Stanley Inv. Advisors, Inc.*, 464 F.3d 338 (2d Cir. 2006) (plaintiff did not even allege the total amount of 12b-1 and advisory fees).

In addition, many of the cases cited by defendants denied the motion to dismiss on facts no more or even less specific than those alleged here. *In re Am. Funds Fee Litig.*, 2005 U.S. Dist. LEXIS 41884, at *14-18 (C.D. Cal. Dec. 16, 2005), *leave to replead granted*, 2007 U.S. Dist. LEXIS 8276 (C.D. Cal. Jan. 18, 2007) (motion to dismiss denied). Indeed, in *Dumond v. Massachusetts Fin. Servs. Co.*, 2006 U.S. Dist. LEXIS 1933, at *12 (D. Mass. Jan. 19, 2006), the Court denied the motion to dismiss the §36(b) claim even though the complaint alleged the need for discovery ("a review of Defendants' full costs of providing advisory serves will also demonstrate the enormous profitability to Defendants of managing the Funds"). The *Dumond* complaint also alleged, as here, that advances in communications and computer technologies had not benefitted plaintiffs. *Id.* at *8. *Compare* Compl. ¶¶ 118, 133-34. Other cases cited by defendants were decided upon summary judgment and are, thus, procedurally inapt. *Pfeiffer*, 2004 U.S. Dist. LEXIS 16924; *Gallus v. Ameriprise Fin., Inc.*, 497 F. Supp. 2d 974, 982 (D. Minn. 2007).

### 4.   There Were No Economies of Scale; If There Were Any Economies of Scale, They Either Did Not Benefit the Fund or Were Not Material

Defendants argue that the Complaint asserts, without detail, that economies of scale were created but that the benefits were not passed on to the Fund and its shareholders.   That is incorrect.   As a threshold matter, the Complaint alleges in detail

that 12b-1 fees do not create economies of scale because economies of scale do not exist in the mutual fund industry.  The complaint thereafter asserts that if economies were created, they did not benefit the Fund (because a fund the size of the Fund, the 25th largest in the United States, by assets, as of mid-2007, does not have economies of scale) or if they did benefit the Fund the economies were not material.

As a threshold matter, and regardless of the size of a fund, economies of scale are not realized in the mutual fund industry on 12b-1 fees, which are only a "dead-weight cost borne by both current and new shareholders," as numerous studies cited in the Complaint demonstrate.  Compl. ¶¶ 104-112, 130-33.

Even if economies theoretically could exist in the industry, the Fund did not realize economies because of its sheer size.  As of mid-2007, the Fund was the 25th largest fund in the United States, with assets of more than $41 *billion*.  *See id*. ¶¶ 113, 137-41.  Thus, even if 12b-1 fees are not inherently a dead-weight cost borne by shareholders, and economies of scale might exist, there are no economies of scale in a fund the size of the Fund, as studies cited in the Complaint demonstrate.  *Id*. ¶¶ 113-21.

In addition, even if economies of scale were created for the Fund as it grew larger, no material savings were passed on to the Fund and its shareholders.  For example, although defendants use breakpoints[4] in calculating the advisory fee, the breakpoint savings to the Fund were *de minimis* – only about $7.15 million in 2007.  In its fiscal year 2007 alone, the 12b-1 fees paid by the Fund to defendants (or accrued against the Fund) were more than $180 million and the advisory fee was $211 million, for a total of $391 million.  The breakpoint savings for the three years ending with fiscal 2007 inclusive were less than $21 million.  In essentially the same three year period, the 12b-1 fees paid by the Fund to defendants (or accrued) were approximately $500 million and the advisory

---

[4] The investment advisory fee is calculated as a percentage of the Net Assets of the Fund.  The percentage sliding scale contained "breakpoints," which are decreases in the marginal percentage charged for the investment advisory fee as the Net Assets of the Fund increase.  Compl. ¶ 140.

1   fees were $600 million, for a total of more than **$1.1 *billion***.  Compl. ¶¶ 141-44.

2   Finally, assuming *arguendo* defendants passed along to the Fund the breakpoint

3   savings described above, the less than $21 million in savings is immaterial as a matter of

4   law when compared to the approximately $500 million in 12b-1 fees and $600 million in

5   advisory fees paid by the Fund to defendants in just the last three years.  Thus, even if all

6   activities financed by the plans herein were deemed primarily intended to result in the

7   sale of fund shares, the 12b-1 plans have not produced material economies of scale

8   benefits for the Fund and its shareholders.  In the cases cited by defendants, Mem. at 15-

9   16, the plaintiffs never alleged that there were no economies of scale so that the only

10  beneficiaries of the 12b-1 fees must have been the defendants.[5]

11          **5.      Comparing the Fund's Fee Structure with that of Other Similar Funds
                      Illustrates the Lack of Price Competition**

12  The Fund charged the maximum amount permitted by law for shareholder

13  services, 0.25%, which is the same percentage charged by a majority of funds.  The same

14  holds true for commissions, where the Fund charged the maximum 12b-1 fee, 0.75%.

