ANDREW S. FRIEDMAN
FRANCIS J. BALINT, JR.
BONNETT FAIRBOURN FRIEDMAN
 & BALINT, P.C.
2901 North Central Avenue, Suite 1000
Phoenix, Arizona 85012
Telephone:  602/274-1100
Facsimile:  602/274-1199
Local Counsel for Plaintiffs

DANIEL W. KRASNER
Krasner@whafh.com
ROBERT B. WEINTRAUB
Weintraub@whafh.com
WOLF HALDENSTEIN ADLER
  FREEMAN & HERZ LLP
270 Madison Avenue
New York, New York 10016
Telephone:  212/545-4600
Facsimile:  212/545-4653
*Lead Counsel for Plaintiff on behalf of
the Davis New York Venture Fund*

UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA
TUCSON DIVISION

| | |
|---|---|
| DONALD TURNER, on behalf of the DAVIS NEW YORK VENTURE FUND<br><br>Plaintiff,<br><br>-against-<br><br>DAVIS SELECTED ADVISERS, L.P. and DAVIS DISTRIBUTORS, LLC,<br><br>Defendants. | NO. CV-08-421-TUC-JMR<br><br>SHAREHOLDER'S AMENDED COMPLAINT UNDER SECTION 36(b) OF THE INVESTMENT COMPANY ACT OF 1940<br><br>JURY TRIAL DEMANDED |

Plaintiff Donald Turner, by and through his attorneys, as a security holder of the

Davis New York Venture Fund ("DNYV Fund" or the "Fund"), a registered investment

company, on behalf of the Fund, alleges upon personal knowledge as to himself, his own acts and the acts and statements of defendants in which he participated directly, including the communications with and documentation and information provided to him by defendants in the ordinary course of business; and upon information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of Securities and Exchange Commission ("SEC") filings, news reports, other publicly available information regarding the Fund, academic studies, and other matters of public record, as follows.

## SUMMARY OF THE ACTION

1.      This is an action by a security holder of the Fund, brought under Section 36(b) of the Investment Company Act of 1940 ("ICA"), 15 U.S.C. §§80a-35(b), against the Distributor and Investment Adviser of the Fund.  The Davis New York Venture Fund is part of the Davis Funds family of mutual funds, one of the larger mutual fund families in the United States.  Plaintiff is a shareholder in the Fund.

2.      These claims are brought exclusively under Section 36(b); thus, plaintiff need not comply with the prerequisites of shareholder litigation set forth in Federal Rules of Civil Procedure 23.1 and 23.  *Daily Income Fund, Inc. v. Fox*, 464 U.S. 523, 534 n.11, 540 (1984); *Kamen v. Kemper Fin. Sers., Inc.*, 500 U.S. 90, 108 (1991).

3.      This action seeks to recover for the Fund excessive and disproportionate 12b-1 fees and investment advisory fees paid by the Fund to these defendant fiduciaries, who breached their fiduciary duties to the Fund under Section 36(b) of the ICA.

4.      The SEC adopted Rule 12b-1 in 1980.  Prior to its adoption, Section 12(b) of

the ICA prohibited mutual funds from using shareholder monies to promote the distribution and sale of fund shares.  Rule 12b-1 relaxed that prohibition, permitting mutual funds, under certain limited circumstances, to use shareholder money – *i.e.*, money taken directly from the funds, which decreases the value of shareholders' assets – for activities "primarily intended to result in the sale of [that mutual fund's shares]" where "there is a reasonable likelihood that the plan will benefit the [Fund] and its shareholders."

5.      In the 1980s, only a few million dollars in 12b-1 fees were paid annually by fund shareholders to their underwriters and brokers <u>in the entire mutual fund industry</u>.

6.      In 2006, **$12 billion** in 12b-1 fees were paid by mutual fund shareholders.

7.      In 2007, approximately **$195 million** in 12b-1 fees were paid by the funds comprising the Davis Funds family of funds alone.

8.      In 2008, approximately **$185 million** in 12b-1 fees were paid by the funds comprising the Davis Funds family of funds alone.

9.      In 2007, approximately **$238 million** in investment advisory fees were paid by the funds comprising the Davis Funds family of funds alone.

10.     In 2008, approximately **$244 million** in investment advisory fees were paid by the funds comprising the Davis Funds family of funds alone.

11.     In its July 31, 2007 and 2008 fiscal years, the Fund and its shareholders paid/(had accrued against them) 12b-1 fees to defendants of more than **$180 million** and **$174 million**, respectively.

12.     In 2007 and 2008, the Fund also paid investment advisory fees to defendants

of more than **$211 million** and **$223 million**, respectively.

13.     Thus, in this two year period, the 12b-1 fees and investment advisory fees paid by the Fund and its shareholders to defendants totaled more than **$788 million** (**$354 million** in 12b-1 fees and **$434 million** in advisory fees).

14.     The assessment of 12b-1 fees against the Fund and its shareholders must by law be reapproved annually by the Fund's Board of Directors.

15.     Under this annual reapproval process, the Fund's Board may continue a 12b-1 plan "only if . . . in light of their fiduciary duties under . . . section 36(b) . . . there is a reasonable likelihood that the plan will benefit the [Fund] and its shareholders."  Rule 12b-1(e).

16.     The 12b-1 fees which defendants charged the Fund and its shareholders were excessive and disproportionate because, among other things: (1) the fees financed shareholder services provided by broker-dealers, but which the broker-dealers were legally obligated to provide to Fund shareholders without payment; (2) the fees grew the Fund, which created economies of scale for defendants, but those economies of scale were not (or were not in material part) passed on to the Fund and its shareholders; (3) the fees grew the Fund, but given the already very large size of the Fund, the Fund's growth inhibited its performance and eventually converted the Fund into an index fund with excessively high fees and expenses; (4) the fees were higher than those of comparable funds, in both absolute terms and with regard to the fact that the Fund acted more as an index fund; (5) defendants had the Fund pay broker-dealers multiple times for providing the same service

to a customer when the broker provided the service only once for that customer (based upon charging each Fund class for a service which is performed only once for all classes combined or charging customers who own multiple funds in the Davis Funds family multiple times for one monthly account statement); and (6) the fees financed commissions to brokers which were materially larger than necessary to act as an incentive to sell Fund shares.

17.     In sum, the 12-1 fees paid by the Fund were excessive and disproportionate because they did not benefit the Fund and its shareholders, but primarily benefitted the defendants who obtained higher investment advisory and transfer fees as a result of the substantial increase in the size of the Fund and who kept most of the economies of scale for their own benefit, and did not share them fairly with the Fund and its shareholders.

18.     Similarly, the investment advisory fees paid by the Fund and its shareholders to defendants were excessive and disproportionate.  For example, given its very large size, the Fund was more like an index fund, but nevertheless charged fees similar to or in excess of those charged by funds which are actively managed.  The Fund's advisory fees were excessively high in comparison to other similar funds. The Fund and its shareholders did not receive benefits from economies of scale, which all flowed to the defendants through exorbitant advisory and 12b-1 fees.

19.     The Fund's directors, in what was essentially a self-perpetuating board, breached their fiduciary duty to independently and conscientiously review the 12b-1 fee plans, which must be reapproved annually.  The directors renewed the plans annually by rote and without giving any consideration to the growth in the size of the Fund (and its

size) and the market power that size gave them in negotiating with broker-dealers. The amount of the 12b-1 fees was excessive in view of the fact that the Fund and its shareholders received no material benefit from the payment of these fees, as alleged above. The directors made no effort to obtain and did not obtain lower 12b-1 fees, despite the fact that the fees charged were the highest percentage allowed by law and did not take into account the large size of the Fund and the Davis Funds family.

20.     Similarly, the directors breached their fiduciary duty by refusing to materially lower advisory fees despite the fact (among other reasons) that the Fund was ever-more functioning as an index fund and any economies of scale passed to shareholders were immaterial.

## PARTIES, JURISDICTION AND VENUE

21.     This Court has jurisdiction over the subject matter of this action pursuant to Sections 36(b), 47 and 48(a) of the Investment Company Act of 1940, 15 U.S.C. §§80a-35(b), 80a-43, 80a-46 and 80a-47(a) and 28 U.S.C. §§1331 (federal question jurisdiction under the laws of the United States).

22.     Venue is proper in this District under 28 U.S.C. §§1391(b) and (c).

23.     Venue also is proper in this District because the defendants are headquartered in this district.

24.     In connection with the acts alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

# PARTIES

## Plaintiff

25.     Plaintiff Donald Turner is a resident of the State of Florida and is the owner and holder of Fund Class A shares.

26.     The Davis New York Venture Fund, Inc. (hereinafter "Davis VF, Inc.") is an open-end management investment company incorporated in Maryland in 1968 and registered under the ICA.

27.     Davis VF, Inc. is a series investment company that may issue multiple series, each of which would represent an interest in its separate portfolio.  Davis VF, Inc. currently offers four series:  Davis New York Venture Fund, Davis Global Fund, and Davis International Fund which are classified under the ICA as diversified companies, and Davis Research Fund which is classified under the ICA as a non-diversified company. Currently, only the directors, officers and employees of the Davis Funds or their investment adviser and sub-adviser (and affiliated companies) are eligible to purchase shares of Davis Research Fund or Davis International Fund.  Davis New York Venture Fund and Davis Global Fund are available for public investment.

28.     The Davis Funds family of funds also operates additional series investment companies which issue multiple series of mutual funds, including Davis Series, Inc., Davis Variable Account Fund, Inc., Selected Funds and Clipper Fund, Inc.

29.     The "Fund" refers to that series of Davis VF, Inc. which is named Davis New York Venture Fund.  Plaintiff is an owner and holder of the Fund's Class A shares.

(The "Fund" does not refer to the "parent" Davis VF, Inc.)

30.     The Fund, which by far is the largest mutual fund operated by the Davis Funds family of funds, and one of the largest mutual funds in the United States, is an open-end, diversified management investment company, which seeks long-term growth of capital, seeking to invest "the majority of its assets in equity securities issued by large companies with market capitalizations of at least $10 billion."  Fund prospectus.

31.     Davis VF, Inc. and the Fund each is headquartered at 2949 East Elvira Road, Suite 101, Tucson, Arizona 85706.  Shares of the Fund are sold throughout the United States, including within this District.

32.     As of March 31, 2007 and March 31, 2008, the Fund had more than $48 billion and $42.3 billion in net assets, respectively.

33.     The Fund has several different classes of shares.

34.     Shares of each class of the Fund represent an interest in the same investment portfolio.

35.     Shares of all classes of the Fund vote together on matters that affect all classes in substantially the same manner.

36.     Although 12b-1 fees are assessed against classes of shareholders, they are in effect paid for out of the assets of the Fund.

**Defendants**

37.     The Davis Funds family of funds consists of approximately nine mutual funds which have approximately $50 billion in assets under management.

38.     Only a very small percentage of mutual fund shareholders are financially

sophisticated; most are ordinary working folk with only small amounts of money to invest.

39.     Upon information and belief, the average size of an account in the Fund is less than $25,000.

40.     Approximately 75 percent of the assets of the Fund is in class A shares.

41.     Although the difference in the terms of each class is not material to this litigation, briefly:  Class A shares incorporate an initial sales charge into the purchase price (approximately 4.75% of the offering price).  Class B and other similar classes have no initial sales charge, but do include a contingent deferred sales charge. All classes pay other fees (detailed below) which are all taken from Fund assets and are material to this litigation:  (a) a management fee to the investment adviser averaging 0.48%;[1] (b) 12b-1 fees for distribution and/or post-sale service, ranging from 0.25% to 1.00%; and (c) fees for other expenses, including transfer agent fees, ranging from 0.12% to 0.17%.  Prospectus, November 30, 2007.

**The Investment Adviser Defendant**

42.     Defendant Davis Selected Advisers, L.P. ("DSA" or the "Adviser") is the investment adviser for the Fund, as well as to all other funds within the Davis Funds family.

43.     DSA is incorporated under the laws of the state of Colorado.  DSA is headquartered in and occupies the same space as the Fund, at 2949 East Elvira Road, Suite 101, Tucson, Arizona 85706.

---

[1] For a detailed discussion of the advisory fee, see Section D.3. below.

44.     DSA, pursuant to the Advisory Agreement, and subject to the general supervision of the Fund's Board of Directors, provides management and investment advice and furnishes statistical, executive and clerical personnel, bookkeeping, office space and equipment necessary to carry out its investment advisory functions and such corporate managerial duties as requested by the Board of Directors of the Fund.

45.     The Fund bears all expenses other than those specifically assumed by the Adviser under the Advisory Agreement, including preparation of its tax returns, financial reports to regulatory authorities, dividend determinations, transaction and accounting matters related to its custodian bank, transfer agency, custodial and Investor Services, and qualification of its shares under federal and state securities laws. The Fund reimburses the Adviser for providing certain services, including accounting and administrative services, and Investor Services (in the past these services included qualifying Fund share for sale with state agencies), provides investment advice for the Davis Funds, manages their business affairs, and provides day-to-day administrative services.  DSA also serves as investment adviser for other mutual funds and institutional and individual clients.  Fund 2007 Statement of Additional Information ("SOAI").

