1
2

K&L GATES LLP
1601 K Street, NW
Washington, DC  20006
TELEPHONE 202-778-9000

3
4

Stephen G. Topetzes (Admitted *pro hac vice*)
stephen.topetzes@klgates.com
Nicole A. Baker (Admitted *pro hac vice*)
nicole.baker@klgates.com

5
6
7

Quarles & Brady LLP
Firm State Bar No. 00443101
One South Church Avenue
Suite 1700
Tucson, AZ  85701-1621
TELEPHONE 520-770-8700

8
9

Shannon L. Giles (#018786)
sgiles@quarles.com

10

*Counsel for Defendant Davis Selected Advisers,*
*L.P. and Davis Distributors, LLC*

11
12
13

**IN THE UNITED STATES DISTRICT COURT**

14

**FOR THE DISTRICT OF ARIZONA**

15
16
17
18
19
20
21
22

| | |
|---|---|
| DONALD TURNER, on behalf of the DAVIS NEW YORK VENTURE FUND, <br><br> Plaintiff, <br><br> -against- <br><br> DAVIS SELECTED ADVISORS L.P. and DAVIS DISTRIBUTORS, LLC, <br><br> Defendants. | NO. CV-08-421-TUC-JMR <br><br> **DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT** <br><br> ORAL ARGUMENT REQUESTED |

23
24
25
26

Defendants Davis Selected Advisers, L.P. ("Davis"), the investment adviser to the

Davis New York Venture Fund (the "Fund"), and Davis Distributors, LLC

("Distributors") respectfully move the Court, pursuant to Rules 8 and 12(b)(6) of the

Federal Rules of Civil Procedure, to dismiss the Amended Complaint ("Complaint" or "Compl.") and submit the following Memorandum of Points and Authorities in Support of their Motion.

## MEMORANDUM OF POINTS AND AUTHORITIES

### PRELIMINARY STATEMENT

Section 36(b) of the Investment Company Act of 1940, 15 U.S.C. §§ 80a-1 et seq., ("ICA"), provides a limited remedy for a plaintiff who is able to meet the difficult burden of showing that a fund's investment adviser has "charge[d] a fee that is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's-length bargaining." Gartenberg v. Merrill Lynch Asset Mgmt., Inc., 694 F.2d 923, 928 (2d Cir. 1982).[1]

It is plain from the history of this litigation that plaintiff's counsel is casting about for a theory – any theory – that will allow them to pursue a § 36(b) lawsuit. See Amron v. Morgan Stanley Inv. Advisors, Inc., 464 F.3d 338, 346 (2d Cir. 2006) (recognizing incentive to bring "a largely groundless" § 36(b) claim based on its "in terrorem" effect) (citation and internal quotation marks omitted).

Plaintiff's counsel commenced this action – and a substantially similar case in the

---

[1]   Jones v. Harris, 527 F.3d 627 (7th Cir. 2008), recently articulated an even stricter standard requiring a showing of deceit – one that plaintiff admits he cannot satisfy. Compl. ¶¶ 387, 402, 411, 419. The Supreme Court will review Jones, No. 08-586, 129 S. Ct. 1579 (Mar. 9, 2009) (cert. granted). But there is no need to await the outcome in view of the Complaint's clear failure to meet the Gartenberg standard.

Central District of California, <u>Korland v. Capital Research and Mgmt. Co.</u>, No. CV 08-4020-GAF – by filing complaints (each an "Initial Complaint") alleging that certain distribution (or 12b-1) fees paid to defendants were "per se illegal" and thus supposedly violated § 36(b).  In opposing the motion to dismiss the Initial Complaint before this Court, plaintiff's counsel expressly disclaimed any intention to assert a claim with respect to the Fund's investment advisory fees.  Predictably, the <u>Korland</u> court followed numerous prior cases and granted a motion to dismiss, holding that plaintiff's theory was outside § 36(b)'s narrow ambit.  <u>Korland v. Capital Research and Mgmt. Co.</u>, 2009 U.S. Dist. LEXIS 33937, at *8-12 (C.D. Cal. Feb. 10, 2009).

Plaintiff amended his pleading before this Court could rule on defendants' prior motion to dismiss.  His new Complaint seeks to recast the action as a traditional excessive fee case.  It runs nearly 80 pages and includes four claims for relief:  two claims under § 36(b) (one for excessive advisory fees and another for excessive 12b-1 fees) and claims under ICA §§ 47(b) and 48(a).

Not surprisingly – given that plaintiff's counsel did not initiate this lawsuit with the intention of asserting a <u>Gartenberg</u>-style case – the Complaint comes nowhere close to pleading a plausible § 36(b) claim.

The new advisory fee claim does not relate back to the prior pleading and therefore is almost completely time-barred.  Further, cannot plead a plausible excessive advisory fee claim for any time period.  His attempt to do so consists mostly of repetitive boilerplate allegations that could be advanced against many or most large mutual funds.  The

Complaint's remaining allegations, and other information appropriately considered on a motion to dismiss, affirmatively demonstrate that the Fund's advisory fees are reasonable and thus undermine plaintiff's case.

Plaintiff lacks standing to bring much of the purported excessive 12b-1 fee claim because it attacks fees levied only on share classes plaintiff does not own.  In any event, the 12b-1 claim is largely a rehash of broad, generalized disagreements with the system of 12b-1 fees that was approved by the U.S. Securities & Exchange Commission ("SEC").  These arguments have been rejected in numerous prior cases.

## STANDARD FOR EVALUATING SUFFICIENCY OF A COMPLAINT

The Supreme Court recently made it more difficult to plead a viable claim.  Previously, a motion to dismiss could not be granted unless the movant showed "beyond doubt that the plaintiff can prove no set of facts in support of his claim [that] would entitle him to relief."  Conley v. Gibson, 355 U.S. 41, 45-46 (1957).  This pleading standard has been "retire[d]."  Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 563 (2007).

The Supreme Court now mandates that "a complaint must contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face."  Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (May 18, 2009) (citation and internal quotation marks omitted).  "[C]onclusory statements" are "not entitled to the assumption of truth."  Id. at 1949, 1950.  When the facts alleged are merely "consistent with a defendant's liability," id. at 1949 (citation and internal quotation marks omitted), but there are other significantly "more likely explanations," plaintiffs do not "plausibly establish" a claim.  Id. at 1951.