15  Compl. ¶¶ 68-72, 168-73, 182.

16          Defendants misrepresent plaintiff's analysis, suggesting it is an attack on the fund

17  industry.  Mem. at 16.  In fact, plaintiff alleges, and decisional law holds, that similar

18  market pricing does not support an inference that competition exists but instead suggests

19  a lack of competition between advisers for fund business given the "unseverable

20  relationship between the adviser-manager and the fund it services."  *Gartenberg*, 694

21  F.2d at 929 ("We disagree with the district court's suggestions that … a fee is fair if it 'is

22

23  _____

24  [5] Defendants turn the legal analysis on its head concerning the absence of economies.
    Even assuming *arguendo* that defendants' partial fee waiver and breakpoint analysis is

25  applicable, if there are no economies of scale, then the Fund and its shareholders paid $180
    million in 12b-1 fees in 2007; received no benefits in return for the $180 million; and,

26  given the increase in the size of the Fund, paid an increased net advisory fee of $211
    million in 2007, which was $45 million more than the 2006 net fee – for a net detriment to

27  the Fund and its shareholders of hundreds of millions of dollars per year.

28

- 17 -

1   in harmony with the broad and prevailing market choice available to the investor.' …

2   [T]he existence in most cases of an unseverable relationship between the adviser-

3   manager and the fund it services tends to weaken the weight to be given to rates charged

4   by advisers of other similar funds").  Compl. ¶¶ 169-72 (GAO Study).  Particularly given

5   the Fund's large size, similar pricing illustrates the lack of competition.

6         **6.      The Fund's Directors Were Not Independent or Conscientious**

7         The Fund's Board of Directors did not fulfill its responsibilities of overseeing, on

8   a yearly basis, whether the Fund's 12b-1 plans should be continued.  After initial

9   adoption, a 12b-1 plan must be reapproved yearly.  In order to continue a plan, the Fund's

10  Board must conclude, "in light of their fiduciary duties under" Section 36(b) of the ICA,

11  that "there is a reasonable likelihood that the plan will benefit the company [the Fund]

12  and its shareholders."  Rule 12b-1(e), Compl. ¶ 66 n.2.[6]

13        The Complaint makes the following detailed allegations about the Board's lack of

14  independence and conscientiousness:

15
16       ● The Fund has a Board of Directors who have not been elected by the
    shareholders in many years, who rarely meet, whose focus is spread over many
17  different funds in the Davis family of funds, and who receive material
    compensation from the Davis family of funds.

18       ● Each so-called independent Director of the Fund sits on approximately
19  nine boards of directors of mutual funds within the Davis Funds family.

20       ● Each of these Davis mutual funds has approximately four classes of shares
21  which charge a 12b-1 fee.

22       ● The Board of Directors of the Fund meets no more than four times per
23  year and does not address the Plans of Distribution at most of its meetings.

24       ● The common board members of the Fund and the other Davis funds, upon
25  information and belief, meet simultaneously as the boards of those funds.

26
            ————————————

27  [6] The SEC has identified nine "normally relevant" factors for a board to consider, which
    are separately discussed in subsection 7, below.
28

● Given the number of Boards which were meeting during one day, the Board of the Fund must have, during 2007 and prior years, spent an immaterial amount of time considering the Fund's Plans of Distribution (because approximately 36 Plans of Distribution were being considered at any one time).

● In this limited amount of time, the Board of the Fund could not possibly have examined in any meaningful way, as required by their fiduciary duty, the factors for continuing a 12b-1 Plan, and were limited simply to acting year after year as a rubber stamp for the proposals of defendants regarding 12b-1 fees.

● Hence, the Fund's Board gave the Fund's 12b-1 Plans only a perfunctory and not a material review in its consideration of whether they should be continued.

● The very fact that the Fund's shareholders for a number of years have been paying between $100 million and $180 million a year in 12b-1 fees, on top of paying approximately $100 million to $211 million a year in investment advisory fees, while receiving a benefit of less than $7 million per year in breakpoints, in itself demonstrates the Board's failure to give the legally required consideration to its annual approval for continuation of the Fund's 12b-1 Plans.

Compl. ¶¶ 40-53, 158-66.  These allegations, taken as a whole, are sufficient for pleading purposes under *Gartenberg*.[7]  *See also id.* ¶¶ 168-73, 180, 182.