**The Distributor Defendant**

46.     Davis Distributors, LLC ("DD") is the principal underwriter of the shares of the Fund.

47.     DD is incorporated under the laws of the state of Delaware and likewise is headquartered at 2949 East Elvira Road, Suite 101, Tucson, Arizona 85706.

48.     DD is the wholly-owned subsidiary of DSA.

49.     DD is a broker-dealer and a member of the National Association of Securities Dealers, Inc. ("NASD").

50.     DD is the "principal underwriter" of the Fund and an "affiliated person" of DSA as these terms are defined in ICA §36(b).

**Non-Parties Related to the Defendants**

51.     The Fund has a board of directors, as well as officers, all of whom are not defendants herein.

52.     Each of the directors and officers of the Fund holds identical offices with each of the Davis Funds (three registrants, a total of 13 separate series): Davis New York Venture Fund, Inc., Davis Series, Inc., and Davis Variable Account Fund, Inc. (and may hold similar positions in the other Davis mutual funds identified above).

53.     The Fund does not hold annual meetings of shareholders.

54.     The Fund has not filed with the SEC or sent to its shareholders a definitive proxy statement, DEF 14A, since in or about September 2000.

55.     The Fund has not held a shareholder meeting to elect directors since December 1, 2000.

56.     A director's term is indefinite in length because it is not anticipated that a meeting of the Fund's shareholders will be held each year.

57.     Directors and officers of the Fund serve until their resignation, removal, retirement or death.

58.     Since the December 1, 2000 shareholders meeting, vacancies on the Fund's Board of Directors have been filled pursuant to the provision in the Fund's By-Laws,

which states:

> ARTICLE II SECTION 1. Number, Vacancies and Tenure. The Directors may, at any time when the stockholders are not assembled in meeting, establish, increase or decrease the number of seats on the Board of Directors by majority vote of the entire Board of Directors; provided, that after the first annual meeting the number of Directors shall never be less than three (3) nor more than fifteen (15). The number of Directors may not be decreased so as to affect the term of any incumbent Director. Except as hereinafter provided, (i) if the number of Directors is increased, the additional Directors to fill the vacancies thus created may be elected by majority vote of the entire Board of Directors, and (ii) any vacancy occurring for any other cause may be filled by a majority of the remaining Directors, even if such majority is less than a quorum. No vacancy may be filled for any cause whatsoever unless, immediately after the filling of such vacancy, at least two-thirds of the entire Board of Directors shall have been elected by the stockholders of the Corporation. A Director shall hold office until his successor is elected and qualified, or until such Director's earlier death, resignation, retirement or removal; provided, however, that if a Director was not elected to office by a vote of stockholders, the term of such Director shall, in any event, end as of the date of the next annual meeting of stockholders which is required to be held pursuant to Article I, Section 1 of these Bylaws following such Director's election to office. Such a Director may be a candidate for election to office at such annual meeting and, if elected at such meeting, shall serve for the indefinite term specified above.

59.     Thus, for all intents and purposes, the Fund's Board is self-perpetuating and does not stand for election annually as do most directors of public companies.

60.     The so-called "independent Directors" of the Fund are: Marc P. Blum, John S. Gates, Jr., Thomas S. Gayner, Jerry D. Geist, G. Bernard Hamilton, Samuel H. Iapalucci, Robert P. Morgenthau, Christian R. Sonne, and Marsha Williams.

61.     Each of the "independent" Directors of the Fund serves on the Board of

Directors of every other mutual fund within the Davis Funds family.

62.    All but one of the Fund's so-called independent Directors receives more than $90,000 per year in total compensation from funds in the Davis Funds family, with an average individual compensation of approximately $101,000.

63.    One of the principal functions of the independent directors of the Fund is to request, review and consider the information deemed necessary to evaluate the terms of certain agreements between the Fund and its investment adviser or the investment adviser's affiliates, such as the Investment Advisory and Service Agreement, Principal Underwriting Agreement, Administrative Services Agreement and Plans of Distribution adopted pursuant to rule 12b-1 under the ICA, that the Fund may enter into, renew or continue, and to make its recommendations to the full board of directors on these matters.

64.    The following chart show that each of the nine so-called independent Directors sits on the Board of Directors of every Davis fund in the Davis Funds family, as well as, in some instances, funds in other fund families also managed by Defendant DSA.

65.    Each Director sits on at least nine Boards of Directors.

66.    Since each of these funds has approximately four classes of shares which charge 12b-1 fees, each independent director has a fiduciary duty, annually, with respect to whether more than thirty 12b-1 Plans of Distribution should be continued.

| Fund name: "X" = board member. | Marc P. Blum (1986) | John S. Gates, Jr. (2007) | Thomas S. Gayner (2004) | Jerry D. Geist (1986) | G. Bernard Hamilton (1978) | Samuel H. Iapalucci (2006) | Robert P. Morgenthau (2002) | Christian R. Sonne (1990) | Marsha Williams (1999) |
|---|---|---|---|---|---|---|---|---|---|
| Davis New York Venture Fund | X | X | X | X | X | X | X | X | X |
| Davis Financial Fund | X | X | X | X | X | X | X | X | X |
| Davis Opportunity Fund | X | X | X | X | X | X | X | X | X |
| Davis Real Estate Fund | X | X | X | X | X | X | X | X | X |
| Davis Appreciation & Income Fund | X | X | X | X | X | X | X | X | X |
| Davis Global Fund | X | X | X | X | X | X | X | X | X |
| Davis Gov't Bond Fund | X | X | X | X | X | X | X | X | X |
| Davis Gov't Money Mkt Fund | X | X | X | X | X | X | X | X | X |
| Davis Value Fund | X | X | X | X | X | X | X | X | X |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Selected American Shares, Inc. | | | | | | | | X |
| Selected Special Shares, Inc. | | | | | | | | X |
| Selected Capital Preservation Trust | | | | | | | | X |
| Clipper Fund | | | | | | | | |

**The Fees At Issue in This Litigation**

67.     The fees at issue in this litigation are:

68.     Investment Advisory Fees:  Investment advisory fees are sometimes referred to as management fees.  They are paid to the investment adviser, here DSA, for managing the portfolio of securities and for providing some of the back-office support operations required to support portfolio management.

69.     Investment advisory fees are calculated as a percentage of assets under management.  The dollar amount of such fees increases as the size of the Fund increases.

70.     12b-1 Fees:   12b-1 fees are calculated as a percentage of assets under management.  The dollar amount of such fees increases as the size of the Fund increases.

71.     There is no discount in 12b-1 fees to take into account the economies of scale resulting from the very large size of the Fund.

72.     Transfer Agency Fees:  Transfer Agent services include the processing of the sale and redemption of Fund shares; maintenance of the records of shareholder accounts, acting as dividend and capital gain distribution disbursing agent, and performing other related shareholder service functions.  The Fund pays transfer agent fees to both affiliated and non-affiliated companies (principally to non-affiliated companies) which provide transfer agent services.  The company, unaffiliated with the Fund, which receives the overwhelming majority of payments for transfer agent services is Boston Financial Data Services, Inc. ("BFDS").

73.     Transfer agent fees are calculated as a percentage of assets under management.  The dollar amount of such fees increases as the size of the Fund increases.

74.     BFDS was paid approximately $47 million for its transfer agent services for the Fund's fiscal year 2007 and more than $52.5 million for the Fund's fiscal year 2008 (according to the Fund's respective Annual Reports).

75.     DSA is also paid by the Fund for certain transfer agent services, which in fiscal 2008 amounted to $2.2 million.

76.     Transfer Agent fees can constitute fall-out benefits.

**The Fund's Plans of Distribution**

77.     Every class of the Fund which assesses a 12b-1 fee charges a 0.25% 12b-1 fee for shareholder services, sometimes known as the "service fee" or the "shareholder servicing fee."  Class A shares are charged only this 0.25% 12b-1 fee.

78.     The Fund pays this service fee to defendant DD, which pays most of the service fee to broker-dealers for service-related expenses.

79.     For those Fund classes which charge a 12b-1 fee greater than 0.25% (the share classes other than Class A), the additional 12b-1 "distribution fee" is 0.75% for Classes B and C, and 0.50% for Class R.  This part of the 12b-1 fee, the distribution fee, is mainly used to finance payments to dealers primarily as commissions to compensate the individual stockbrokers for their sales activities. The total 12b-1 fee is 1.00% for Classes B and C, and 0.75% for Class R.

80.     DD retains for its own account a portion of the service fees from all classes of the Fund's shares.

## THE INHERENT CONFLICTS IN THE OPERATION OF A MUTUAL FUND

81.    The Securities and Exchange Commission has stated that "Mutual funds are unique . . . in that they are 'organized and operated by people whose primary loyalty and pecuniary interest lie outside the enterprise.'"   Role of Independent Directors of Investment Companies, Securities Act Release No. 33-7754 [1999-2000 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶86, 212, at 82, 451 (Oct. 14, 1999), quoting SEC, Div. of Investment Mgmt., "Protecting Investors: A Half Century of Investment Company Regulation" 251 (1992).

### Section 36(b) of the ICA

82.    Section 36(b) of the ICA states in relevant part:

> Section 36 – Breach of Fiduciary Duty  . . . .
>
> b.  Compensation or payments as basis of fiduciary duty; civil actions by Commission or security holder; burden of proof; judicial consideration of director or shareholder approval; persons liable; extent of liability; exempted transactions; jurisdiction; finding restriction.  For the purposes of this subsection, the investment adviser of a registered investment company shall be deemed to have a fiduciary duty with respect to the receipt of compensation for services, or of payments of a material nature, paid by such registered investment company, or by the security holders thereof, to such investment adviser or any affiliated person of such investment adviser.  An action may be brought under this subsection by the Commission, or by a security holder of such registered investment company on behalf of such company, against such investment adviser, or any affiliated person of such investment adviser, or any other person enumerated in subsection (a) of this section who has a fiduciary duty concerning such compensation or payments, for breach of fiduciary duty in respect of such compensation or payments paid by such registered investment company or by the security holders thereof to such investment adviser or person.  With respect to any such action the following provisions shall apply:
>
> 1. It shall not be necessary to allege or prove that any defendant engaged in personal misconduct, and the plaintiff shall have the burden of proving a breach of fiduciary duty. . . .

**Section 12(b) of the ICA**

83.     Prior to the SEC's adoption of Rule 12b-1 in 1980, it was unlawful under Section 12(b) of the ICA for a mutual fund to "act as a distributor of securities of which it [wa]s an issuer."

84.     One of the reasons this was so was the inherent conflicts in the operation of a mutual fund, discussed above.

**Rule 12b-1 Was Adopted to Encourage Mutual Fund Sales Because, at that Time, There Were Net Redemptions in the Mutual Fund Industry and Because Economies of Scale Might Benefit Shareholders**

85.     On May 23, 1978, the SEC announced an "advance notice of proposed rulemaking" concerning whether mutual funds should be permitted to utilize shareholder "assets to pay expenses incurred in connection with the distribution of their shares." Bearing Of Distribution Expenses By Mutual Funds, Investment Company Act of 1940, Release No. 10252 (May 23, 1978).

86.     The threshold reasons the SEC gave for bringing this issue to the forefront of discussion were the net redemption of mutual fund shares industry-wide, particularly in equity funds, and the desire to increase the sale of mutual fund shares because it was perceived that increased sales of fund shares might be beneficial to investors, including that there might be economies of scale benefiting fund shareholders as the size of a fund increased.  Release 10252.

87.     At the time Rule 12b-1 was adopted in 1980, the mutual fund industry had experienced net redemptions from 1973 - 1979 inclusive, in equity, hybrid and bond

mutual funds.  In 1972, the industry had $60 billion and in 1979 it had $49 billion in assets, in equity, hybrid and bond funds.  The computerization of the securities industry which has lead to exponential growth in productivity was in its infancy.

88.     At the time of its adoption by the SEC in 1980, the main objectives of Rule 12b-1 were:  (1) for the first time to permit mutual fund management companies, such as defendants here, to use shareholder assets to bear expenses for the distribution of Fund shares, to increase sales and benefit shareholders from economies of scale, and (2) to impose restrictions and safeguards concerning these expenditures by (a) minimizing the inherent conflicts of interest that management has in having the fund itself bear a part of the burden of selling the fund's shares; and (b) putting the decision and oversight of any such expenditures in the hands of directors, especially independent directors.   SEC Release Nos. 10251, 10862, 11414 (passim).