1    Apart from the complaint, courts addressing Rule 12(b)(6) motions examine other

2    sources, such as "documents incorporated into the complaint by reference, and matters of

3

4    which a court may take judicial notice." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 127

5    S. Ct. 2499, 2509 (2007).[2]  Accordingly, this Memorandum refers to materials appended

6    to the Declaration of Stephen G. Topetzes in Support of Motion to Dismiss (the "Decl."),

7    filed herewith.

8

9    **ARGUMENT**

10    **I.     THE §§ 47(b) AND 48(a) CLAIMS MUST BE DISMISSED**

11    Plaintiff's claims under ICA §§ 48(a) and 47(b), Compl. ¶¶ 410-22, can be

12    disposed of swiftly.

13

14    Before either provision becomes operative, a plaintiff must establish a violation of

15    another substantive provision of the ICA. See, e.g., In re Evergreen Mut. Fund Fee Litig.,

16    423 F. Supp. 2d 249, 260 (S.D.N.Y. 2006) (because plaintiffs failed to state a primary

17    violation of the ICA "their [§ 48(a)] claim . . . for control person liability is insufficient

18    and is . . . dismissed."); 15 U.S.C. § 80a-46(b) (authorizing limited rescission remedy for

19

20    contracts involving "a violation of [the ICA]").  This plaintiff has failed to do.

21    Even setting this aside, plaintiff may not sue to enforce either provision.

22    Section 48(a) does not authorize any private right of action. See, e.g., Bellikoff v.

23

24    ────────────

[2]    See also Metzler Inv. GMBH v. Corinthian Colleges, Inc., 540 F.3d 1049, 1064 n.7

25    (9th Cir. 2008) (judicially noticing issuer's "reported stock price history and other

    publicly available financial documents, including a number of [the issuer's] SEC filings").

26    Plaintiff expressly references the Fund's SEC filings. Compl. ¶ 385.

<u>Eaton Vance Corp.</u>, 481 F.3d 110, 115-17 (2d Cir. 2007); <u>Korland v. Capital Research and</u>

<u>Mgmt. Co.</u>, 2009 U.S. Dist. LEXIS 33937, at *12-13 (C.D. Cal. Feb. 10, 2009) and <u>In re</u>

<u>Franklin Mut. Funds Fee Litig.</u>, 478 F. Supp. 2d 677, 688 (D.N.J. 2007).

And, in contrast to § 36(b), which creates a remedy that may only be enforced by a

shareholder, <u>see</u> <u>Daily Income Fund, Inc. v. Fox</u>, 464 U.S. 523, 539 (1984), § 47(b) may

be enforced only by a mutual fund itself. <u>Lessler v. Little</u>, 857 F.2d 866, 874 (1st Cir.

1988); <u>Hamilton v. Allen</u>, 396 F. Supp. 2d 545, 558 (E.D. Pa. 2005); <u>Highland Crusader</u>

<u>Offshore Partners, L.P. v. Motient Corp.</u>, No. CV 06-540 LY, 2006 U.S. Dist. LEXIS, at

*25-26 (W.D. Tex. Nov. 17, 2006).[3]

## II.   THE § 36(b) ADVISORY FEE CLAIM MUST BE DISMISSED

### A.   The Advisory Fee Claim Is Almost Entirely Time Barred

Section 36(b)(3) expressly provides that "[n]o award of damages shall be

recoverable for any period prior to one year before the action was instituted." 15 U.S.C. §

80a-35(b)(3). This time bar largely eliminates plaintiff's excessive advisory fee claim.

This case was commenced on July 28, 2008. <u>See</u> Dckt. No.1. The Initial

Complaint had nothing to do with advisory fees. Indeed, on page 1 of his opposition to

---

[3]   Plaintiff chose not to bring the case as a shareholder derivative action. <u>See</u> Compl.
¶ 2 (asserting plaintiff "need not comply with the prerequisites of shareholder litigation set
forth in Federal Rule[] of Civil Procedure 23.1"). Any attempt to do so would be futile.
<u>See, e.g.</u>, <u>In re Davis Selected Mutual Funds Litig.</u>, No. CV 04-4186 MGC, 2005 U.S.
Dist. LEXIS, at *10-13 (S.D.N.Y. Oct. 11, 2005) (rejecting purported shareholder
derivative claim seeking rescission of advisory contracts under Section 215 of the
Investment Advisers Act of 1940).

defendants' prior motion to dismiss (filed December 16, 2008, Dckt. No. 31), plaintiff represented to the Court that "[t]he appropriateness of the investment advisory fees is not at issue in this action." Nonetheless, the current Complaint, filed April 23, 2009, alleges for the first time that the Fund's advisory fee is legally excessive.

Three points are clear in light of this history, and they collectively preclude any relief being granted for the new claim of excessive advisory fees except for fees received from April 23, 2008 to July 28, 2008. First, given the one-year look-back period in § 36(b)(3) and the July 28, 2008 filing date of the Initial Complaint, plaintiff may not assert claims for any conduct occurring prior to July 28, 2007. Second, plaintiff may not assert claims for any conduct after July 28, 2008, given that plaintiff filed an amended pleading without leave of the court and did not request leave to file a supplemental pleading.[4] Thus, the only time frame relevant to the amended complaint is the 1-year period prior to July 28, 2008. But, third, given the one-year look-back period of § 36(b)(3) and the April 23, 2009 filing date of the Amended Complaint, plaintiff's claims for the time period April 23, 2007 to April 22, 2008 are time barred unless saved by Fed. R. Civ. P. 15(c)(1)(B), which allows an amended complaint to "relate back" to an earlier filing only if the claim stated therein arises out of the same "conduct, transaction, or occurrence set out – or attempted to be set out – in the original pleading."

---

[4]   See Fed. R. Civ. P. 15(d); Young-Henderson v. Spartanburg Area Mental Health Ctr., 945 F.2d 770, 775 (4th Cir. 1991) ("facts accruing after the suit is brought may not be inserted by way of amendment but must be added by supplemental pleading . . . supplemental pleadings require leave of court").

The Amended Complaint's entirely new claim for excessive advisory fees does not relate back to the initial complaint for two independent reasons.