           *                *             *

Thus, the Complaint directly and extensively addresses five of the six *Gartenberg* factors (all but the fall-out benefits) by name.  The Complaint alleges specific facts under each of the *Gartenberg* factors, although the headings do not necessarily use *Gartenberg's* literal words:  (1) the nature and quality of the services provided by the

---

[7] The cases cited by the defendants (Mem. at 17-18) are inapposite.  *In re Davis Selected Mut. Funds. Litig.*, 2005 U.S. Dist. LEXIS 23203, at *11-*13 (S.D.N.Y. Oct. 11, 2005), and *In re Franklin Mut. Funds Fee Litig.*, 388 F. Supp. 2d 451 (D.N.J. 2005) both concerned a claim under the Investment Advisors Act, whether demand futility was required under Maryland law and whether board members were so conflicted or controlled that demand was not required.  *Scalisi v. Fund Asset Mgmt, L.P.*, 380 F.3d 133 (2d Cir. 2004), concerned the same issues with respect to an ICA §36(a) claim.  *Jones v. Harris*, 527 F.3d 627 (7th Cir. 2008), concerned advisory fees only and its analysis focused thereon.  Further, plaintiff here asserts more detailed factual allegations concerning the nature and quality of the services received for the 12b-1 fees and the directors' conduct.

1    12b-1 fees to the Fund and its shareholders.  (Compl. ¶¶ 68-97, 168-73);  (2) the

2    profitability of the mutual fund to the defendants (*Id*. ¶¶ 7-8, 68-73, 136-45); (3) the

3    economies of scale achieved by the mutual fund and whether such savings were passed

4    on to the shareholders (*Id*. ¶¶ 103-50);  (4) comparative fee structures with other similar

5    funds (under the heading the Board's failure to negotiate lower fees) (*Id*. ¶¶ 68-73, 168-

6    74); and (5) the independence and conscientiousness of the mutual fund's outside

7    directors (*Id*. ¶¶ 40-53, 158-67).  *See also Id*. ¶¶ 98-102 (interrelationship of the Plans and

8    defendants' other activities, akin to fall-out benefits).  All these facts strongly support the

9    conclusion that the motion to dismiss should be denied.

10            **7.      The SEC's Rule 12b-1 Criteria Further Support the Complaint's**
                        ***Gartenberg* Analysis**
11
12            In addition to the *Gartenberg* factors, the Complaint cites SEC criteria for setting

13    Rule 12b-1 fees that support plaintiff's allegations.  Rule 12b-1 itself expressly refers to

14    the SEC Release that published the rule as adopted, ICA Release No. 11414, for "the

15    factors enumerated in rule 12b-1 [which] would normally be relevant to a determination

16    of whether to use fund assets for distribution."  Compl. ¶ 87.[8]

17            These SEC criteria provide further support to plaintiff's *Gartenberg* analysis.  For

18    example, it is clear, given the size of the Fund, that there is no "problem or circumstance"

19    making continuation of the plans "necessary or appropriate."  Criteria Nos. 2-4.  Compl.

20    _____

21    [8] The relevant factors are in pertinent part as follows: "(2) consider the nature of the
      problems or circumstances which purportedly make implementation or continuation of
22    such a plan necessary or appropriate; (3) consider the causes of such problems or
      circumstances; (4) consider the way in which the plan would address these problems or
23    circumstances and how it would be expected to resolve or alleviate them, including the
      nature and approximate amount of the expenditures; the relationship of such expenditures
24    to the overall cost structure of the fund; the nature of the anticipated benefits, and the time
      it would take for those benefits to be achieved; … (7) consider the possible benefits of the
25    plan to any other person relative to those expected to inure to the company; (8) consider
      the effect of the plan on existing shareholders; and (9) consider, in the case of a decision
26    on whether to continue a plan, whether the plan has in fact produced the anticipated
      benefits for the company and its shareholders."
27

28

¶¶ 89-97.  Moreover, the hundreds of millions of dollars in 12b-1 fees benefit only defendants, but not the Fund or its shareholders.  Criteria Nos. 7-8.  For at least a number of years, the Fund's 12b-1 plans have provided no or *de minimis* benefits for the Fund and its shareholders.  Criteria No. 9.  Compl. ¶ 167.

**E.     The Section 48(a) Claim Should Not Be Dismissed**

The Complaint also contains a claim under Section 48(a) of the ICA against the parent management company, defendant DSA, for what is in effect "control person" liability.  Section 48(a) states "[i]t shall be unlawful for any person, directly or indirectly, to cause to be done any act or thing through or by means of any other person which it would be unlawful for such person to do under the provisions of this title or any rule, regulation, or order thereunder."  15 U.S.C. § 80a-47(a).  The provision is akin to § 15 of the Securities Act of 1933 and § 20(a) of the Securities Exchange Act of 1934 in that it makes control persons liable for primary violations of underlying acts.  As many courts have recognized, § 48(a) "is remedial and is to be construed liberally."  *See Strougo v. Scudder*, 964 F. Supp. 783, 806 (S.D.N.Y. 1997), *dism'd on other grounds*, 27 F. Supp. 2d 442 (S.D.N.Y. 1998), *vacated in part & remanded*, 282 F.3d 162 (2d Cir. 2002).