89.     Rule 12b-1 permits mutual funds, under certain limited circumstances, to use shareholder money for activities "primarily intended to result in the sale of [that mutual fund's shares]" where "there is a reasonable likelihood that the plan will benefit the [Fund] and its shareholders."

**The "Gartenberg Factors" to Be Used in Analyzing Whether the Fees Defendants Charged to the Fund and Its Shareholders Were Excessive and Disproportionate**

90.     The "Factors" to be assessed when evaluating the legality of a 12b-1 fee or an investment advisory fee are:

(i)   the nature and quality of the services provided by the adviser to the shareholders;

(ii)  the profitability of the mutual fund to the adviser-manager;

(iii) "fall-out" benefits -- meaning whether the fee in question has been reduced to reflect the "fall-out benefits" received by defendants.  The fall-out benefits are those benefits (other than the fee in question) that flow to the adviser and its affiliates as a result of the adviser's relationship with the Fund;

(iv)  the economies of scale achieved by the Fund and whether such savings were passed on to shareholders or kept by the defendants;

(v)  comparative fee structures with other similar funds, both other funds within the same fund family or within other fund families;

(vi)  the independence and conscientiousness of the Fund's outside directors.

91.    The above six Factors, often referred to as the "Gartenberg Factors," *Gartenberg v. Merrill Lynch Asset Management*, 694 F.2d 923, 928-29 (2d Cir. 1982), *cert. denied*, 461 U.S. 906, 103 S. Ct. 1877, 76 L. Ed. 2d 808 (1983), are applicable to analyzing the legality of 12b-1 fees and investment advisory fees.

92.    There also are additional factors relevant to analyzing a 12b-1 fee.  These nine factors are listed in the narrative accompanying SEC Rule 12b-1, as adopted. Investment Company Act Release No. 11414.

## I.    THE 12B-1 FEES ARE UNLAWFUL WHEN ANALYZED AGAINST THE RELEVANT FACTORS

93.    Many commentators and economists have noted that the use of 12b-1 fees exacerbates the conflict of interest between fund management and shareholders.

94.    A recent study by the staff of the Securities and Exchange Commission

concluded that "12b-1 plans do seem to be successful in growing fund assets, but with no apparent benefits accruing to the shareholders of the fund."  Lori Walsh, "The Costs and Benefits to Fund Shareholders of 12b-1 Plans:  An Examination of Fund Flows, Expenses and Returns at 11, 14, 18 (2004).

95.     Under the Gartenberg Factors, the 12b-1 fees paid by the Fund and its shareholders were excessive and disproportionate, and there was no "reasonable likelihood that the [12b-1] plan" was benefiting "the Fund and its shareholders."

96.     The plan should not have been renewed annually, certainly without securing significant discounts, given the size of the Fund and the Davis Funds family, so that the Fund and its shareholders were no longer paying the maximum percentages permitted by law.

A.     **The Nature and Quality of the Services Provided By the Adviser to the Shareholders**

97.     The 12b-1 fee paid by Fund shareholders was comprised of two components, a service fee of 0.25% and a distribution fee of either 0.50% or 0.75%.

98.     Every class of Fund shares which has a 12b-1 fee assesses the full 0.25% service fee against the Fund and its shareholders.

99.     The 0.25% portion of the 12b-1 fee paid by the Fund shareholders, which is known as the "service fee," is the largest component of the $170 to $180 million in 12b-1 fees paid in total annually by Fund shareholders, comprising over 50 percent of the 12b-1

fees paid by Fund shareholders.[2]

100.    The 0.25% service fee assessed by defendants is the maximum 12b-1 service fee permitted by law.

101.    The 0.25% "service fee" pays for "servicing efforts."

102.    "Servicing efforts" include both pre-sale and post-sale shareholder services.

103.    Servicing efforts include post-sale shareholder services which are not "primarily intended" to result in the sale of Fund shares.

104.    The Fund's November 30, 2007 SOAI states that portions of the 12b-1 fee are paid by the Fund to "compensate the dealer . . . for recordkeeping services" and for "servicing [the Fund's] shareholders and maintaining shareholder accounts."

105.    The remainder of the 12b-1 fee, paid by some classes of Fund shareholders only, is 0.75%, (and for one class 0.50%) which is a distribution fee principally used to pay commissions.

106.    The 0.75% distribution fee assessed by defendants is the maximum 12b-1 distribution fee permitted by law.

107.    The Fund's SOAI dated November 30, 2007 states that "because these fees

---

[2] The mutual fund industry's largest trade association, the Investment Company Institute ("ICI"), surveyed its members in late 2004 concerning how its members used 12b-1 fees.  Its members are mutual funds that manage over 75% of assets nationwide, including the Davis Funds family (including the Fund), which are subject to 12b-1 fees.  The Davis Funds family responded to the survey.  The survey found that over 50 percent of 12b-1 fees paid by ICI member mutual funds were paid not for broker commissions and other pre-sale activities, but rather were paid to provide ongoing services to shareholders *after* their purchase.

[paid from 12b-1 Plans of Distribution] are paid out of a Class's assets on an on-going basis, over time these fees will increase the cost of an investment and may cost more than other types of sales and marketing charges."

> **1.      The Fund Paid For the Maintenance of Mutual Fund Supermarkets on Broker-Dealer Websites When the Brokerage Firms Had a Material Incentive to Maintain the Websites at Their Own Expense**

108.    Defendants used the 12b-1 fees paid by the Fund and its shareholders to finance broker-dealers to maintain mutual fund "supermarkets" on their websites.

109.    A fund supermarket website contains hundreds or even thousands of funds which a client can choose to purchase.

110.    For the broker-dealer maintaining the website supermarket, the purpose of having a website supermarket with many mutual funds is to gain a competitive advantage vis-à-vis other brokerage houses, with or without supermarket websites, who are their competitors.

111.    A broker-dealer with a fund supermarket website has an incentive to include on its website as many mutual funds from as many mutual fund families as possible in order to obtain customers who might otherwise purchase mutual funds from the website of a competing broker-dealer.

112.    These supermarkets are not primarily intended to result in the sale of the shares of any particular mutual fund.

113.    The broker-dealer would have an even greater incentive to include on its website the funds of a large and well-known fund family, such as the Fund as part of the

Davis Funds family of funds.

114.    The broker-dealer would have these incentives to include on its website as many mutual funds from as many mutual fund families as possible, and to include well-known funds and fund families, even if a given mutual fund and/or its fund family did not pay, or paid a lesser amount, in 12b-1 fees to support the website.

115.    This is so because if there are fewer mutual funds and fund families on a given fund supermarket website then that company losses some of its competitive advantage to its competitors who are able to offer its customers a wider selection of fund choices.

116.    It therefore was unnecessary for the Fund to charge the maximum 0.25% service fee or the maximum 0.75% distribution fee to the Fund and its shareholders because the business incentives for the broker-dealer to maintain a fund supermarket with the largest number of funds made it unnecessary for the Fund to pay a 12b-1 fee to support the website or, in any event, to pay such a large 12b-1 fee to support it.

117.    The Fund 12b-1 fees which were paid by Fund shareholders to subsidize mutual fund supermarket websites are excessive and disproportionate to the extent the payments were unnecessary or unnecessarily large in view of the business incentives for the broker-dealers to maintain the fund supermarkets themselves.

### 2.    The 12b-1 Fees Charged By Defendants Were Almost as Large as the Advisory Fees Charged By Defendants

118.    During its fiscal years 2004-08 inclusive, the Fund and its shareholders paid $859.8 million in 12b-1 fees.

119.    In the same time period, the Fund and its shareholders paid $933.5 million in advisory fees.

120.    In its 2007 fiscal year, the Fund's 12b-1 fees were 92.0% of its advisory fees for that year ($179.9 million in 12b-1 fees versus $211.1 million in advisory fees).

121.    In its 2008 fiscal year, the Fund's 12b-1 fees were 77.9% of its advisory fees for that year ($174.2 million in 12b-1 fees versus $223.5 million in advisory fees).

122.    Thus, shareholders have been paying almost as much to have the Fund sold to others as to have it managed by the defendants.

### 3.    The Fund Paid For Services Which the Broker-Dealers Were Legally Obligated to Provide in Any Event

123.    The majority of servicing efforts paid for by the Fund and its shareholders are for post-sale shareholder services.

124.    Post-sale "servicing efforts" include, among other activities, operational and compliance functions with respect to the shareholder's brokerage account, such as providing monthly or quarterly account statements, confirmations of transactions, and suitability analyses of the client's account.  Suitability includes the following activities, among others -- assisting customers in rebalancing their portfolios; reviewing customer holdings on a regular basis; reassessing customer needs and investment strategies, and helping investors generally understand their investments.

125.    The broker-dealer is legally obligated to provide all customers with the post-sale shareholder services described immediately above pursuant to its operations and compliance obligations.

126.    These obligations exist under the applicable statutes and New York Stock Exchange and NASD/FINRA regulatory regimes.

127.    The Fund 12b-1 fees which were paid by Fund shareholders for post-sale services are excessive and disproportionate to the extent they were paid for services which the broker-dealer is legally obligated to provide to all its clients who own securities, generally, or mutual fund shares, specifically, including but not limited to its clients who are shareholders of the Fund.

B.    **The Fund Was Excessively Profitable to the Advisor-Manager**

128.    The information in the chart below was obtained from the Fund's annual reports and statements of additional information for the relevant time periods.

129.    The chart illustrates much of the information contained in the subsections of Section B.

| All July 31 fiscal yr end | 12b-1 fee ($millions) | Advisory fee ($millions) | Total 12b-1 plus advisory fees | Transfer agent fees | Total Fund expenses $millions | Net Assets in $billions, fiscal yr end | Total increase in net assets over prior year in $billions | $ increase in net assets from performance operations* |
|---|---|---|---|---|---|---|---|---|
| 2003 | 95.6 | 87.9 | 183.5 | 28.2 | 218.4 | 18.7 | | |
| 2004 | 119.4 | 112.1 | 231.5 | 29.7 | 269.4 | 23.4 | 4.7 | -- |
| 2005 | 135.4 | 133.0 | 268.4 | 33.1 | 310.2 | 30.3 | 6.9 | 3.9B |
| 2006 | 155.3 | 165.9 | 321.2 | 39.8 | 369.2 | 37.7 | 7.4 | 3.1B |
| 2007 | 179.9 | 211.1 | 391.0 | 47.8 | 450.7 | 48.0 | 10.3 | 5.4B |
| 2008 | 174.2 | 223.5 | 397.7 | 52.5 | 462.8 | 42.3 | -5.7 | -6.3B |
| | | | | | | | | |

* meaning the Fund's performance, and not from "capital share transactions" (meaning the sale of additional Fund shares apart from an increase in net asset valuation).

1.     **The Size of the 12b-1 Fees and the Advisory Fees Increased at A Rate Which Was Out of Proportion to the Increase in Fund Assets**

130.    During its two fiscal years beginning August 1, 2006 through July 31, 2008, the Fund's net assets increased by 12.2%, from $37.7 billion to $42.3 billion.

131.    In the same time period, the Fund's 12b-1 fees increased by 12.2%, from $155.3 million to $174.2 million.

132.    In the same time period, the Fund's advisory fees increased by 34.7%, from $165.9 million to $223.5 million.

133.    In the same time period, the Fund's total of 12b-1 fees plus investment advisory fees increased by 23.8%, from $321.2 million to $397.7 million.

134.    In the same time period, the Fund's total expenses increased by 25.4%, from $369.2 million to $462.8 million.

135.    The percentage increase in the Fund's 12b-1 fees, advisory fees, combined 12b-1 and advisory fees, and total expenses, substantially exceeded the percentage growth in the Fund's assets (and exceeded net asset growth by even more if the performance of the Fund is taken into account).

136.    As the size of the Fund grew by huge amounts, the Fund's expenses grew even more, even though the expenses of the investment adviser and underwriter defendants grew at a much lower rate because of economies of scale.

137.    There were no material decreases in the proportional amount of Fund expenses, even as the Fund grew substantially larger.

138.    Thus, the Fund and its shareholders have not been receiving any meaningful

benefit from the increase in the size of the Fund over the past years since the percentage increase in fees and expenses equaled or substantially exceeded the percentage increase in the size of the Fund.

> **2.    The Amount of the 12b-1 Fees and Advisory Fees Charged By Defendants Were Disproportionate and Excessive in Comparison to the Fees Charged By Other Funds**

139.    The Windsor II Fund is comparable to the Fund.

140.    As of October 31, 2007, according to its annual report, Form N-CSR, Windsor II had net assets of $54 billion.

141.    For its fiscal year ended October 31, 2007, Windsor II paid distribution fees of $9.6 million; $67.9 million in advisory fees; $70.6 million in management fees, and total expenses of $149.4 million.