First, relation back is categorically unavailable to resuscitate otherwise untimely § 36(b) claims because § 36(b)(3) is not an ordinary statute of limitations, but is instead a substantive limit on damages. In re Franklin Mut. Funds Fee Litig., 478 F. Supp. 2d 677, 685 (D.N.J. 2007).[5]

Second, relation back principles cannot save the advisory fee claim in any event. A new claim for excessive advisory fees plainly does not relate back to a claim for excessive or improper distribution fees given that the fees are paid pursuant to different contractual arrangements and are for separate and distinct services. See, e.g., Brever v. Federated Equity Mgmt. Co. of Pennsylvania, 233 F.R.D. 429, 432 (W.D. Pa. 2005) (no relation back for amendment that would have expanded § 36(b) claim to include advisory fees for a different time period as this "necessarily cover[s] fee arrangements and services that are distinct from those initially brought under review by [the original plaintiff's] claims").[6]

Accordingly, no advisory fee claim may proceed except insofar as it relates to the

---

[5]    Accord ING v. Principal Protection Funds Derivative Litig., 369 F. Supp. 2d 163, 170-71 (D. Mass. 2005).

[6]    See also Oja v. U.S. Army Corps of Eng'rs, 440 F.3d 1122, 1134-35 (9th Cir. 2006) (Privacy Act claim challenging one statement does not relate back to Privacy Act claim challenging an earlier, nearly identical statement on different web site); Lapidus v. Hecht, Civ. No. 98-3130-MMC, 2002 U.S. Dist. LEXIS 14566, at *24-25 (N.D. Cal. May 17, 2002).

period April 23, 2008 to July 28, 2008.

**B.      Plaintiff Fails to Plead a Plausible Claim for Any Time Period**

When the Complaint's allegations are examined, it is clear why an excessive advisory claim was not plaintiff's first choice.  Six non-exclusive factors bear upon the Gartenberg inquiry, 694 F.2d at 930.  Each is addressed in turn.

**1.      Nature and Quality of Services Provided**

Plaintiff asserts that, for the past three years, "the Fund's performance [has] resemble[d] that of an index fund."[7]  This is unavailing.  That a fund's investment return "resembles" that of an index fund does not begin to suggest that the adviser is not spending the time and money researching stocks and general market forces that is the hallmark of active management.  See In re Franklin Mut. Funds Fee Litig., 478 F. Supp. 2d at 687 (rejecting allegations that a fund "grew so large that it began to function more like an index fund;" and "the allegations pertaining to these Funds' resemblance to index funds do[] not address the actual services rendered to those Funds").

Plaintiff additionally asserts that the Fund has underperformed the S&P 500 Index "during each calendar year beginning January 1, 2006," Compl. ¶ 349, and for the trailing five-year period, Compl. ¶ 350.  However, "allegations of underperformance alone are insufficient to prove that an investment adviser's fees are excessive."  Migdal v. Rowe

---

[7]      Compl. ¶ 173.  Elaborating, plaintiff alleges that the Fund had an "R-squared" of 98, meaning that the Fund's performance was 98% correlated with the Standard & Poor's Total Return Index.  Compl. ¶¶ 351-52; see also Compl. ¶¶ 275-79, 296-300.

Price-Fleming Int'l., Inc., 248 F.3d at 327.  Underperformance figures for relatively short time horizons are of especially limited utility given that "[a]n underachieving fund one year may be an overachieving fund the next."  Id. at 327-28.

Looking at a longer, more meaningful horizon, the Fund had significantly outperformed its benchmarks when this action was commenced.[8]  If anything, the track record suggests that the quality of the adviser's services has been extraordinary.

### 2.   Profitability

The caption of one short section of the Complaint asserts that the advisory fees were "[e]xcessively [p]rofitable" to Davis.  Compl. at p. 65.  But none of the allegations in this section actually relates to profitability.  They instead purport to demonstrate the excessiveness of the advisory fees by reference to allegedly comparable funds.  Compl. ¶¶ 354-58.  Plaintiff's "comparable funds" allegations are discussed separately below.

### 3.   "Fall-Out Benefits"

Fall-out benefits are "benefits other than the advisory fees that flow to the adviser or its affiliates as a result of the adviser's relationship with the fund."  Hoffman v. UBS-AG, 591 F. Supp. 2d 522, 539 n.30 (S.D.N.Y. 2008).  According to plaintiff, the Fund's 12b-1 and transfer agency fees amounted to fall-out benefits to Davis.  Compl. ¶¶ 360-66.

---

[8]     See, e.g., Davis New York Venture Fund Semi-Annual Report (January 31, 2009) (Decl. Ex. A) at 4 (noting that Fund has outperformed S&P 500 Index for every rolling 10-year period since the Fund's inception); Davis New York Venture Annual Report (July 31, 2008) (Decl. Ex. B) at 4, 34 (similar, and noting that Fund's board took account of performance).

1    The mere fact that an investment adviser or its affiliates perform services for a fund

2    other than investment advisory services (and receive a separate fee therefor) does not

3    establish fall-out benefits for purposes of § 36(b).  To do so, a plaintiff must sufficiently

4    allege that the fees received for other services are themselves legally excessive.  <u>See</u>

5    <u>Meyer v. Oppenheimer Mgmt. Corp.</u>, 895 F.2d 861, 866 (2d Cir. 1990).

6    Section III below demonstrates the insufficiency of plaintiff's 12b-1 fee

7    allegations.  Regarding transfer agency fees, plaintiff speculates about possible economies

8    of scale, Compl. ¶ 367; alleges the amount of the fees paid by the Fund and by other

9    Davis funds, Compl. ¶¶ 364-65; and asserts that the fees are computed as a percentage of

10   Fund net assets, and hence have increased with the size of the Fund, Compl. ¶¶ 73, 367.

11   This boilerplate fails to suggest that the fees are excessive or unearned in any respect.[9]

12   Worse, the transfer agency fee allegations are simply misleading.  Buried in the

13   Complaint is an admission that "the overwhelming majority of payments for transfer agent

14   services" are received not by defendants at all but by a company that is unaffiliated with

15   the Fund or with Davis.  Compl. ¶ 72.  Such payments to non-affiliates are manifestly

16   outside the scope of § 36(b).[10]

_____

[9]    See <u>In re Scudder Mutual Funds Fee Litig.</u>, Civ. No. 04-1921-DAB, 2007 U.S. Dist. LEXIS 59643, at *52 (S.D.N.Y. Aug. 14, 2007) (allegations insufficient to suggest fall-out benefits where, although plaintiffs "enumerated the total amount of administrative fees charged," the complaint failed, among other things, to compare the fees to administrative fees charged to similar mutual funds).