Defendants rely on a line of cases holding that there is no private right of action under § 48(a).  However, there is a contrary line of cases, which plaintiff respectfully submits should be followed here, holding that if the underlying claim alleging a primary violation is not dismissed (here, §36(b)), then the 48(a) claim also is sustained.

Defendants rely on decisions which derive from the United States Supreme Court's decision in *Alexander v. Sandoval*, 532 U.S. 275 (2001), which held, in a different context, that there was no private right of action to enforce regulations promulgated under Title VI of the Civil Rights Act of 1964.  The issue in these cases was the criteria for determining whether an implied private right of action existed.  These decisions did not address the question, presented here, whether when a statute, Section 36(b) of the ICA, contains an express private right of action with respect to a particular substantive provision of the ICA, and a violation of a control parent section, Section

1   48(a), is predicated upon the Section 36(b) violation, should there be a private right of

2   action under Section 48(a) against the parent company.  The court decisions cited in

3   defendants' brief did not directly address this issue.

4      We respectfully disagree with the line of decisions that extend the *Alexander*

5   analysis to section 48(a).  For example, most of the 48(a) decisions cited in defendants'

6   memorandum also discuss the court decisions holding that there are no private rights of

7   action under ICA Sections 34(b) and 36(a).  Section 34(b) states "[i]t shall be unlawful

8   for any person to make any untrue statement of a material fact in any registration

9   statement," but does not expressly create a private right of action.  ICA section 36(a)

10  expressly states that "[t]he Commission is authorized," but does not identify any other

11  permitted plaintiff.  Concerning both of these sections, the courts note that ICA Section

12  42 authorizes the SEC to enforce all provisions of the ICA.  Thus, Section 34(b) contains

13  a substantive violation but does not expressly create a private right of action to enforce it.

14  Section 36(a) contains an injunctive provision, but it is expressly limited to actions by the

15  SEC.  The difference between these provisions and 36(b) is that unlike these sections,

16  36(b) expressly creates a private right of action with respect to a substantive provision of

17  the ICA and the Section 48(a) claim is expressly predicated upon a violation of 36(b), and

18  merely adds additional persons who may be named as defendants in such a claim.

19     In other words, plaintiff believes that the best way to harmonize these cases is to

20  draw a distinction between (1) a plaintiff asserting a claim under an ICA section, such as

21  34(b), that does not have an express private right of action, where there would be no

22  standalone private right of action under Section 48(a); and (2) a plaintiff asserting a claim

23  under § 36(b), where the Section 48(a) claim is predicated on the express private right of

24  action.  Many courts have sustained the latter such claim.  *In re Evergreen Mut. Funds

25  Fee Litig.*, 423 F. Supp. 2d 249, 259-60 (S.D.N.Y. 2006); *In re Franklin*, 388 F. Supp. 2d

26  at 469; *In re Dreyfus Mut. Funds Fee Litig.*, 428 F. Supp. 2d 342, 356 (W.D. Pa. 2005),

27  *judgment on the pleadings in defendants' favor on other grounds*, 428 F. Supp. 2d 357

28  (W.D. Pa. 2006).

1

## IV.   CONCLUSION

2        For the reasons set forth above, defendants' motion to dismiss should be denied in

3    its entirety.[9]

4    DATED:  December 16, 2008

5

6                                              Respectfully submitted,

7                                              WOLF HALDENSTEIN ADLER
                                                 FREEMAN & HERZ LLP
8

9                                              By:  /s/ Robert B. Weintraub
                                               Daniel W. Krasner
10                                             Robert B. Weintraub
                                               270 Madison Avenue
11                                             New York, New York 10016
                                               Telephone:   (212) 545-4600
12                                             Facsimile:   (212) 545-4653
                                               *Lead Counsel for Plaintiff on behalf of*
13                                             *the Davis New York Venture Fund*

14

15                                             Andrew S. Friedman
                                               Francis J. Balint, Jr.
16                                             BONNETT, FAIRBOURN, FRIEDMAN & BALINT
17                                             2901 N. Central Avenue, Suite 1000
                                               Phoenix, AZ 85012
18                                             Telephone:  (602) 274-1100
                                               Facsimile:  (602) 274-1199
19                                             *Local Counsel for Plaintiff*

20   529570v20

21

22

23

24

25

26
     _____
27   [9] If this Court should grant the dismissal motion, plaintiff intends to amend his complaint
     as of right under Rule 15(a) (1) of the Federal Rules of Civil Procedure.
28