142.    The Fund (using July 31, 2007 year-end data) is 11.1% **smaller** (by dollar amount) than the Windsor II Fund.

143.    Nevertheless, the Fund's 12b-1 fee was 1,773% more ($170.3 million more) than the Windsor II Fund's distribution fee (Fund 12b-1 fee of $179.9 million versus Windsor II distribution fee of $9.6 million), even before grossing-up the Fund's expenses to account for the fact that the Fund is smaller than Windsor II Fund.

144.    The Fund's advisory fee was 52.4% more ($72.6 million more) than Windsor II's advisory and management fees alone (Fund advisory fee of $211.1 million versus Windsor II advisory/management fee of $138.5 million), even before grossing-up the Fund's expenses to account for the fact that the Fund is smaller than Windsor II.

145.    The Fund's 12b-1 and advisory fees combined was 164% more ($242.9

million more) than the distribution, advisory and management fees of the Windsor II Fund (Fund 12b-1 and advisory fees of $391 million versus Windsor II distribution, advisory and management fees of $148.1 million), even before grossing-up the Fund's expenses to account for the fact that the Fund is smaller than Windsor II.

146.    The Fund's total expenses were 201% more ($301.3 million more) than Windsor II's total expenses (Fund total expenses of $450.7 million versus Windsor II total expenses of $149.4 million), even before grossing-up the Fund's expenses to account for the fact that the Fund is smaller than Windsor II.

147.    If the Fund's fees and expenses are grossed-up to account for the fact that the Fund is smaller than Windsor II, the difference between the Fund's fees and expenses and those of Windsor II would be even greater.

148.    The Wellington Fund is another comparable fund.

149.    As of November 30, 2007, according to its annual report, Form N-CSR, Wellington Fund had net assets of $50.8 billion.

150.    For its fiscal year ended November 30, 2007, the Wellington Fund paid distribution fees of $8.9 million; $27.9 million in advisory fees; $71.7 million in management fees, and total expenses of $109.6 million.

151.    The Fund (using July 31, 2007 year-end data) is 5.5% **smaller** (by dollar amount) than the Wellington Fund.

152.    Nevertheless, the Fund's 12b-1 fee was 1,921% more ($171 million more) than the Wellington Fund's distribution fee (Fund 12b-1 fee of $179.9 million versus Wellington distribution fee of $8.9 million), even before grossing-up the Fund's expenses

to account for the fact that the Fund is smaller than Wellington Fund.

153.    The Fund's advisory fee was 111% more ($111.5 million more) than Wellington's advisory and management fees alone (Fund advisory fee of $211.1 million versus Wellington advisory and management fees of $99.6 million), even before grossing-up the Fund's expenses to account for the fact that the Fund is smaller than the Wellington Fund.

154.    The Fund's 12b-1 and advisory fees combined were 260% more ($282.5 million more) than the distribution, advisory and management fees of the Wellington Fund (Fund 12b-1 and advisory fees of $391 million versus Wellington distribution, advisory and management fees of $108.5 million), even before grossing-up the Fund's expenses to account for the fact that the Fund is smaller than the Wellington Fund.

155.    The Fund's total expenses were 311% more ($341.1 million more) than Wellington's total expenses (Fund total expenses of $450.7 million versus Wellington total expenses of $109.6 million), even before grossing-up the Fund's expenses to account for the fact that the Fund is smaller than the Wellington Fund.

156.    If the Fund's fees and expenses are grossed-up to account for the fact that the Fund is smaller than Wellington, the difference between the Fund's fees and expenses and those of Wellington would be even greater.

157.    The Dodge & Cox Stock Fund is another comparable fund.

158.    As of December 31, 2007, according to its annual report, Form N-CSR, Dodge & Cox Stock Fund had net assets of $63.3 billion.

159.    For its fiscal year ended December 31, 2007, Dodge & Cox Stock paid

distribution fees of zero; $344.5 million in management fees, and total expenses of $356.6 million.

160.    The Fund (using July 31, 2007 year-end data) is 24.2% **smaller** (by dollar amount) than the Dodge & Cox Stock Fund (the Fund's dollar amounts would have to be grossed-up 31.9%  to equate to Dodge & Cox Stock Fund).

161.    Nevertheless, the Fund's total expenses were 26.4% more ($94.1 million more) than Dodge & Cox Stock's total expenses (Fund total expenses of $450.7 million versus Dodge & Cox Stock total expenses of $356.6 million), even before grossing-up the Fund's expenses to account for the fact that the Fund is smaller than Dodge & Cox Stock.

162.    Since Dodge & Cox Stock does not charge a 12b-1 fee, any sales or distribution expenses incurred by Dodge & Cox Stock would come out of its management fee.

163.    The Fund's 12b-1 and advisory fees combined are 13.5% more ($46.5 million more) than Dodge & Cox Stock's management fee (Fund 12b-1 and advisory fees of $391 million versus Dodge & Cox Stock management fees of $344.5 million), even before grossing-up the Fund's expenses to account for the fact that the Fund is smaller than Dodge & Cox Stock.

164.    If the Fund's fees and expenses are grossed-up to account for the fact that the Fund is smaller than Dodge & Cox Stock, the Fund's 12b-1 and advisory fees combined would be 49.7% more ($171.2 million more) than those of Dodge & Cox Stock (Fund 12b-1 and advisory fees of $515.7 million after gross-up versus Dodge & Cox Stock management fees of $344.5 million).

165.    The Dodge & Cox International Stock Fund is another comparable fund.

166.    As of December 31, 2007, according to its annual report, Form N-CSR, Dodge & Cox International Stock Fund had net assets of $53.5 billion.

167.    For its fiscal year ended December 31, 2007, Dodge & Cox International paid distribution fees of zero; $267.5 million in management fees, and total expenses of $288.8 million.

168.    The Fund (using July 31, 2007 year-end data) is 10.3% **smaller** (by dollar amount) than Dodge & Cox International.

169.    Nevertheless, the Fund's total expenses were 56% more ($161.9 million more) than Dodge & Cox International's total expenses (Fund total expenses of $450.7 million versus Dodge & Cox International total expenses of $288.8 million), even before grossing-up the Fund's expenses to account for the fact that the Fund is smaller than Dodge & Cox International.

170.    Since Dodge & Cox International does not charge a 12b-1 fee, any sales or distribution expenses incurred by Dodge & Cox International would come out of its management fee.

171.    The Fund's 12b-1 and advisory fees combined are 46.2% more ($123.5 million more) than Dodge & Cox International's management fee (Fund 12b-1 and advisory fees of $391 million versus Dodge & Cox International management fee of $267.5 million), even before grossing-up the Fund's expenses to account for the fact that the Fund is smaller than Dodge & Cox International.

172.    If the Fund's fees and expenses are grossed-up to account for the fact that

the Fund is smaller than Dodge & Cox International, the difference between the Fund's fees and expenses and those of Dodge & Cox International would be even greater.

173.    As detailed below in Section E, "The Fund's Fee Structure Is Excessive and Disproportionate in Comparison With Other Similar Funds," the Fund's performance resembles that of an index fund.

174.    Index funds have lower expenses than more actively managed funds, according to the SEC.  SEC, Index Funds, http://sec.gov/answers/indexf.htm (as of March 9, 2008).

175.    A fund's "R-squared" figure is a measure of a fund's movement against its particular benchmark index on a scale ranging from 1 to 100.  An S&P 500 index fund will have an R-squared number very close to 100 because the fund mirrors the index.

176.    The Fund has a 3-year trailing R-Squared of 98 measured against the Standard & Poor's 500 Total Return Index.  (Morningstar.com, password not required).

177.    The Fund, in its annual reports, has compared itself to the S&P 500 Index since at least as early as its 2003-04 fiscal year.

178.    The Vanguard 500 Index Fund is comparable to the Fund.

179.    As of December 31, 2007, according to its annual report, the Vanguard 500 Index Fund had net assets of $121.9 billion.

180.    For its fiscal year ended December 31, 2007, the Vanguard 500 Index Fund paid distribution fees of $23.1 million; $3.3 million in advisory fees; $114.2 million in management fees, and total expenses of $142.2 million.

181.    The Fund (using July 31, 2007 year-end data) is more than 60% **smaller**

than the Vanguard 500 Index Fund (the Fund's dollar amounts would have to be grossed up 150% to equate to the Vanguard 500 Index Fund).

182.    Nevertheless, the Fund's 12b-1 fee was 678% more ($156.8 million more) than the Vanguard 500 Index Fund's distribution fee (Fund 12b-1 fee of $179.9 million versus Vanguard 500 distribution fee of $23.1 million), even before grossing-up the Fund's expenses to account for the fact that the Fund is smaller than Vanguard 500 Index Fund.

183.    The Fund's advisory fee was 79.7% more ($93.6 million more) than the Vanguard 500 Index Fund's total advisory and management fees (Fund advisory fee of $211.1 million versus Vanguard 500 advisory and management fee of $117.5 million), even before grossing-up the Fund's expenses to account for the fact that the Fund is smaller than Vanguard 500 Index Fund.

184.    The Fund's total expenses (using July 31, 2007 data) were at least 216% more ($308.5 million more) than the Vanguard 500 Index Fund's total expenses (Fund total expenses of $450.7 million versus Vanguard 500 total expenses of $142.2 million), even before grossing-up the Fund's expenses to account for the fact that the Fund is smaller than Vanguard 500 Index Fund.

185.    If the Fund's fees and expenses are grossed-up to account for the fact that the Fund is smaller than Vanguard 500 Index Fund, the Fund's 12b-1 and advisory fees combined would be 595% more ($836.9 million more) than the distribution, advisory and management fees of Vanguard 500 Index Fund (Fund 12b-1 and advisory fees of $977.5 million after gross-up versus Vanguard 500 distribution, advisory and management fees of

$140.6 million).

186.    The Vanguard Total Stock Market Index Fund also is comparable to the Fund.

187.    As of December 31, 2007, according to its annual report, the Vanguard Total Stock Market Index Fund had net assets of $106.4 billion.

188.    For its fiscal year ended December 31, 2007, the Vanguard Total Stock Market Index Fund paid distribution fees of $21.8 million; $2.4 million in advisory fees; $74.6 million in management fees, and total expenses of $101.6 million.

189.    The Fund (using July 31, 2007 year-end data) is more than 50% **smaller** than the Vanguard Total Stock Market Index Fund (the Fund's dollar amounts would have to be grossed up more than 100% to equate to the Vanguard Total Stock Market Index Fund).

190.    Nevertheless, the Fund's 12b-1 fee was 725% more ($158.1 million more) than the Vanguard Total Stock Market distribution fee (Fund 12b-1 fee of $179.9 million versus Vanguard Total Stock Market distribution fee of $21.8 million), even before grossing-up the Fund's expenses to account for the fact that the Fund is smaller than Vanguard 500 Index Fund.

191.    The Fund's advisory fee was 174% more ($134.1 million more) than the Vanguard Total Stock Market Index Fund's total advisory and management fees (Fund advisory fee of $211.1 million versus Vanguard advisory and management fee of $77.0 million), even before grossing-up the Fund's expenses to account for the fact that the Fund is smaller than Vanguard Total Stock Market Index Fund.

192.    The Fund's total expenses (using March 31, 2007 data) were 343% more ($349.1 million more) than the Vanguard Total Stock Market Index Fund's total expenses (Fund total expenses of $450.7 versus Vanguard total expenses of $101.6 million), even before grossing-up the Fund's expenses to account for the fact that the Fund is smaller than Vanguard Total Stock Market Index Fund.

193.    If the Fund's fees and expenses are grossed-up to account for the fact that the Fund is smaller than Vanguard Total Stock Market Index Fund, the Fund's 12b-1 and advisory fees combined would be 691% more ($683.2 million more) than the distribution, advisory and management fees of Vanguard Total Stock Market Index Fund (Fund fees of $782 million after gross-up versus Vanguard distribution, advisory and management fees of $98.8 million).

194.    In 2007, the Fund's total net asset weighted expense ratio was 13.5 times that of a benchmark of all index funds.  Calculated based on data from CRSP Survivor-Bias-Free US Mutual Fund Database ©200809 Center for Research in Security Prices (CRSP®), The University of Chicago Booth School of Business (hereinafter cited as "CRSP").

195.    In 2008, the Fund's total net asset weighted expense ratio was 24.4 times that of a benchmark of index funds for the first nine months of 2008.  CRSP.

196.    In 2008, the Fund's total net asset weighted expense ratio was 15% more than that of a benchmark of large size funds for the first nine months of 2008.  CRSP.

197.    The Fund's advisory fees, the largest part of its profits, were excessive and disproportionate in comparison to these other similar funds.

C.   **The Defendants Received Substantial Fall-Out Benefits**

    1.   **The Marginal Annual Increase in Advisory Fees Constituted Disproportionate and Excessive Fall-Out Benefits Based Upon the Excessive and Unlawful 12b-1 Fees**

198.   Fall-out benefits are those benefits other than the particular fee whose legality is being analyzed (here, the 12b-1 fee) that flow to the investment advisor and its affiliates as a result of the relationship between the advisor/affiliates and the Fund, including indirect profits to the defendants attributable in some way to the existence of the Fund.