[10]   Section 36(b) provides a limited remedy only for "receipt of compensation for services" by an investment adviser and certain related persons. 15 U.S.C. § 80a-35(b). It

1

### 4.   Economies of Scale

2

Plaintiff offers an assortment of allegations that could be made regarding many or

3

4

most large mutual funds:  (a) "all managers of mutual funds" enjoy economies of scale,

5

Compl. ¶ 231, see also Compl. ¶¶ 227-30, 232-33; (b) the Fund was large, Compl. ¶¶ 269,

6

334 (the Fund was nation's 25th largest); and Compl. ¶ 282, (c) the fee was large in

7

absolute terms and (because it is based on net asset value) has increased with the Fund's

8

size.[11]

9

10

Courts have repeatedly recognized that such generic "large fund" allegations do not

11

support a reasonable inference that a particular adviser achieved any economies of scale,

12

let alone that it achieved them to such a degree that excessive fees can be inferred.  See,

13

e.g., In re Salomon Smith Barney Mut. Fund Fees Litig., 528 F. Supp. 2d 332, 339

14

15

(S.D.N.Y. 2007) ("Plaintiffs cannot meet their burden simply by pointing to the size of the

16

funds and their rates of growth. There must be allegations regarding the costs of

17

performing fund transactions or the relationship between such costs and the number of

18

transactions performed") (citation and internal quotation marks omitted); In re Franklin

19

20

_____

21

does not encompass unaffiliated transfer agents.  Even where an investment adviser or its affiliate receives compensation on a "pass-through" basis (it re-allows the money to an unaffiliated service provider), the adviser is not regarded as the recipient, and the compensation is not subject to § 36(b). Pfeiffer v. Bjurman, Barry & Assoc., No. 03-Civ.-9741-DLC, 2006 U.S. Dist. LEXIS, at *9-16 (S.D.N.Y. Mar. 2, 2006), aff'd 215 Fed. Appx. 30 (2d Cir. 2007).

22

23

24

[11]   Compl. ¶ 129 (advisory fee increased from $87.9 million in fiscal year ended July 31, 2003 to $223.5 million in fiscal year ended July 31, 2008); Compl. ¶¶ 234, 237.

25

26

Mut. Funds Fee Litig., 478 F. Supp. 2d at 687 (dismissing complaint alleging that fund "ranked 18[th] out of 50 in terms of total fees charged to the Funds, taking in over $251.3 million in fees"); Amron, 464 F.3d at 345; Gartenberg, 694 F.2d at 929 (§ 36(b) does not require a "cost-plus" contract).

Even assuming *arguendo* that plaintiff had adequately alleged economies of scale, it is indisputable that the Fund's advisory fee is structured so that the Fund shares such economies. As the Complaint acknowledges, the Fund's advisory fee schedule includes breakpoints – asset levels above which marginal fee rates are reduced.[12] The existence of such breakpoints, which are not legally required, distinguishes the Fund from many other large mutual funds, which either have significant assets above the last breakpoint or do not have breakpoints in their advisory fee schedules at all.[13] Accordingly, plaintiff cannot seriously contend that he has properly alleged a failure to share any economies of scale

---

[12]   See Compl. ¶ 249 (table showing that the marginal investment advisory fee rate drops from .75% of net assets to .41%); Davis New York Venture Fund Annual Report (July 31, 2008) (Decl. Ex. B) at 34. In another effort to muddy the water, plaintiff alleges that the percentage increase in the advisory fee for a particular period was greater than the percentage increase in net assets as of particular dates. See Compl. ¶¶ 130, 132, 234-43. Because net assets rise or fall with investment returns and with sales and redemptions of fund shares, such arbitrary comparisons are meaningless. Given the Fund's advisory fee breakpoints, it is indisputable that the advisory fee decreases as a percentage of net assets as the fund increases in size.

[13]   SEC Division of Investment Management, Report on Mutual Fund Fees and Expenses, Dec. 2000 at 6, 32, 57 n.107 ("Fee Study"), available at http://www.sec.gov/news/studies/feestudy.htm (attached hereto as Decl. Ex. C). For example, 19% of the 100 largest mutual funds had "[s]ingle fee contracts [that] do not employ breakpoints" *at all*. Id. at 32 (emphasis added).

associated with investment advisory functions.   Compare <u>Kalish v. Franklin Advisers,</u> <u>Inc.</u>, 742 F. Supp. 1222, 1239 (S.D.N.Y. 1990) (advisers may share economies of scale with a fund by methods including "appropriately fixed 'break-points'") (internal citation omitted).

### 5.   Fee Structures of Comparable Funds

Plaintiff's "comparable funds" allegations actually undermine his claim.

The Complaint expatiates about how the Fund's fees compare to those of Vanguard index funds and to a benchmark of index funds.   Compl. ¶¶ 173-96.   As already noted, however, the Fund is actively managed.   These allegations are frivolous.

The Complaint also compares the Fund to four actively managed funds.   Given the myriad funds in the marketplace, even allegations that the Fund's advisory fees exceeded those of four genuinely comparable funds would be entitled to almost no weight.[14]

But plaintiff does not even manage that.   He conveniently fails to mention that two of the four "comparable funds" – the Windsor II and Wellington Funds, Compl. ¶¶ 139, 148 – are Vanguard funds.[15]   "That a mutual fund has an expense ratio higher than Vanguard, a firm known for its emphasis on keeping costs low, raises little suspicion."

---

[14]     See <u>Amron</u>, 464 F.3d at 345 (insufficient to allege that fund expenses were higher than the industry mean "conveniently omitting where the [fund] falls on the distribution of fees"); <u>In re Scudder Mutual Funds Fee Litig.</u>, Civ. No. 04-1921-DAB, 2007 U.S. Dist. LEXIS 59643, at *56-57 (S.D.N.Y. Aug. 14, 2007) (comparison to four funds insufficient).