199.   When considering the lawfulness of the 12b-1 fees paid by the Fund, the investment advisory fees and transfer agent fees can constitute fall-out benefits to the defendants.

200.   The yearly, marginal dollar increase in advisory fees (starting from the annual dollar amount of advisory fees prior to the damage period) is an excessive fall-out benefit.

201.   The advisory fee increased by $45 million between 2006 and 2007.

202.   The advisory fee increased by another $12 million between 2007 and 2008.

203.   These yearly increases in advisory fees each is excessive and disproportionate because each is based upon the unlawful use of the excessive 12b-1 fee to increase Fund assets so as to increase the advisory fee, where there was no reasonable likelihood of a benefit to the Fund and its shareholders from the 12b-1 fees.

204.   In addition, Fund Class B shares convert to Class A shares after seven years. The Fund has a maximum deferred sales charge for Class B shares of 4% (which is not

paid if the Class B shares are held until conversion).  Class A shares have an up front sales charge of 4.75%.  The dealer retains 84.2% of that amount (4% of the 4.75%) as a commission.

205.   It takes 5.3 years for the defendants to collect enough money from the Fund's 12b-1 fee (from the 0.75% distribution fee portion) to pay off the commission earned by the selling broker-dealer at the time of sale.  That commission is the 0.75% part of the 12b-1 fee (assuming 4 percent divided by 0.75% equals 5.3 years).

206.   The remaining money collected by defendants from the 12b-1 fee in the ensuing 1.7 years prior to automatic conversion into Class A shares is profit to the defendants and not related to distribution expenses since the selling broker-dealer has been paid in full.

> **2.  Fund Shareholders Paid Excessive and Disproportionate 12b-1 Fees Based Upon the Existence of Multiple Classes of the Fund and Multiple Funds Within the Davis Funds Family, Each of Which Paid for the Same Service Although the Service Was Undivided and Performed Only Once**

207.   All but one of the Davis funds, including the Fund, charges a separate 12b-1 fee to pay for certain expenses.

208.   Each class of the Fund charges a separate 12b-1 fee to pay for certain expenses.

209.   The 12b-1 fee for each class of the Fund, or for each fund, is used to pay for the same types of activities within each class or within each fund.

210.   Defendants charge each class of the Fund separately for these expenses, even though many of the expenses paid for by the 12b-1 fee are not related to a particular

share class or how many different share classes the client owns; are undertaken jointly by the Fund as a whole; cannot be (and in any event are not) apportioned among classes, and are performed only once and the cost is incurred only once by the applicable vendor (usually a broker-dealer).

211.   Similarly, defendants charge each fund (including the Fund) separately for these expenses, even though many of the expenses paid for by the 12b-1 fee are not related to how many separate funds within the Davis Funds family the client owns; are undertaken jointly among the funds within the Davis Funds family; cannot be (and in any event are not) apportioned among the funds, and are performed only once and the cost is incurred only once by the applicable vendor.

### a)   <u>Services Which Are Not Divided By Class or by fund</u>

212.   There is only one portfolio of securities purchased by the Fund for all classes of the Fund combined.

213.   Although defendants state that the management fee is applied by class, the management fee is identical for every class of the Fund.

214.   Services not divided by class or by fund include (without limitation) account maintenance activities, operational functions, suitability activities, fund supermarket websites and advertising expenses.

### b)   <u>Shareholders of Each Davis fund, Including the Fund, Are Charged Separately for the Same Service Even Though It Is Performed Jointly and Only Once on Behalf of All Davis Funds</u>

215.   Many shareholders of the Fund own shares of more than one Davis Fund,

including the Fund, in either one account or in multiple accounts at the same broker-dealer.

216.   If one Fund shareholder owns three mutual funds within the Davis Funds family (including the Fund), and those funds are in one account at a given broker-dealer, the shareholder is charged three times by defendants for account maintenance and operations activities and suitability analyses, even though the broker-dealer prepares and sends to that shareholder only one monthly account statement (not three), and the broker conducts only one suitability analysis for the whole account.

217.   If a shareholder of the Fund has more than one account at a particular broker-dealer, the shareholder receives only one combined account statement covering all accounts, and the broker will conduct only one suitability analysis for all the shareholder's investments.

218.   If a Fund shareholder owns, in one account, both the Fund and either mutual funds from other fund families or individual stocks (which are unconnected to any fund family), the 12b-1 fee paid by Fund shareholders is paying for shareholder services provided with respect to securities other than the Fund (such as providing for monthly account statements and suitability analyses for the whole account).

219.   Thus, a Fund shareholder who owns both the Fund and other funds within the Davis funds family, whether in one account or in multiple accounts, is being charged multiple times (once for each Fund) for only one monthly account statement and for one suitability analysis for all the shareholder's investments.

220.   Each class of the Fund is paying an excessive and disproportionate 12b-1 fee

for these services, where the "service" or "distribution" expense is not divided by class, and the service is performed only once and the cost is incurred only once by the broker-dealer (and not three times).

221.    Similarly, each of the funds in the Davis Funds family, including the Fund, is paying an excessive and disproportionate 12b-1 fee for these services, where the "service" or "distribution" expense paid for is not divided by Fund, and the service is performed only once and the cost is incurred only once by the broker-dealer (and not multiple times).

222.    The above analysis concerning being charged multiple times for one service is equally applicable where a shareholder of the Fund owns more than one class of the Fund, whether in the same or multiple accounts.

### 3.    Transfer Agent Fees Also Constitute Fall-out Benefits

223.    Transfer agent fees are calculated as a percentage of net assets under management.

224.    The Fund paid transfer agent fees totaling over $54 million in 2008.

225.    All of the funds in the Davis Funds family paid to defendants approximately $60 million in transfer agent fees in fiscal 2008.

226.    As with advisory fees, transfer agent fees may constitute an excessive fall-out benefit because:  (1) they derive from the increase in the size of the fund as a result of the excessive 12b-1 fees and (2) as discussed above with respect to multiple classes and multiple funds within the Davis Funds family, a shareholder of the Fund may pay multiple times for the same service (with respect to each fund owned by the shareholder) even

though the service is only performed once, for example, the maintenance of records of shareholder accounts (and the transfer agent fees may duplicate the 12b-1 fees).

> **D.**     **There Were Economies of Scale Achieved and Such Savings Were Not Passed on to Shareholders**
>
> > **1.**     **Economies of Scale Were Not Passed on to the Fund and Its Shareholders**

227.     Congress enacted Section 36(b) because it believed that, as mutual funds became ever-larger, economies of scale were not being passed on to funds and their shareholders.

228.     Increasing the size of the Fund through the assessment against the Fund and its shareholders of 12b-1 fees is supposed to benefit the Fund and its shareholders by passing along to them savings from the economies of scale created through increasing the size of the Fund.

229.     As the Fund grows larger, economies of scale occur for many Fund activities.

230.     In addition, over time many shareholder services have substantially decreased in cost to defendants because they benefit from the significant increases in computerization (in both back office operations, information technologies and front office trading and sales platforms) and telecommunications in the securities industry in the last quarter century, and the concomitant increase in productivity in the industry.  Such services include virtually every operational and compliance issue, obtaining prospectuses on the Internet, trading platforms, the creation of account statements and trade

confirmations, computerized telephone records, and analyzing suitability issues and flagging suitability concerns.

231.   These technological advances have benefitted all managers of mutual funds including defendants.

232.   There are additional economies of scale with respect to research for the Fund.

233.   The research cost to conduct a fundamental analysis and technical analysis investigation concerning whether the Fund should make a particular investment in a particular stock, the time and expense involved, remains the same regardless of whether the size of the investment would be for millions of dollars or hundreds of millions of dollars.

### 2.   The Fund's 12b-1 Fees and Advisory Fees Increased at the Same Rate or Faster Than Its Net Assets

234.   During its two fiscal years beginning August 1, 2006 through July 31, 2008, the Fund's net assets increased by 12.2%, from $37.7 billion to $42.3 billion.

235.   Of this increase in net assets during this time period, however, less than 50% of the increase came from "operations" (meaning the performance of the Fund) while the remainder came from "capital share transactions" (meaning the sale of Fund shares apart from an increase in net asset valuation).

236.   In the same time period, the Fund's 12b-1 fees increased by 12.2%, from $155.3 million to $174.2 million.

237.   In the same time period, the Fund's advisory fees increased by 34.7%, from

$165.9 million to $223.5 million.

238.    In the same time period, the Fund's total of 12b-1 fees plus investment advisory fees increased by 23.8%, from $321.2 million to $397.7 million.

239.    In the same time period, the Fund's total expenses increased by 25.4%, from $369.2 million to $462.8 million.

240.    The percentage increase in the Fund's 12b-1 fees, advisory fees, combined 12b-1 and advisory fees, and total expenses, substantially exceeded the percentage growth in the Fund's assets (and exceeded net asset growth by even more if the performance of the Fund is taken into account).

241.    As the size of the Fund grew by huge amounts, the Fund's expenses grew even more, even though the expenses of the investment adviser and underwriter defendants grew at a much lower rate because of economies of scale.

242.    There were no material decreases in the proportional amount of Fund expenses, even as the Fund grew substantially larger.

243.    The Defendants, and not the Fund and its shareholders, benefitted from the increase in the size of the Fund, which provided to defendants a huge windfall from the increase in fees paid to defendants by the Fund and its shareholders.

> ### 3.    The Fund's Investment Advisory Fee Breakpoints Did Not Confer a Material Benefit Upon Shareholders With Respect to the 12b-1 Fees Paid By Them

244.    During the fiscal year ended July 31, 2008, the advisory fee paid by the Fund was $223.5 million.  For the fiscal year ended July 31, 2007, the advisory fee was

$211.1 million.

245.    During the Fund's five fiscal years ended July 31, 2004 through July 31, 2008, the Fund paid investment advisory fees totaling **more than $845.6 million**.

246.    During the Fund's same five fiscal years, the Fund's total 12b-1 fees were **more than $764.2 million**.

247.    Taken together, Fund shareholders paid approximately **$1.609 billion** total in advisory fees and 12b-1 fees for the years 2004-08 inclusive.

248.    In addition, and above and beyond any accrued but not paid 12b-1 fees, there are unlawful, cumulative carryover payments, of amounts owed by the Fund to the Distributor, under the Class B, C and R Distribution Plans, which total over $900 million.

249.    The Fund's agreement with the investment advisor provides for a very slight scale-down in advisory fees as the Fund grows larger, containing the following breakpoints:

| Annual Fee as Percent of Net Assets of the Fund | Net Assets of the Fund |
|---|---|
| Not exceeding $250 million | .75% |
| In excess of $250 million but not exceeding $500 million | .65% |
| In excess of $500 million but not exceeding $3 billion | .55% |
| In excess of $3 billion but not exceeding $4 billion | .54% |
| In excess of $4 billion but not exceeding $5 billion | .53% |
| In excess of $5 billion but not exceeding $6 billion | .52% |
| In excess of $6 billion but not exceeding $7 billion | .51% |
| In excess of $7 billion but not exceeding $10 billion | .50% |
| In excess of $10 billion but not exceeding $18 billion | .485% |
| In excess of $18 billion but not exceeding $25 billion | .47% |
| In excess of $25 billion but not exceeding $33 billion | .455% |

| | |
|---|---|
| In excess of $33 billion but not exceeding $40 billion | .44% |
| In excess of $40 billion but not exceeding $48 billion | .425% |
| In excess of $48 billion | .41% |

250.    The percentages charged for the 12b-1 fees (0.25% and mainly 0.75%) did not decrease as the amount of assets in the Fund increased.

251.    The total savings for the Fund from the investment advisory fee breakpoints for Fund assets, contained in the above chart, for the fiscal year ending July 31, 2007, was only a miniscule $7.15 million (assuming $48 billion of net assets in the Fund) compared to the approximately $180 million in 12b-1 fees paid by the Fund and its shareholders for fiscal year 2007.

252.    For years 2003 through 2006, inclusive, the savings from any breakpoints was less than $7.15 million annually.

253.    Thus, in contrast to the total 12b-1 fees paid in this five year period of more than $764 million, the total breakpoint savings during the same time period was less than $35 million.

254.    These miniscule breakpoint savings passed along to the Fund and its shareholders (less than $35 million over five years) were immaterial in comparison to the approximately $764 million paid by the Fund and its shareholders in 12b-1 fees and the more than $845 million paid in advisory fees.

255.    Beyond the sheer numbers, academic studies suggest that breakpoints do not capture the economies of scale.  Freeman & Brown, Mutual Fund Advisory Fees:  The

Cost of Conflicts of Interest, The Journal of Corporation Law 609, 619-27 (2001).