[15]     See Vanguard Windsor II Fund Prospectus (February 27, 2009) (Decl. Ex. D) at 13; Vanguard Wellington Fund Prospectus (March 20, 2009) (Decl. Ex. E) at 16.

Amron, 464 F.3d at 345.

Significantly, the Fund's effective advisory fee is *lower* than those charged by the other two funds mentioned in the Complaint – the Dodge & Cox Stock Fund and Dodge & Cox International Stock Fund, Compl. ¶¶ 157, 165. This is true even though the Dodge & Cox funds are alleged to be larger, Compl. ¶¶ 160, 168, and thus (at least according to plaintiff) should be enjoying greater economies of scale. Plaintiff attempts to paper over this inconvenient fact by alleging that the Dodge & Cox funds' advisory fees were lower than the Fund's advisory fees and Rule 12b-1 fees <u>combined</u>. Compl. ¶¶ 163, 171. However, 12b-1 fees and advisory fees are "for entirely different services," and thus are not properly "aggregated . . . to determine the merits of a Section 36(b) claim." <u>Meyer</u>, 895 F.2d at 866.[16] The Complaint's affirmative allegations that the Dodge & Cox funds are appropriate benchmarks exclude the possibility that the Fund's advisory fee was legally excessive. The advisory fee claim should be dismissed on this basis alone. <u>See</u> <u>Lekas v. Briley</u>, 405 F.3d 602, 613 (7th Cir. 2005) ("A plaintiff can plead himself out of court by alleging facts which show that he has no claim.") (citation and internal quotation marks omitted).

---

[16]    The Complaint misleadingly states that the Dodge & Cox funds' lack of a 12b-1 fee means that marketing expenses incurred by the funds "would come out of its management fee." Compl. ¶ 162. But the Dodge & Cox funds are no-load funds, <u>see</u> Dodge & Cox Funds Prospectus (May 1, 2009) (Decl. Ex. F) at 1. They, therefore, simply do not incur the expenses associated with compensating brokers to advise shareholders. <u>See</u> Section II.C. below.

Consideration of comparative fees yields another independently sufficient reason for dismissal of the excessive advisory fee claim.   As the Complaint obliquely acknowledges, Compl. ¶¶ 212-13, exactly the same advisory fee is assessed on retail class shares as on Class Y shares that are offered only to limited classes of investors consisting largely of those who qualify as "accredited investors" under Rule 501(a)(6) of Regulation D under the Securities Act of 1933.[17]   The willingness of such sophisticated investors to pay the Fund's advisory fee further underscores the inadequacy of plaintiff's claim that the fee was legally excessive.

### 6.   Independence and Conscientiousness of the Directors

Because plaintiff has failed to plausibly allege excessive fees, it is unnecessary to consider his allegations regarding the directors.   See Migdal, 248 F.3d at 328. Nonetheless, plaintiff's claims are further undermined by the fact that the Fund's advisory fee and 12b-1 plans were reviewed and approved by the Fund's independent directors, i.e., those directors who were not "interested persons" within the meaning of ICA § 2(a)(19), 15 U.S.C. § 80a-2(a)(19).[18]   See 15 U.S.C. § 35(b)(3) (board approval "shall be given

---

[17]   See Davis New York Venture Fund Statement of Additional Information ("SAI") (December 1, 2008) (Decl. Ex. G) at 50 (class Y shares only available to limited classes of presumably large or otherwise sophisticated investors, including institutions and government entities investing at least $5 million and 401(k) and similar plans investing at least $500,000.  Accredited investors are presumed to be sophisticated enough that they can fend for themselves without regulatory safeguards, and thus even securities not registered to the SEC may be sold to them.  See, e.g., Sec. & Exch. Comm'n v. Ralston Purina Co., 346 U.S. 119, 125 (1953); see generally 15 U.S.C.A. § 77b(a)(15)(i).

[18]   See 15 U.S.C. § 80a-15(c) (advisory contract must be approved by majority of non-

such consideration by the court as is deemed appropriate").

Plaintiff suggests that the board was not in fact disinterested, but his allegations in this regard are boilerplate and defective.

Plaintiff alleges that the directors serve on the boards of multiple funds with the same adviser and receive significant compensation for their service (a prevailing industry practice), Compl. ¶¶ 52, 61-66, and (because of the short duration of meetings and disregarding that directors doubtless spent time preparing for meetings) devote insufficient time to each fund. Compl. ¶¶ 321-22, 324-25. Plaintiff also criticizes the board for relying on information furnished by the investment adviser, Compl. ¶ 314-15, ignoring that "[t]he ICA itself approves this very practice." Migdal, 248 F.3d at 331 (citing 15 U.S.C. § 80a-15(c)). Courts have repeatedly held that substantially similar allegations do not suggest that the directors were "interested."[19]

Plaintiff also alleges that directors do "not stand for election annually as do most directors of public companies," Compl. ¶ 59, and instead "serve until their resignation, removal, retirement or death." Compl. ¶ 57. In addition, in certain circumstances, the board is authorized to fill director vacancies. Compl. ¶ 58. Both these allegations merely

_____

interested directors); Rule 12(b)(1)(b)(2) (similar). Such directors constituted a super-majority of the Fund's board. See Compl. ¶ 60; Davis New York Venture Fund SAI (December 1, 2008) (Decl. Ex. G) at 31-35. The ICA expressly presumes that such directors "are disinterested" and "a plaintiff's burden to overcome this presumption is a heavy one." Amron, 464 F.3d at 344 (citation and internal quotation marks omitted).

[19]   E.g., Migdal, 248 F.3d at 330-31; Krantz v. Prudential Inv. Fund Mgmt. LLC, 305 F.3d 140, 143-44 (3d Cir. 2002); Amron, 464 F.3d at 345.

restate in a pejorative manner legal and permissible prevailing industry practices.[20] Plaintiff's allegations plainly do not suggest that any of the independent directors were interested. See e.g., Krantz v. Fidelity Mgmt. & Research Co., 98 F. Supp. 2d 150, 157 (D. Mass. 2000) (rejecting challenge to investment company director independence based on allegation that "the investment adviser appointed the directors").

## III.   THE § 36(b) 12b-1 FEE CLAIM MUST BE DISMISSED

A somewhat different analysis applies to plaintiff's allegations of excessive 12b-1 fees, but the upshot is the same.  Plaintiff clearly has failed to plead a plausible claim.