> **4.     The Extraordinary Increase in the Size Of The Fund Through the Use of 12b-1 Fees Created Diseconomies of Scale Which Undermined Defendants Ability to Obtain Above-Average <u>Returns</u>**

256.     One of two things happens when a fund's asset base grows.  If, as is the case here, it is a large cap fund, it "morphs" over time into an expensive index fund.  If it is a small cap fund, the manager's ability to pursue the small cap strategy is impeded, according to Shannon Zimmerman, an investment analyst with The Motley Fool, a well-known and respected Internet service which gives investment advice, particularly to retail investors.

257.     The distributor sets the 12b-1 fees to increase compensation to the broker-dealer by selling more fund shares.  This drives up the cost to investors.  The selling of those fund shares also continually drives up the cost to shareholders, regardless of how large the fund becomes, because the increase in the advisory fee continually outpaces the increase in economies of scale.  "Fund shareholders are paying the costs to grow the fund, while the fund adviser is the primary beneficiary of the fund's growth," according to Barbara Roper, Director of Investor Protection, Consumer Federation of America.  The Acid Test: Does Rule 12b-1 Benefit Mutual Fund Shareholders? (The Mutual Fund Distribution Expense Mess), cited in John P. Freeman, The Journal of Corporation Law (June 2007).

258.     Thus, even if a large fund continues to achieve economies of scale at the margin, the cost of the 12b-1 plan to shareholders far exceeds the benefits of the plan

derived from these marginal economies of scale in an already large fund, and these benefits are not material in a fund the size of the Fund.  Coates & Hubbard, Competition in the Mutual Fund Industry:  Evidence and Implications for Policy, 33 Iowa J. Corp. L. 151, 189-193, 193 & notes (2007).

259.    Given the already huge size of the Fund, further growth in the Fund does not generate additional material financial benefits to the Fund and its shareholders from economies of scale sufficient to offset the cost to them in 12b-1 fees of approximately $180 million per year.

260.    The only beneficiaries of this huge increase in fund assets under management, which resulted from using part of the 12b-1 fee to increase distribution of the shares, were the defendants.  They reaped a materially larger advisory fee – at least $40 million to $60 million more per year (and materially increased Transfer Agent fees) -- merely based upon the increase in the size of the Fund, an increase in size which the Fund and its shareholders consistently paid over $150 million per year to finance but received no benefit therefrom.

261.    The directors of the Fund should either have closed the Fund to new investors to limit the growth of the Fund so that the Fund could be actively managed, or if the Fund was not closed and was permitted to grow (as has been the case), then the directors should have dramatically lowered the 12b-1 and advisory fees.

### a)    The Directors Did Not Close the Fund

262.    Most funds have official or unofficial limits on how much of any one security can be in a fund.

263.    Such limits undermine maximum performance because they force the advisor to purchase additional stocks beyond the initial group of stocks which the advisor thinks will increase the most in share price.

264.    Whether or not a fund has such limits, however, for a very large fund such as the Fund (whether or not it continues to increase in size), the fund must find more and more stocks its adviser hopes will increase in share price.

265.    A fund's large size undermines the ability to obtain above-average returns because the number of stocks available for a fund's portfolio decreases.  John C. Bogle, Common Sense on Mutual Funds 265 (John Wiley & Sons 1999).

266.    As the fund's investments expand to include more stocks, there are fewer and fewer superior stocks, because the stocks the fund thought would increase the most would be the fund's first purchases.  John Waggoner, "Some Mutual Funds' Success Has Supersized Them,"  USA Today, Jan. 19, 2007.

267.    The Fund's portfolio followed this pattern.

268.    The Fund is one of the largest stock funds in the United States.

269.    Currently, it is approximately the 25th largest mutual fund in the nation.

270.    As of April 21, 2009, its top ten holdings totaled 34% of the Fund's assets (Morningstar.com website), with ConocoPhillips the largest holding at 4.13% of the Fund's net assets.

271.    The Davis Funds family of funds also includes the Davis Financial Fund and the Davis Opportunity Fund.

272.    Of the Fund's 25 largest holdings, nine of those securities are also in the

portfolio of the Davis Financial Fund (accounting for 43% of that Fund's portfolio) and eight of the 25 are also in the portfolio of the Davis Opportunity Fund (accounting for 25% of that Fund's portfolio) (from Morningstar.com website, password not needed).

273.    Because of its large holdings of individual securities across multiple Davis Funds, including the Fund, and given the size of the Fund, a fund the size of the Fund can have trouble selling a security without causing the price to fall. John Waggoner, "Some Mutual Funds' Success Has Supersized Them," USA Today, Jan. 19, 2007.  This negative impact is exacerbated through continual increases in the size of the fund as a result of charging excessive 12b-1 fees.

274.    The directors did not close the Fund.

### 5.    The Fund Performed Like an Index Fund, Which Should Have Decreased Costs and Generated Economies of Scale

275.    As the Fund has grown, its performance increasingly resembled that of an index fund.

276.    As detailed below in Section E, "The Fund's Fee Structure Is Excessive and Disproportionate in Comparison With Other Similar Funds," the Fund has had a 3-year trailing R-Squared of 98 measured against the Standard & Poor's 500 Total Return ("TR") Index, for at least the last three years.

277.    Thus, the Fund has performed largely as an index fund for at least the past three years.

278.    The Fund acted like an index fund and was passively managed in material part.

279.    Passive management as an index fund would create additional economies of scale.

**E.    The Fund's Fee Structure Is Excessive and Disproportionate in Comparison With Other Similar Funds**

280.    A General Accounting Office study found that mutual fund firms generally do not attempt to compete on the basis of fees (and so the mutual funds accept the fees and coverage sought by the broker-dealer and do not even attempt to negotiate lower fees with the broker-dealer).  Mutual Fund Fees:  Additional Disclosure Could Encourage Price Competition, General Accounting Office, Rpt. No. GGD-00-126 at 62 (June 2000).

281.    The GAO Report found that fund boards "may be keeping fees at higher levels because of [a] focus on maintaining fees within the range of other funds."  GAO Rpt. at 8. Palmiter, The Mutual Fund Board: A Failed Experiment in Regulatory Outsourcing, 1 Brook. J. Corp. Fin. & Com. L. 165, 192 (2006) (citing sources).

282.    As of mid-2007, the Fund was one of the largest mutual funds ranked by dollar assets, with approximately $48 billion in total assets.

283.    At that time, it was approximately the 25th largest fund in the nation; but, it charged 12b-1 fees which were, approximately, the 9th largest in the nation.

284.    The Davis Funds family of funds is one of the largest fund families in the nation.

285.    The Fund charged the maximum 12b-1 service fee permitted by law, 0.25%.

286.    The Fund charged the maximum 12b-1 distribution fee permitted by law (for al but one of its share classes), 0.75%.

287.    The Fund's 12b-1 fees were materially higher (in dollars) than those of other comparable funds.

### 1.    The 12b-1 Fees Charged By Defendants Were Excessive and Disproportionate in Comparison to the 12b-1 Fees Charged By Other Comparable Funds Which Were Not Index Funds

288.    The Fund's 12b-1 fees were disproportionately higher in relation to its advisory fees than comparable funds which were not index funds.

289.    This demonstrates that shareholders have been paying almost as much to have the Fund sold to others as to have it managed.

290.    In its 2007 fiscal year, the Fund's distribution fees were 85.2% of its advisory fees ($179.9 million in 12b-1 fees versus $211.1 million in advisory fees).

291.    For its fiscal year ending October 31, 2007, the Windsor II Fund's distribution fees were only 14% of its advisory fees ($9.6 million in distribution fees versus $67.9 million in advisory fees) and were only 6.9% of its advisory and management fees combined ($9.6 million in distribution fees versus $138.5 million in advisory and management fees).

292.    For its fiscal year ending November 30, 2007, the Wellington Fund's distribution fees were only 31.9% of its advisory fees ($8.9 million in distribution fees versus $27.9 million in advisory fees) and were only 8.9% of its advisory and management fees combined ($8.9 million in distribution fees versus $99.6 in advisory and management fees combined).

293.    The excessiveness of the Fund's 12b-1 fees in relation to comparable funds,

as demonstrated by the much higher percentage of the Fund's 12b-1 fees in relation to its advisory fees, has been exacerbated by the fact that the Funds advisory fee in total dollars is materially greater than the dollar amount of the advisory fees of other funds, thus increasing the multiplier effect of the higher percentage of 12b-1 fees.

294.    In other words, unlike the Fund, other very large funds have been charging distribution fees which were materially lower than their advisory fees.

295.    As of mid-2007, only one other mutual fund family in the United States operated any mutual funds which charged a 12b-1 fee (in dollars) larger than the 12b-1 fee charged by the Fund (at that time approximately $180 million).

> **2.    The Fund Acted Like an Index Fund, But Defendants Charged 12b-1 Fees as if the Fund Were Actively Managed, and Those 12b-1 Fees Were Excessive in Comparison to Index Funds**

296.    The Fund's performance is almost identical to that of an index fund.

297.    A fund's "R-squared" figure is a measure of a fund's movement against its particular benchmark index on a scale ranging from 1 to 100.  An S&P 500 index fund will have an R-squared number very close to 100 because the fund mirrors the index.  "A number above 90 indicates that it's pretty close to the S&P index [or the particular index used as a comparison to the fund]."  Russel Kinnel, *Fund Spy:  How to Diversify With Big Funds*, Sept. 9, 2002. (at Morningstar.com).

298.    The Fund has a 3-year trailing R-Squared of 98 measured against the Standard & Poor's 500 Total Return Index.  (Morningstar.com, password not required).

299.    The Fund, in its annual reports, has compared itself to the S&P 500 Index

since at least as early as its 2003-04 fiscal year.

300.    Thus, the Fund has performed largely as an index fund for at least the past five years.

301.    In its 2007 fiscal year, the Fund's distribution fees were 85.2% of its advisory fees ($179.9 million in 12b-1 fees versus $211.1 million in advisory fees).

302.    In its 2008 fiscal year, the Fund's distribution fees were 77.9% of its advisory fees ($174.2 million in 12b-1 fees versus $223.5 million in advisory fees).

303.    For its fiscal year ending December 31, 2007, the Vanguard 500 Index Fund's distribution fees were only 19.7% of its advisory and management fees combined ($23.1 million in distribution fees versus $117.5 million in advisory and management fees).

304.    For its fiscal year ending December 31, 2007, the Vanguard Total Stock Market Index Fund's distribution fees were only 28.3% of its advisory and management fees combined ($21.8 million in distribution fees versus $77.0 million in advisory and management fees).

305.    For its fiscal year ended October 31, 2007, the Vanguard European Stock Index Fund's distribution fees were only 16.6% of its advisory and management fees combined ($7.0 million in distribution fees versus $42.176 million in advisory and management fees).

306.    For its fiscal year ended October 31, 2007, the Vanguard Pacific Stock Index Fund's distribution fees were only 17.5% of its advisory and management fees combined ($3.4 million in distribution fees versus $19.4 million in advisory and

management fees).

307.    Thus, shareholders of the Fund have been paying almost as much to have the Fund sold to others as to have it managed.

308.    The following chart, using information taken from each of the fund's SEC filings, shows the distribution fees for each fund per million dollars in net assets under management:

| Fund Name | Distribution fees (millions) | Net assets (billions) | Distribution fees per million dollars under management |
|---|---|---|---|
| Davis New York Venture Fund 2008 | $174.2 | $42.3 | $4,118 |
| Davis New York Venture Fund 2007 | $179.9 | $48.0 | $3,747 |
| Vanguard Total Stock Market Index | $21.8 | $106.4 | $205 |
| Vanguard 500 Index | $23.1 | $121.9 | $189 |
| Windsor II (not an index fund) | $9.6 | $54.0 | $178 |
| Wellington (not an index fund) | $8.9 | $50.8 | $175 |

309.    The Fund's distribution fee per million dollars under management was more than 18 times greater than each of the other comparable funds.

310.    In 2007, the Fund's total net asset weighted 12b1- fee (the dollar amount of 12b-1 fees paid to total net assets) was 21.2% more than that of a benchmark of large size funds.  CRSP.

311.    In 2008, the Fund's total net asset weighted 12b1- fee (the dollar amount of

12b-1 fees paid to total net assets) was 33.5% more than that of a benchmark of large size funds.  CRSP.

312.    In 2007, the Fund's total net asset weighted 12b1- fee (the dollar amount of 12b-1 fees paid to total net assets) was 17.57 times that of a benchmark of index funds. CRSP.

313.    In 2008, the Fund's total net asset weighted 12b-1 fee was 35.89 times that of a benchmark of index funds (for the first nine months of 2008).  CRSP.

F.    **The Independence and Conscientiousness of the Mutual Fund's Outside Directors**

314.    The United States Supreme Court has held that independent directors on a mutual fund board are supposed to be "independent watchdogs."  *Burks v. Lasker*, 441 U.S. 471, 484 (1979).