The Fund has multiple classes of shares, all but one of which has a separate plan of distribution authorizing certain Rule 12b-1 fees.[21]  Each class of shares with a 12b-1 plan is authorized to pay a shareholder service fee of 0.25% of net asset value.  Compl. ¶¶ 77, 98.  That is the only type of 12b-1 fee assessed on Class A shares.  Compl. ¶ 77.  In lieu of the front-end sales charge paid by Class A shareholders, other share classes are charged a

---

[20]     See Inv. Co. Act Release No. 23325, 67 S.E.C. Docket 1377, 63 F.R. 40231-01, 40233 n.38 (July 22, 1998) ("The [ICA] does not require that shareholders annually elect directors.  Most open-end funds are organized in states that do not require annual shareholder meetings.  [citing MD. CODE ANN., CORPS. & ASS'NS § 2-501(b) (1993) and other applicable state law provisions.]").  See generally 15 U.S.C. § 80a-16(a).  If anything, allegations that the directors enjoy what amounts to lifetime tenure underscore their independence.

[21]     See, e.g., Compl. ¶¶ 41, 77-80.  The Fund's Class Y institutional shares do not pay 12b-1 fees.  This comports with prevailing industry practice.  See generally SEC Division of Investment Management, Report on Mutual Fund Fees and Expenses, Dec. 2000, available at http://www.sec.gov/news/studies/feestudy.htm (Decl. Ex. C) at 20.

distribution fee, which is .75% of net assets for Class B and C shares.  Compl. ¶¶ 79, 105.

Plaintiff, a Class A shareholder, Compl. ¶¶ 25, 29, purports to challenge all 12b-1 fees paid by all of the Fund's share classes.  The themes of plaintiff's lengthy and repetitive 12b-1 fee allegations are that (1) the fees are large – large in absolute dollar terms, Compl. ¶¶ 130, large compared to the 12b-1 fees charged certain other funds, Compl. ¶¶ 310-11, and large compared to the Fund's advisory fees and to the advisory fees charged by other funds, Compl. ¶¶ 288-95; (2) shareholders allegedly received an immaterial benefit from the 12b-1 fees because the fees exceeded the Fund's savings from the advisory fee breakpoints discussed above, Compl. ¶¶ 244-55; and (3) it was impermissible, or at least bad business judgment, for the Fund's directors to approve the Fund's 12b-1 plans (and the Fund should have been closed to new investors) because larger funds often do not perform as well as smaller funds, Compl. ¶¶ 262-74, and the Fund has no current problem with respect to net redemptions.  Compl. ¶ 339.[22]

## A.   Plaintiff Lacks Standing to Challenge 12b-1 Fees Other than the Service Charge That is Assessed on Class A Shares

Plaintiff's claim that defendants received excessive Rule 12b-1 fees must be dismissed on Article III standing grounds except insofar as the Complaint attempts to state a claim based on the .25% service fee that is the only 12b-1 fee assessed on the Class A

---

[22]   Some allegations border on the nonsensical.   Paragraphs 215-22 imagine a shareholder who owns shares of multiple Davis Funds and consequently is charged "three times" for the same service.  Compl. ¶ 216.  This hypothetical is baffling.  If someone invests $1 each in three funds with identical 12b-1 fees, the same amount of 12b-1 fees is assessed on his shares as if he invested $3 in any one of the funds.

shares that plaintiff allegedly owns.  Compl. ¶¶ 25, 29, 77.

Plaintiff (who allegedly holds only Class A shares, Compl. ¶¶ 25, 29) lacks the requisite direct or indirect financial interest in the outcome of litigation relating to 12b-1 fees other than the 0.25% service fee.[23] As the Supreme Court made clear in the analogous context of the derivative right of action afforded by § 16(b) of the Securities Exchange Act of 1934, a statute such as § 36(b) must not be construed in a manner inconsistent with the fundamental requirements of Article III, including that a plaintiff have at least an indirect financial stake in this type of litigation.  See Gollust v. Mendell, 501 U.S. 115, 125-26 (1991) (in light of Article III, "Congress must . . . have assumed any plaintiff would maintain some continuing financial stake in the litigation," id. at 125); cf. In re Mutual Funds Inv. Litig., 519 F. Supp. 2d 580, 588 n.11 (D. Md. 2007).

**B.      Plaintiff Has Not Alleged Disproportionality Between the Fund's 12b-1 Fees and the Services Provided for Those Fees**

**1.      Plaintiff Must Allege Disproportionality**

If (contrary to the analysis in Section III.E. below) § 36(b) can be used to attack 12b-1 fees, a plaintiff seeking to do so must state a claim that the distribution fee received by a fund distributor is disproportionate to the distribution services rendered.  See, e.g., Yameen v. Eaton Vance Distribs., Inc., 394 F. Supp. 2d 350, 358 (D. Mass. 2005)

---

[23]      For example, assuming *arguendo* that the .75% 12b-1 fee distribution assessed on Class B shares were found to violate § 36(b), the result would be a return of the amount deemed to be excessive, which would accrue only to the benefit of Class B shareholders. See generally 17 C.F.R. §270.18f-3(a) (2009).

(dismissing complaint that failed to allege "that the distribution fees are disproportionate and unrelated to the sales-related services actually provided") (citation and internal quotation marks omitted); ING Principal Prot. Funds Derivative Litig., 369 F. Supp. 2d 163, 169 (D. Mass. 2005).

Conversely, courts have repeatedly held that § 36(b) does not encompass a claim that a 12b-1 plan is of insufficient or no benefit to the fund due to supposed failures to achieve economies of scale or otherwise.  See, e.g., Bellikoff v. Eaton Vance Corp., 481 F.3d 110 (2d Cir. 2007) (noting same allegation that "the benefits of certain 'economies of scale' were not passed along to shareholders," id. at 114, but rejecting § 36(b) claim based on 12b-1 fees because "one must allege excessive fees, rather than fees that might simply be described as 'improper'" and "the complaint must specifically allege that the fees were so disproportionately large that they bore no relationship to the services rendered" id. at 118); Yameen, 394 F. Supp. 2d at 358 (dismissing § 36(b) action alleging that fund closed to new investors could not achieve further economies of scale).[24]

### 2.    Plaintiff Does Not Allege Disproportionality

Plaintiff does not claim that the Fund's 12b-1 fees were not actually used to distribute the Fund or to provide services to the Fund's shareholders.