315.    This has not been the case with the Fund.

316.    The investment advisor controls the information which reaches the so-called independent directors of the Fund, undermining their statutory duties as "independent watchdogs" and undermining the presumption under the ICA that a director is not a controlled person.

317.    DSA controls:  (1) the information which is given to the independent directors; (2) the agenda of board meeting; (3) the materials prepared and presented at board meetings; (4) who presents items at board meetings, and (5) who is involved in advising the independent directors.

1. **The Fund's Board Breached Its Fiduciary Duty By Continually Approving the Fund's 12b-1 Plans With Virtually No Time Given to Their Consideration and Because There Is No Reasonable Likelihood That the Millions of Dollars of 12b-1 Fees Paid By the Fund and Its Shareholders Will Benefit <u>The Fund and Its Shareholders</u>**

318.     As set forth in the earlier section of this pleading concerning non-parties related to the defendants, the Fund has a Board of Directors who have not been elected by the shareholders in many years, who rarely meet, whose focus is spread over many different funds in the Davis family of funds, and who receive material compensation from the Davis family of funds.

319.     Each so-called independent Director of the Fund sits on approximately nine boards of directors of mutual funds within the Davis Funds family.

320.     Each of these Davis mutual funds has approximately four classes of shares which charge a 12b-1 fee.

321.     The Board of Directors of the Fund meets no more than four times per year and does not address (for purposes of reapproval) the Plans of Distribution at most of its meetings.

322.     The common board members of the Fund and the other Davis mutual funds, upon information and belief, meet simultaneously, or *seriatim* on the same day, as the boards of those funds.

323.     The statute and SEC rules require a board of directors to make certain findings and to come to certain, separate conclusions concerning the continuation of each plan of distribution.

324.    Given the number of Boards which were meeting during one day, the Board of the Fund must have, during 2007, 2008 and prior years, spent an immaterial amount of time considering the Fund's Plans of Distribution (because approximately 36 Plans of Distribution were being considered at any one time).

325.    In this limited amount of time, the Board of the Fund could not possibly have examined in any meaningful way, as required by their fiduciary duty, the factors for continuing a 12b-1 Plan of Distribution, and were limited simply to acting year after year as a rubber stamp for the proposals of defendants regarding 12b-1 fees.

326.    Hence, the Fund's Board gave the Fund's 12b-1 Plans only a perfunctory review and not the careful consideration required as to whether the plans should be continued.

327.    The very fact that the Fund's shareholders for a number of years have been paying hundreds of millions of dollars per year, now between $150 million and $180 million a year, in 12b-1 fees, on top of paying approximately $200 million a year in advisory fees, while receiving an immaterial benefit of a few million dollars per year in advisory fee breakpoints, in itself demonstrates the Board's failure to give the legally required consideration to its annual approval for continuation of the Fund's 12b-1 Plans.

328.    For the reasons set forth in detail above, the plans have, for at least a number of years, provided no benefits to the Fund or its shareholders.

2. **The Fund's Board Did Not Fulfill Its Fiduciary Duty When It Failed to Engage in Arms-Length Bargaining**

a) **The Board Failed to Negotiate Lower 12b-1 Fees**

329.   Despite the large size of the Fund and of the Davis Funds family overall, and despite the tremendous increases in computerization and productivity, when negotiating with broker-dealers the size of its 12b-1 fees, the Funds' independent Directors have not sought to obtain, and have not obtained, any benefits for the Fund and its shareholders including but not limited to:

● A reduction in 12b-1 fee percentages paid by the Fund.  The Fund pays the maximum service fee permitted by law and (in most cases) the maximum distribution fee permitted by law.

● A limitation on the activities for which the 12-1 service fee is paid.  The Fund current pays 12b-1 fees for services which the broker-dealer is legally obligated to provide in any event.

● The Fund current pays 12b-1 fees for services which are not "primarily intended" to result in the sale of Fund shares.

● A limitation on the distribution fee for broker commissions.

● The 12b-1 fee distribution fee benefits only a mutual fund which does not yet have a foot-hold in the marketplace.  The fee does not benefit a mutual fund, such as the Fund, which already is established in the marketplace, according to Richard Phillips, law firm senior partner and former SEC official, who participated in the SEC "Roundtable" discussion on 12b-1 fees, June 19, 2007.

● The amount of the 12b-1 fee for broker compensation is less relevant to increasing Fund sales than the types of funds (and the types of stocks in the portfolios) which the fund family sells and the client is interested in purchasing.

● The size of the Fund as well as of the Davis Funds family of funds gives the Board the ability to seek and obtain materially lower costs from the broker-dealers which should be passed on to the Fund and its shareholders.

● The Fund and its shareholders pay very high 12b-1 fees for a performance record which essentially is that of an index fund.

● Economies of scale were present, but the Board failed to pass along those economies to the Fund and its shareholders.

330.    The Board had available to it the data necessary to determine whether, with respect to the continuation of the 12b-1 fees, the 12b-1 plans were reasonably like to result in material benefits to the Fund and its shareholders.

331.    The allegations here demonstrate that the 12b-1 fees have been so disproportionately large that they bear no reasonable relationship to the services rendered and could not have been the product of arm's length bargaining (both between the defendants and the Fund's board and between broker-dealers and the Fund's board).

332.    The 12b-1 agreements approved by the Board have resulted in excessive and disproportionate service fees and distribution fees.[3]

_____

[3] There are some types of expenses which still may be *per se* unlawful.  Section 12 of the ICA makes it unlawful for any mutual fund to act as a distributor of securities

333.    A number of the separate criteria in the SEC Release adopting Rule 12b-1 are addressed below.  Investment Company Act Release No. 11414.

G.      **There Are No Problems or Circumstances Which Make the Continuation of the 12b-1 Plan Necessary or Appropriate**

334.    As of mid-2007, the Fund was approximately the 25th largest fund in the United States, ranked by dollar assets.

335.    At that time, the Fund's 12b-1 fee was the 9th largest in the United States, ranked by the dollar amount of the fee.

336.    Even with the decline in the market since that time, the Fund is still approximately the 25th largest fund in the United States.  (Morningstar.com, password required, information obtained on April 21, 2009).

337.    The Davis Funds family of funds is one of the largest fund families in the United States.

338.    The Fund and the fund family have not had a problem with respect to net redemptions.

_____

of which it is the issuer, except to the extent the mutual fund comes within the limited exception under Rule 12b-1.  The permitted exception under Rule 12b-1 states that it is lawful to use 12b-1 fees only to "finance[] any activity which is *primarily intended* to result in the sale of shares issued by such company, including, but not necessarily limited to, advertising, compensation of underwriters, dealers and sales personnel, the printing and mailing of prospectuses *to other than current shareholders*, and the printing and mailing of sales literature."  (emph. added).  Thus, it would, for example, make little sense to require that the *Gartenberg* Factors be applied to the printing and mailing of prospectuses to current shareholders.

339.    The Fund and the fund family do not have a current problem with respect to net redemptions.

340.    The Fund does not have a problem with respect to its ability to finance advertising expenditures.

341.    In 2006, the Davis Funds family of funds was 23rd nationally in mutual fund companies ranked by total advertising expenditures.

### H.    For a Number of Years, the Plan Has Not Produced Benefits for the Fund and its shareholders

342.    Defendants are not passing on to the Fund and its shareholders the economies of scale created by the increase in the size of the Fund.

343.    The only material beneficiaries to further increases in the size of the Fund are defendants, who reaped ever larger advisory and other fees for managing the Fund.

344.    For all of the reasons stated above, the Fund's 12b-1 plans, for a number of years, have been highly lucrative for defendants -- gaining them $50 million or more per year in additional advisory fees and other amounts in additional transfer agent fees - but have provided no benefits whatsoever for the Fund and its shareholders.  (The remainder of the nine criteria contained in the SEC Release essentially are duplicative of the *Gartenberg* Factors.)

## II.    THE INVESTMENT ADVISORY FEES ARE EXCESSIVE AND DISPROPORTIONATE

345.    Whether advisory fees are excessive and disproportionate is governed by the same six "*Gartenberg* Factors."

346.    Virtually all of the above analysis with respect to 12b-1 fees is applicable to the investment advisory fee analysis.

347.    The above allegations are incorporated by reference as if fully set forth in Section II of this amended complaint.

348.    A few of the above allegations are summarized below.

### A.    The Nature and Quality of the Services Provided By the Adviser to the Shareholders

349.     The Fund has underperformed the S&P 500 TR Index during each calendar year beginning January 1, 2006.

350.    As a result, the Fund has underperformed the S&P 500 TR Index for at least the last five years, on an annualized basis.

351.    As discussed in the 12b-1 section of this pleading, for a number of years the Fund's performance has been almost identical to that of an index fund.

352.    The Fund has had an R-Squared of at least 98 for at least the past three years.

353.    Nevertheless, the Fund has charged advisory fees as if it were an actively managed fund.

### B.    The Fund Was Excessively Profitable to the Advisor-Manager

354.    When measured against comparable funds (see above), the Fund's advisory fees were a multiple of what they should have been for a fund which essentially was an index fund.

355.    In 2007, the Fund's total net asset weighted expense ratio was 13.5 times

that of a benchmark of all index funds.  CRSP.

356.    In 2008, the Fund's total net asset weighted expense ratio was 24.4 times that of a benchmark of index funds for the first nine months of 2008.  CRSP.

357.    Even when compared to funds which were not index funds, the Funds' advisory fees were excessive and disproportionate.  Section I.B. above.

358.    Accordingly, in comparison to the management fees of comparable funds (stated for the most part in Section I.B. above), the Fund's advisory fees were excessive and disproportionate to the extent of more than $100 million per year.

C.    **The Defendants Received Substantial Fall-Out Benefits**

1.    **The 12b-1 Fees and Transfer Agent Fees Constituted Disproportionate and Excessive Fall-Out Benefits Based Upon the Excessive and Disproportionate Advisory Fees**

359.    Fall-out benefits are those benefits other than the particular fee whose legality is being analyzed (here, the advisory fee) that flow to the investment advisor and its affiliates as a result of the relationship between the advisor/affiliates and the Fund, including indirect profits to the defendants attributable in some way to the existence of the Fund.

360.    When considering the lawfulness of the advisory fees paid by the Fund, the 12b-1 fees and transfer agent fees can constitute fall-out benefits to the defendants.

361.    The purpose of 12b-1 fees is to promote the sale of Fund shares.

362.    Increases in the size of the Fund in turn increase Fund assets and advisory fees and transfer agent fees.

363.     Defendants received increased advisory fees as a result of the increase in the size of the Fund, but did not pass on to the Fund and its shareholders the benefits of any economies of scale, and did not lower the Fund's excessive 12b-1 fees.

364.     Similarly, the Fund and its shareholders paid to defendants $54 million in transfer agent fees in fiscal 2008.

365.     All of the funds in the Davis Funds family paid to defendants approximately $60 million in transfer agent fees in fiscal 2008.

366.     Increases in transfer agent fees are based upon increases in the size of the Fund.

367.     As the Fund increases in size, a transfer/subtransfer agent will obtain increasing economies of scale with respect to recordkeeping for the Fund's shareholders (which are not being passed on to shareholders because the transfer agent fee is a percentage of net assets) and because Fund/class shareholders are paying multiple times for a service (account maintenance) which is performed only once (as discussed above).

**D.     There Were Economies of Scale Achieved and Such Savings Were Not Passed on to Shareholders**

368.     As set forth in Section I.D., there were economies of scale.

369.     The economies of scale were not passed on to the Fund and its shareholders.

370.     The Fund's advisory fees increased faster than its net assets, even before taking into account that a material percentage of the Fund's net asset increase was not performance-based but resulted from the sale of additional shares.

371.     Advisory fee breakpoints did not confer any material benefits upon the Fund

and its shareholders.

372.    The increase in the size of the Fund created diseconomies of scale for Fund shareholders.

373.    The Fund performed like an index fund but charged advisory fees as if it were actively managed.

374.    In the past, one of the principal functions of the Adviser, in relation to its providing "Investor Services" for the Fund, was to separately qualify, with every state and territorial agency, the shares of all of its mutual funds, including the Fund, for sale in every state and territory.

375.    Pursuant to federal law which negated this requirement, a mutual fund no longer must qualify with the state agencies of any state or territorial jurisdiction to sell fund shares.

376.    Removing this requirement enabled the Adviser to obtain additional economies of scale, which again were not passed on by the Adviser to the Fund and its shareholders.

**E.      The Fund's Fee Structure Is Excessive and Disproportionate in Comparison With Other Similar Funds**

377.    Mutual funds generally do not attempt to compete on the basis of fees. General Accounting Office Study (above).

378.    As set forth in Sections I.B. and I.E. above, the Fund's advisory fees are materially greater than the advisory fees of other comparable funds, both other stock funds and index funds.