To the contrary, with respect to service fees, plaintiff expressly alleges that the

---

[24]    See also Alexander v. Allianz Dresdner Asset Mgmt. of America Holding, Inc., 509 F. Supp. 2d 190, 195-96 (D. Conn. 2007); ING Principal Prot. Funds Derivative Litig., 369 F. Supp. 2d 163, 168-69 (D. Mass. 2005); Amron, 464 F.3d at 344-45.

Fund pays the .25% of net assets to "[Distributors], which pays most of the service fee to broker-dealers for service related expenses." Compl. ¶ 78. See also Compl. ¶ 16 (12b-1 fees "financed shareholder services provided by broker-dealers"); Compl. ¶¶ 101-04, 123-24. These allegations generally comport with the Fund's disclosure documents.[25]

Accordingly, in this case as in Yameen:

> Plaintiff does not dispute that the Fund charged a 0.25% service fee to provide ongoing personal services, such as shareholder assistance, in accordance with NASD Rule 2830 . . .   It follows that the portion of [his] claim relating to the 0.25% service fee must be dismissed.

394 F. Supp. 2d at 355-56 n.5. See also ING, 369 F. Supp. 2d at 169 (similar); Amron, 464 F.3d at 344-45 (approving treatment of 12b-1 fees as a "'wash,' offset by the cost of payments to personnel") (internal citation omitted).

Similarly, with respect to the 0.75% fee assessed on Class B and Class C shares, plaintiff acknowledges that the fees were assessed to reimburse Distributors for commissions paid to unaffiliated third-party broker-dealers who sold Fund shares. See, e.g., Compl. ¶ 79 ("the distribution fee[] is mainly used to finance payments to dealers

---

[25]   See, e.g., Davis New York Venture Fund Prospectus (December 1, 2008) (Decl. Ex. H) at 15; Davis New York Venture Fund SAI (December 1, 2008) (Decl. Ex. G) at 47. The SAI additionally notes that "[p]ayments under the Class A Distribution Plan also may be used to reimburse the Distributor for other distribution costs (excluding overhead) not covered in any year by any portion of the sales charges the Distributor retains." Id. Based perhaps on this disclosure, the Complaint alleges in conclusory fashion that "[Distributors] retains for its own account a portion of the service fees from all classes of the Fund's shares." Compl. ¶ 80. As the SAI makes clear, however, any such amounts as described in the last sentence of the excerpt were to "reimburse" Distributors for actual distribution costs, "excluding overhead." Plaintiff makes no effort to plead that any such portion of the service fee is disproportionate to the service rendered in return for the fee.

primarily as commissions to compensate the individual stockbrokers for their sales activities."); Compl. ¶¶ 105.[26]

The Complaint obfuscates in one respect relevant here.  Based on a "back-of-the-envelope" calculation, Compl. ¶ 205, plaintiff hypothesizes that, at some point in the future, Distributors may profit from the 12b-1 fees.  Such speculation is irrelevant.  As plaintiff knows, Distributors' actual expenses in selling Fund shares (i.e., its payments of dealer's commissions) have substantially exceeded the amount it has collected from the 12b-1 plans.[27]  As the Complaint acknowledges, the deficit is reflected in a "carryover payment" that Distributors intends to recoup from the Fund with interest in future years. See Davis New York Venture Fund SAI (December 1, 2008) at 48; Compl. ¶¶ 248, 398.

Similar arrangements were validated in ING and Yameen.  ING, 369 F. Supp. 2d at 169 ("Rule 12b-1 permits fund-advisory firms to recover certain sales-related expenses previously paid out when distributing the fund's shares.  Compensation for past distribution services are considered payments made 'in connection with' the distribution

---

[26]    Plaintiff criticizes the wide industry practice of using 12b-1 fees to compensate unaffiliated broker-dealers for maintaining mutual fund "supermarkets" on their websites. Compl. ¶¶ 108-17.  Plaintiff's supermarket allegations cannot bolster his § 36(b) claim because defendants are not alleged to have received the payments for maintenance of the supermarket websites. See Pfeiffer, supra.

[27]    Davis New York Venture Fund SAI (December 1, 2008) (Decl. Ex. G) at 48.  The payments under the Fund's Class B and Class C distribution plans allow investors to buy shares without a front-end sales charge.  Davis New York Venture Fund SAI (December 1, 2008) (Decl. Ex. G) at 47-48.  Distributors advances the compensation to dealers that sell those shares.  Id.  Through the Distribution Plan, the Fund reimburses Distributors for such payments.  Id. at 48.

of a fund's shares.") (footnotes omitted); <u>Yameen</u>, 394 F. Supp. 2d at 357 ("Rule 12b-1 . .

. allow[s] mutual funds to compensate companies for past distribution services.").

### C.   Plaintiff and the Funds Received a Legally Sufficient Benefit

Plaintiff's "no benefit" theory fails even on its own legally erroneous terms. The

Fund's 12b-1 plans (like many others) facilitate investor choice, and enable investors to

fully or partially pay for the advice and assistance of a broker or other financial adviser

indirectly and over time (through a charge levied against an investor's fund shares).  <u>See,</u>

<u>e.g.,</u> <u>Yameen</u>, 394 F. Supp. 2d at 354 (recognizing that Rule 12b-1 effectively allows

investors in mutual funds "to choose between paying distribution and service charges up

front and spreading them out over a period of several years").  Plaintiff has not – and

indeed, cannot – allege adequately the 12b-1 fees did not benefit Fund shareholders.

### D.   Plaintiff's Disagreement with the Directors' Decision to Approve the 12b-1 Plans Does Not State a § 36(b) Claim

A 12b-1 plan must be renewed annually by a vote of the independent directors.

<u>See</u> Rule 12b-1(b)(3)(i), (b)(2).  It may be continued if the directors reach the business

judgment that the plan likely will benefit the fund and its shareholders.  <u>See</u> Rule 12b-

1(e).