379.    Advisory fee breakpoints did not confer any material benefits upon the Fund and its shareholders.

380.    The Fund's advisory fees are excessive and disproportionate when viewed against the advisory fees of comparable funds.

**F.     The Independence and Conscientiousness of the Mutual Fund's
         Outside Directors**

381.    The allegations stated above (principally in Sections I.B. and I.F.) which include but are not limited to the allegations concerning the size of the advisory fees charged the Fund, the failure to pass on economies of scale to the Fund and its shareholders, the board's approval of advisory fee breakpoints which provided no material benefit to the Fund and its shareholders, the board of directors involvement in and knowledge of the facts concerning the size of the 12b-1 fees and the purposes for which they are used, and the board's failure to negotiate materially lower 12b-1 fees on behalf of the Fund and its shareholders, all are equally applicable to the board's knowledge and involvement concerning advisory fees, and the board's conduct with respect to advisory fees including its failure to negotiate materially lower investment advisory fees with defendants.

382.    The Board had available to it the data necessary to determine whether the advisory fees were excessive and disproportionate.

383.    The Fund's independent directors have not sought to obtain, and have not obtained, a reduction in the advisory fee paid by the Fund.

384.    The Fund's investment advisory fees were excessive and disproportionate

given the facts and circumstances including but not limited to when viewed against the advisory fees of other comparable funds.

**Incorporation of the Fund's SEC Filings and Other Documents**

385.    The following SEC filings made by the Fund, and any and all amendments thereto, are incorporated herein by reference:  (1) The Fund's annual reports, semi-annual reports, registration statements, N-CSRs, prospectuses and Statements of Additional Information, filed with the SEC beginning with January 1, 2001 through the date of the commencement of this action, and (2) all 12b-1 Plans of Distribution and filings concerning the implementation or continuation of the Plan for each class of the Fund; and (3) all filings and other documents specifically identified herein.

**FIRST CLAIM FOR RELIEF**
**For Violation Of §36(b) of the ICA, against DD and DSA**

386.    Plaintiff incorporates each of the foregoing paragraphs as if fully set forth herein.

387.    Plaintiff does not allege that there are material omissions and/or misstatements set forth herein, nor does plaintiff allege that any such material omissions and/or misstatements were made intentionally or recklessly by defendants.

388.    The defendant in this claim is DD, the distributor of the Fund, which is both the principal underwriter of the Fund and an affiliated person of defendant investment adviser DSA.

389.    DSA is also a defendant on this claim to the extent it received advisory fees which were excessive and disproportionate fall-out benefits based upon the excessive and

disproportionate 12b-1 fees.

390.    Pursuant to Section 36(b) of the ICA, 15 U.S.C. § 80a-35(b), the investment adviser, principal underwriter, directors and officers of a mutual fund owe to the mutual fund fiduciary duties "with respect to the receipt of compensation for services, or of payments of a material nature, paid by such registered investment company, or by the security holders thereof, to such investment adviser or any affiliated person of such investment adviser."

391.    Pursuant to Section 36(b) of the Investment Company Act, 15 U.S.C. § 80a-35(b), mutual fund shareholders may bring, on behalf of the Fund, a civil action against an investment adviser or any affiliated person who has breached his or its fiduciary duty concerning such compensation or other payments.

392.    Distributor defendant DD (an affiliated person of DSA) as a matter of statutory law, owed the Fund fiduciary duties with respect to its receipt of compensation for services, paid by the Fund, or by the shareholders thereof.

393.    Distributor defendant DD as a matter of statutory law, owed the Fund fiduciary duties with respect to payments of a material nature, paid by the Fund, or by the shareholders thereof, either to DD or by DD.

394.    For the reasons set forth in detail above, the Fund and its shareholders have paid to DD (and are continuing to pay to DD) hundreds of millions of dollars in 12b-1 fees which are excessive and disproportionate, and hence unlawful, when considering, among other things:  (i)  the nature and quality of the services provided by the defendants to the Fund and its shareholders did not justify the fees; (ii)  the profitability of the mutual fund

to the adviser-manager; (iii) the defendants received "fall-out" benefits which benefitted them but not the Fund, and the defendants did not reduce their fees to reflect the fall-out benefits they received; (iv) there were economies of scale, but those economies were not passed on to the Fund and its shareholders but were kept by defendants; (v) the fees charged the Fund were materially higher than those charged by other comparable funds; and (vi) the board of directors did not exercise the independence and conscientiousness required.

395.    There is no reasonable likelihood that the 12b-1 fees benefitted both the Fund and its shareholders.

396.    Concerning that part of the advisory fees constituting fall-out benefits, defendant DSA as a matter of statutory law, owed the Fund fiduciary duties with respect to its receipt of compensation for services, paid by the Fund, or by the shareholders thereof.

397.    DSA received advisory fees which were excessive and disproportionate fall-out benefits as a result of the excessive and disproportionate 12b-1 fees, based upon the same factors identified above.

398.    By virtue of the foregoing, the defendants on this Claim breached their fiduciary duties under Section 36(b) of the ICA by charging the Fund and its shareholders hundreds of millions of dollars in 12b-1 fees which were excessive and disproportionate in that the 12b-1 fees were for payments (or the accrual of a liability for payment) prohibited under ICA Section 12 and Rule 12b-1; and, by the defendant's charging additional, cumulative carryover payments of amounts owed by the Fund to the Distributor, under the

Class B, C and R Distribution Plans, in excess of $900 million.

399.    By virtue of the foregoing, the defendants on this Claim violated Section 36(b) of the ICA, and are liable to the Fund on behalf of the Fund's shareholders (and directly to those shareholders who no longer have accounts with the Fund).

400.    As a direct and proximate result of defendants' breaches of their fiduciary duties as alleged herein, the Fund and its shareholders have suffered damages, in the amount of more than $200 million by, among other things:  (a) the adoption and approval of the 12b-1 Plans of Distribution, and (b) the payment (or the accrual of a liability for payment) by the Fund and its shareholders of more than $200 million in unlawful 12b-1 fees (beginning on July 28, 2007 which is one year prior to the institution of this action, and continuing through and after the date hereof), in an amount to be proved at trial.

## SECOND CLAIM FOR RELIEF
## For Violation Of §36(b) of the ICA, against DSA

401.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

402.    Plaintiff does not allege that there are material omissions and/or misstatements set forth herein, nor does plaintiff allege that any such material omissions and/or misstatements were made intentionally or recklessly by defendants.

403.    The defendant in this Claim is DSA.

404.    Pursuant to Section 36(b) of the ICA, 15 U.S.C. § 80a-35(b), the investment adviser, principal underwriter, directors and officers of a mutual fund owe to the mutual fund fiduciary duties "with respect to the receipt of compensation for services, or of

payments of a material nature, paid by such registered investment company, or by the security holders thereof, to such investment adviser or any affiliated person of such investment adviser."

405.    Defendant DSA as a matter of statutory law, owed the Fund fiduciary duties with respect to its receipt of compensation for services, paid by the Fund, or by the shareholders thereof.

406.    For the reasons set forth in detail above, the Fund and its shareholders have paid to DSA (and are continuing to pay to DSA) hundreds of millions of dollars in advisory fees which are excessive and disproportionate, and hence unlawful, when considering, among other things, those factors identified above: (i) the nature and quality of the services provided by the defendants to the Fund and its shareholders did not justify the fees; (ii)  the profitability of the mutual fund to the adviser-manager; (iii) the defendants received "fall-out" benefits which benefitted them but not the Fund, and the defendants did not reduce their fees to reflect the fall-out benefits they received; (iv) there were economies of scale, but those economies were not passed on to the Fund and its shareholders but were kept by defendants; (v) the fees charged the Fund were materially higher than those charged by other comparable funds; and (vi) the board of directors did not exercise the independence and conscientiousness required.

407.    By virtue of the foregoing, defendant DSA breached its fiduciary duties under Section 36(b) of the ICA by charging the Fund and its shareholders hundreds of millions of dollars in advisory fees which were excessive and disproportionate.

408.    By virtue of the foregoing, defendant DSA violated Section 36(b) of the

ICA, and is liable to the Fund on behalf of the Fund's shareholders (and directly to those shareholders who no longer have accounts with the Fund).

409.    As a direct and proximate result of DSA's breaches of its fiduciary duties as alleged herein, the Fund and its shareholders have suffered damages of more than $200 million, in an amount to be proved at trial.

**THIRD CLAIM FOR RELIEF**
**For Control Person Liability Under §48(a) of the ICA, Against DSA**

410.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

411.    Plaintiff does not allege that there are material omissions and/or misstatements set forth herein, nor does plaintiff allege that any such material omissions and/or misstatements were made intentionally or recklessly by defendants.

412.    The defendant in this Claim is DSA.

413.    Section 48(a) of the ICA imposes "control person liability" by making it "unlawful for any person, directly or indirectly, to cause to be done any act or thing through or by means of any other person which would be unlawful for such person to do under the provisions of this subchapter or any rule, regulation, or order thereunder." 15 U.S.C. § 80a-47(a).

414.    DSA was and is a "control person" of DD and caused the violations complained of herein. By virtue of its position of operational control and/or authority over DD – DSA, directly and indirectly, had the power and authority, and exercised the same, to cause DD to engage in the wrongful conduct complained of herein.

415.   DSA caused DD to commit the breaches of fiduciary duty of the ICA as alleged herein.

416.   Pursuant to Section 48(a) of the Investment Company Act, by reason of the foregoing, DSA is liable to the same extent as is DD for DD's primary violations of Section 36(b) of the Investment Company Act.

417.   By virtue of the foregoing, the Fund is entitled to damages against DSA in an amount to be proved at trial.

**FOURTH CLAIM FOR RELIEF**
**For Rescission Under §47 of the ICA, Against DSA and DD**

418.   Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

419.   Plaintiff does not allege that there are material omissions and/or misstatements set forth herein, nor does plaintiff allege that any such material omissions and/or misstatements were made intentionally or recklessly by defendants.

420.   For the reasons set forth above, the Fund's investment advisory contracts with defendant DSA were made in violation of the ICA and/or their performance involves a violation of the ICA.

421.   For the reasons set forth above, the Fund's 12b-1 Plans of Distribution with defendants (and all other agreements with respect thereto) were made in violation of the ICA and Rule 12b-1 and/or their performance involves a violation of the ICA and Rule 12b-1.

422.   The investment advisory agreement and the Plans of Distribution should be

voided and rescinded.

## REQUESTS FOR RELIEF

WHEREFORE, plaintiff demands judgment as follows:

(a)     An order providing for relief, including but not limited to declaratory and injunctive relief, including the following:

(1)     declaring that defendants' 12b-1 fees charged or assessed are excessive, disproportionate and unlawful;

(2)     declaring that defendants' advisory fees are excessive, disproportionate and unlawful;

(3)     awarding plaintiff on behalf of the Fund compensatory damages with respect to the unlawful 12b-1 fees and advisory fees taken from the Fund, jointly and severally against the defendants to the extent appropriate, in an amount to proved at trial;

(4)     ordering the defendants to cease the charging of excessive fees;

(5)     rescinding the 12b-1 Plans and the investment advisory contract adopted by the Fund;

(6)     Rescinding and/or voiding the over $900 million in cumulative carryover payments currently owed by the Fund to defendant DD under the Class B, C and R distribution plans;

(7)     removing each of the independent Directors/Trustees of the Fund and replacing them with truly independent Directors;

(8)     removing the Adviser Defendant and the Distributor Defendant;

- 77 -

(9)     awarding such other and further relief as this Court may deem just and proper including any extraordinary equitable and/or injunctive relief as permitted by law or equity to attach, impound or otherwise restrict the defendants' assets to assure plaintiff has an effective remedy (including but not limited to an accounting and restitution); and

(10)    Other equitable relief that the Court may deem proper.

(b)     An award of prejudgment and post judgment interest.

(c)     An award of attorneys' fees and the costs and the expenses of this litigation, including experts' fees; and

(d)     Any other or further relief that this Court deems just and equitable.

## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury on all issues so triable.

DATED:  April 23, 2009

WOLF HALDENSTEIN ADLER
  FREEMAN & HERZ LLP

By:  /s/ Robert B. Weintraub
Daniel W. Krasner
Robert B. Weintraub
270 Madison Avenue
New York, New York 10016
Telephone:   (212) 545-4600
Facsimile:   (212) 545-4653
*Lead Counsel for Plaintiff on behalf of
the Davis New York Venture Fund*

Andrew S. Friedman
Francis J. Balint, Jr.
BONNETT, FAIRBOURN, FRIEDMAN &
BALINT

2901 N. Central Avenue, Suite 1000
Phoenix, AZ 85012
Telephone:  (602) 274-1100
Facsimile:  (602) 274-1199
Local Counsel for Plaintiff

542132v6