Plaintiff disagrees with the board's judgment.  He opines that the 12b-1 plans were

not necessary to deal with net redemptions, and speculates that the Fund would have

performed better had it been smaller.  Compl. ¶¶ 262-74, ¶ 339.  Plaintiff additionally

offers that he would have closed the Fund to new investors.  Compl. ¶ 261.

Such assaults on the independent trustees' business judgment are not cognizable under § 36(b).  To the extent they may be brought at all, plaintiff must seek redress for his supposed grievances through a shareholder derivative action subject to state law demand requirements and Fed. R. Civ. P 23.1.  See Migdal, 248 F.3d at 329 ("if this claim for general breach of fiduciary duty is to be brought, it must be done under some other section of the ICA [besides § 36(b)], or alternatively under state law"); Green v. Nuveen Advisory Corp., 295 F.3d 738, 744 n.9 (7th Cir. 2002) ("fund mismanagement issues" are not "within the purview" of Section 36(b)).

### E.     Rule 12b-1 Fees Are Outside the Ambit of § 36(b)

The 12b-1 fee claim must be dismissed for the additional reason that § 22(b) and the regulations thereunder – not § 36(b) – govern the permissible amount of the fees.

Congress enacted § 36(b) in 1970 to impose a judicially enforced outer limit on advisory fees.  See ICA Amendments Act of 1970, Pub. L. No. 91-547, 84 Stat. 1413.  Section 22(b), enacted contemporaneously, contemplates that excessive mutual fund sales charges would be defined and prohibited by the National Association of Securities Dealers, Inc. ("NASD") (now known as the Financial Industry Regulatory Authority ("FINRA")), subject to SEC supervision.  See 15 U.S.C. § 22(b) (NASD authorized to strike a balance between prohibiting "excessive" sales charges and "allow[ing] for reasonable compensation for sales personnel, broker-dealers, and underwriters").  And § 22(b) trumps any inconsistent provision of the ICA.  15 U.S.C. § 80a-22(b)(3).  The only mutual fund sales charges extant in 1970 were sales loads paid directly by investors,

which were and are expressly excluded from § 36(b). <u>See</u> 15 U.S.C. § 80a-35(b)(4).

Rule 12b-1 fees are properly treated as "sales loads" exempt from § 36(b) under § 36(b)(4).  In 1992, exercising its authority pursuant to § 22(b) and recognizing that "12b-1 fees generally serve as the functional equivalent of traditional front-end sales charges," Inv. Co. Act Release No. 34-30897, 57 Fed. Reg. 30,985, 30,988 (July 7, 1992), the SEC approved NASD Rule 2830, which limits the amount and permissible purposes of 12b-1 fees.  <u>See</u> <u>Yameen</u>, 394 F. Supp. 2d at 353-55 (reviewing regulatory framework, including authorization for separate service and distribution fees).  The SEC found that sales charges consistent with Rule 2830 are reasonable and that the Rule appropriately balances investor protection and the economic health of the securities industry.[28]

Plaintiff concedes that the Fund's 12b-1 fees complied with Rule 2830.  Compl. ¶¶ 285-86.  Accordingly, the Fund's 12b-1 fees cannot be legally excessive under § 36(b).[29]  Indeed, § 36(b)(4) expressly exempts from § 36(b) "sales loads" and "payments made in

---

[28]   <u>See, e.g.</u>, Exch. Act Release No. 34-30895, 57 Fed. Reg. 30,985, 30,989 (July 7, 1992) (Rule 2830 "carries out the NASD's congressional mandate to prevent excessive sales charges on mutual fund shares" and "appropriately balances the need to ensure that the NASD's rules allow broker-dealers, sales personnel and underwriters to receive reasonable compensation, against the need to ensure that investors are charged reasonable sales loads.").  Notwithstanding plaintiff's frivolous assertion that "broker-dealers [are] legally obligated to provide [services] to Fund shareholders without payment," Compl. ¶ 16; <u>see also</u> Compl. ¶¶ 123-27, Rule 12b-1 and Rule 2830 establish the system through which broker-dealers are compensated by mutual funds.

[29]   <u>Cf.</u> <u>Gordon v. NYSE, Inc.</u>, 422 U.S. 659, 688-89 (1975) (private antitrust suits preempted based on the fixed commission rates that prevailed in 1970; allowing a private antitrust remedy "would conflict with the operation of the regulatory scheme which specifically authorize[d] the SEC to oversee the fixing of commission rates").

connection with transactions subject to[30] [ICA § 17] or [the] rule . . . thereunder." 15 U.S.C. § 80a-35(b)(4).   12b-1 fees clearly so qualify because payments under contracts with fund distributors are specifically addressed and regulated by Rule 17d-3, which incorporates the constraints of Rule 12b-1.[31]

## CONCLUSION

The Complaint should be dismissed with prejudice.

RESPECTFULLY SUBMITTED this 22d day of June, 2009.

K&L GATES LLP


By:      /s/ Stephen G. Topetzes
         Stephen G. Topetzes
         Nicole A. Baker
         1601 K Street, N.W.
         Washington, D.C.  20006

         - and -

         Shannon L. Giles
         Quarles & Brady LLP
         One South Church Avenue
         Suite 1700
         Tucson, AZ  85701


         *Counsel for Defendants Davis Selected
         Advisers, L.P and Davis Distributors, LLC*

---

[30]     In this context, "subject to" is synonymous with "governed by."  United States ex rel. Totten v. Bombardier Corp. and Envirovac, Inc., 286 F.3d 542, 547 (D.C. Cir. 2002).

[31]     See 12b-1 Adopting Release, 45 Fed. Reg. 73,898, at 73,898 (Nov. 7, 1980); id. at 73,901 n.48 ("The [SEC] is exercising its authority under section 17(d) to permit arrangements for use of fund assets for distribution which involve covered joint transactions only if such arrangements comply with Rule 12b-1.").

CERTIFICATE OF SERVICE

I hereby certify that on the 22d day of June, 2009, I electronically submitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing for the following CM/ECF registrants:  Francis J. Balint, Jr. fbalint@bffb.com; Daniel W. Krasner, Krasner@whafh.com; and Robert B. Weintraub, Weintraub@whafh.com.

/s/ Stephen G. Topetzes
K&L GATES LLP
1601 K Street, NW
Washington, DC  20006
202-778-9000
202-778-9100 (fax)