Francis J. Balint, Jr.  (007669)
BONNETT FAIRBOURN FRIEDMAN
 & BALINT, P.C.
2901 North Central Avenue, Suite 1000
Phoenix, Arizona 85012
Telephone:  602/274-1100
Facsimile:  602/274-1199
*Local Counsel for Plaintiff*

Daniel W. Krasner  (*Admitted Pro Hac Vice*)
Krasner@whafh.com
Robert B. Weintraub  (*Admitted Pro Hac Vice*)
Weintraub@whafh.com
WOLF HALDENSTEIN ADLER
  FREEMAN & HERZ LLP
270 Madison Avenue
New York, New York 10016
Telephone:  212/545-4600
Facsimile:  212/545-4653
*Lead Counsel for Plaintiff on behalf of
the Davis New York Venture Fund*

## UNITED STATES DISTRICT COURT
### DISTRICT OF ARIZONA
### TUCSON DIVISION

| | |
|---|---|
| Donald Turner, on behalf of the Davis New York Venture Fund,<br><br>　　　　Plaintiff,<br><br>　　vs.<br><br>Davis Selected Advisers, L.P. and Davis Distributors, LLC,<br><br>　　　　Defendants. | NO. 4:08-cv-00421-JMR<br><br>**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT**<br><br>ORAL ARGUMENT REQUESTED |

1

# TABLE OF CONTENTS

2                                                                                         PAGE NOS.

3   TABLE OF AUTHORITIES ..................................................................................... iii

4   I.     PRELIMINARY STATEMENT ............................................................... - 1 -

5
    II.    CASE SUMMARY ................................................................................. - 1 -
6

7   III.   ARGUMENT ........................................................................................... - 3 -

8          A.     Plaintiff Has Sufficiently Pled that Defendants' 12b-1 Fees and
                  Advisory Fees Each Were Excessive and Disproportionate Under
9                 ICA § 36(b) .................................................................................. - 3 -

10
           B.     The Amended Complaint's Allegations Are Adequate under
11                Gartenberg ................................................................................... - 6 -

12                1.     The Amended Complaint Expressly Alleges
                         "Disproportionality" ......................................................... - 6 -
13

14                2.     The Amended Complaint Sufficiently Articulates the
                         Gartenberg Factors .......................................................... - 10 -
15

16                       a)    The Nature and Quality of the Services Provided ............. - 11 -

17                       b)    The Profitability of the Mutual Fund to the Advisor –
                               Manager ........................................................................... - 14 -
18

19                       c)    Defendants Received Substantial Fall-Out Benefits .......... - 15 -

20                       d)    Any Economies of Scale Benefitted Only Defendants
                               and Not the Fund and Its Shareholders ............................. - 16 -
21

22                       e)    The Fund's Fee Structure Is Excessive and
                               Disproportionate in Comparison With Other
23                             Similar Funds .................................................................. - 18 -

24                       f)    The Fund's Directors Were Not Independent or
                               Conscientious .................................................................. - 19 -
25

26         C.     Plaintiff May Assert Claims With Respect to the 12b-1 Fees
                  Paid By All Classes of the Fund .................................................. - 22 -
27

28

i

D.   ICA Section 36(b) Applies to Violations of ICA §12 and Rule 12b-1 ........................................................................... - 24 -

E.   Plaintiff's Advisory Fee Claim Is Not Almost Entirely Time Barred By the Statute of Limitations.......................................... - 26 -

   1.   The Statutory Language of Section 36(b) Itself Governs the Beginning of the Damages Period........................... - 27 -

   2.   Even if the Relation Back Doctrine Is Applicable, the Advisory Fee Claim Relates Back to the 12b-1 Fee Claim .......... - 28 -

   3.   Plaintiff May Recover Damages On Behalf of the Fund Through the End of the Case, Including Through the Time of Trial ........................................................ - 31 -

F.   The Sections 48(a) and 47(b) Claims Sufficiently State Causes of Action ........................................................................ - 33 -

IV.   CONCLUSION ................................................................... - 36 -

ii

1
2

# TABLE OF AUTHORITIES

3

<u>CASES</u>                                                           <u>PAGE NOS.</u>

4
5
*In re American Funds Fees Litigations*, (a/k/a *Nicholas J. Corbi*
  *et al. v. The Capital Group Companies Inc. et al.*)
  Master File CV 04-5593 (GAF) (C.D. Cal.),
6
  2005 U.S. Dist. LEXIS 41884 (C.D. Cal. Dec. 16, 2005) ................................. 2, 6, 21n
7
  2007 U.S. Dist. LEXIS 8276 (C.D. Cal. Jan. 18, 2007) ...................................... 2, 6, 21n

8
*Amron v. Morgan Stanley Investment Advisors, Inc.*,
9
  464 F.3d 338 (2d Cir. 2006) ............................................................................. 18

10
*Bensel v. Allied Pilots Association*,
11
  387 F.3d 298 (3d Cir. 2004) ............................................................................. 29

12
*Brever v. Federated Equity Management Company of Pennsylvania*,
13
  233 F.R.D. 429 (W.D. Pa. 2005) ...................................................................... 31

14
*Cassirer v. Kingdom of Spain*,
15
  06 Civ. 56325, 2009 WL 2857188 (9th Cir. Sept. 8, 2009) ............................. 31

16
*Daily Income Fund, Inc. v. Fox*,
17
  464 U.S. 523 (1984) .......................................................................................... 35

18
*Diehl v. Twin Disc, Inc.*,
  No. 94-C-50031, 1995 U.S. Dist. LEXIS 7569 (N.D. Ill. May 30, 1995) .................... 23
19

20
*In re Dreyfus Mutual Funds Fee Litigation*
21
  428 F. Supp. 2d 342 (W.D. Pa. 2005),
  *judgment on the pleadings in defendants' favor on other grounds,*
22
  428 F. Supp. 2d 357 (W.D. Pa. 2006) .............................................................. 35

23
*Dumond v. Massachusetts Financial Services Co.*,
24
  04 Civ. 11458, 2007 WL 602589 (D. Mass. Feb. 22, 2007) ........................... 32

25
*Eisenberg v. Gagnon*,
26
  766 F.2d 770 (3d Cir. 1985) ............................................................................. 24

27
*Erickson v. Pardus*,
28
  551 U.S. 89 (2007) ............................................................................................ 10

iii

1

*In re Evergreen Mutual Funds Fee Litigation,*
  423 F. Supp. 2d 342 (S.D.N.Y. 2006) ........................................................................ 34

*Forsythe v. Sun Life Financial, Inc.,*
  417 F. Supp. 2d 100 (D. Mass. 2006) ........................................................................ 28

*In re Franklin Mutual Funds Fee Litigation,*
  388 F. Supp. 2d 451 (D.N.J. 2005) ...................................................................... 34, 35

*In re Franklin Mutual Funds Fee Litigation,*
  478 F. Supp. 2d 677 (D.N.J. 2007) ............................................................... 13, 18, 28

*Frietsch v. Refco Inc.,*
  No. 92 C 6844, 1994 U.S. Dist. LEXIS 312 (N.D. Ill. Jan. 12 1994) ........................... 24

*Gallus v. Ameriprise Financial, Inc.,*
  561 F.3d 816 (8th Cir. 2009) ...........................................................................*passim*

*Gartenberg v. Merrill Lynch Asset Management, Inc.,*
  694 F.2d 923 (2d Cir. 1982),
  *cert. denied,* 461 U.S. 906 (1983) ..................................................................*passim*

*Green v. Fund Asset Management, L.P.,*
  286 F.3d 682 (3d Cir. 2002) ..................................................................................... 28

*Green v. Nuveen Advisory Corp.,*
  186 F.R.D. 486 (N.D. Ill. 1999) ................................................................................ 25

*Hoxworth v. Blinder, Robinson & Co., Inc.*
  980 F.2d 912 (3d Cir. 1985) ..................................................................................... 24

*ING Principal Protection Funds Derivative Litigation,*
  369 F. Supp. 2d 163 (D. Mass. 2005) ........................................................................ 28

*Kamen v. Kemper Financial Services, Inc.,*
  500 U.S. 90 (1991).................................................................................................... 35

*Korland v. Capital Research and Mgmt. Co.,*
  CV-08-4020 (C.D. Cal. Feb. 10, 2009) ........................................................................ 6

iv

*Krinsk v. Asset Fund Management,*
  715 F. Supp. 472,
  *aff'd,* 875 F.2d 404 (2d Cir. 1989) ................................................................. 26

*Lapidus v. Hecht,*
  No. 98-3130-MMC, 2002 U.S. Dist. LEXIS 14566 (N.D. Cal. May 17, 2002) .......... 31

*Long v. Ford Motor Co.,*
  07 Civ. 2206, 2008 WL 2937751 (D. Ariz. July 23, 2008) ................................. 29, 30

*Longden v. Sunderman,*
  123 F.R.D. 547 (N.D. Tex. 1988) ................................................................. 24

*Maywalt v. Parker & Parsley Petroleum Co.,*
  147 F.R.D. 51 (S.D.N.Y. 1993) ................................................................. 23, 24

*Meyer v. Oppenheimer Management Corp.,*
  764 F.2d 76 (2d Cir. 1985) ................................................................. 25, 26

*Meyer v. Oppenheimer Management Corp.,*
  895 F.2d 861 (2d Cir. 1990) ................................................................. 26

*Migal v. Rowe Price-Fleming International, Inc.,*
  248 F.3d 321 (4th Cir. 2001) ................................................................. 13

*Millenco L.P. v. meVC Advisors, Inc.,*
  02 Civ. 142, 2002 U.S. Dist. LEXIS 19512 (D. Del. Aug. 21, 2002) ...................... 11

*In re Painewebber Limited Partnerships Litigation,*
  MDL No. 1005, 1995 U.S. Dist. LEXIS 22103 (S.D.N.Y. 1997) .......................... 23

*Oja v. United States Army Corps of Engineers,*
  233 F.R.D. 429 (W.D. Pa. 2005) ................................................................. 31

*Olesen v. Union Bank,*
  No. 73-418-T, 1976 U.S. Dist. LEXIS 15783 (S.D. Cal. Apr. 1, 1976) ...................... 24

*Pfeiffer v. Bjurman, Barry & Associates,*
  03 civ. 9741, 2004 U.S. Dist. LEXIS 16924 (S.D.N.Y. Aug. 27, 2004) ............... *passim*

*In re Prudential Securities Inc. Limited Partnership Litigation,*
  MDL No. 1005, 1995 U.S. Dist. LEXIS 22103 (S.D.N.Y. Nov. 20, 1995) ................. 23

*Roberts v. Heim,*
  670 F. Supp. 1466 (N.D. Cal. 1987) ........................................................... 24

*Salomon Smith Barney Mutual Fund Fees Litigation,*
  528 F. Supp. 2d 332 (S.D.N.Y. 2007) ........................................................ 18

*Schneider v. Traweek,*
  88 Civ. 0905, 1990 U.S. Dist. LEXIS 15596 (C.D. Cal. Aug. 7, 1990) ........................ 24

*Siemers v. Wells Fargo & Co.,*
  05 civ. 04518, 2006 U.S. Dist. LEXIS 60858 (N.D. Cal. Aug. 14, 2006) .............. 11, 26

*Tedesco v. Mishkin,*
  689 F. Supp. 1327 (S.D.N.Y. 1988) ........................................................... 23

*Wicks v. Putnam Investment Management*,
  04 Civ. 10988, 2005 U.S. Dist. LEXIS 4892 (D. Mass. Mar. 28, 2005) ...................... 11

## **STATUTES & RULES**

Federal Rules of Civil Procedure
  23.1 ........................................................................................ 35

Investment Company Act of 1940
  Section 12(b) ................................................................................ 3
  Section 22 .................................................................................. 25
  Section 34(b) ............................................................................... 34
  Section 36(b) .......................................................................... *passim*
  Section 47(b) ......................................................................... 3, 33-35
  Section 48(a) ......................................................................... 3, 33-34

NASD Rule
  2830 ....................................................................................... 25

Securities Act of 1933
  §15 ........................................................................................ 33

Securities Exchange Act of 1934
  §20(a) ..................................................................................... 32

1

SEC Rules
    Rule 12b-1 ...................................................................................................*passim*

2

    Rule 12b-1(a) .......................................................................................... 4

3

    Rule 12b-1(e) .......................................................................................... 4

4

15 U.S.C. § 80a-35(b)(3) ........................................................................... 31

5

15 U.S.C. § 80a-47(a) ................................................................................ 33

6

7

**OTHER AUTHORITIES**

8

ICA Release 16431 ..................................................................................... 25

9

Mutual Fund Fees:  Additional Disclosure Could Encourage Price Competition,
   General Accounting Office, Rpt. No. GGD-00-126 at 62 (June 2000)......................... 12

10

11

SEC Release 30,897................................................................................... 25

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## I.     PRELIMINARY STATEMENT

Plaintiff respectfully submits this memorandum of points and authorities in opposition to the motion of defendants Davis Selected Advisers, L.P. ("DSA") and Davis Distributors, LLC ("DD") (collectively "defendants") to dismiss the Amended Complaint ("AC").  Because defendants ignore the AC's well-pled allegations and assert spurious substantive and procedural arguments about the applicable statutory scheme, defendants' motion should be denied.

## II.    CASE SUMMARY

This action is brought by Donald Turner, a shareholder of the Davis New York Venture Fund (the "Fund") on behalf of the Fund.  The Fund is a mutual fund in the Davis Funds family, one of the nation's largest fund families.  The defendants are the investment adviser (DSA) and distributor (DD) of the Fund.

The AC alleges that defendants violated Section 36(b) of the Investment Company Act of 1940 ("ICA") by charging the Fund and its shareholders 12b-1 fees (under SEC Rule 12b-1)[1] and advisory fees, each of which were excessive and disproportionate and thus unlawful.

In its fiscal year 2007 alone, the Fund paid to defendants 12b-1 fees and advisory fees of more than $180 *million* and $211 *million*, respectively.  In fiscal 2008, the Fund paid to defendants 12b-1 fees and advisory fees of more than $174 *million* and $223 *million*, respectively.  In fact, in its three most recent fiscal years, 2006-2008, the Fund paid to defendants fees of more than $1.1 **billion**, at least $509 *million* in 12b-1 fees and $600 *million* in advisory fees.  AC ¶¶129 (chart), 248.

As the AC alleges, despite the Fund's enormous payments to defendants, only defendants and neither the Fund nor its shareholders benefitted from them.  The AC

---

[1] Rule 12b-1, promulgated by the SEC pursuant to the ICA, prohibits mutual funds from directly or indirectly distributing or marketing their own shares unless certain specified conditions set forth in Rule 12b-1 are met, including a limit on fees under the Rule to those "primarily intended" to result in the sale of mutual fund shares.

alleges that by charging unauthorized and excessive 12b-1 and advisory fees, defendants violated their fiduciary duties under Section 36(b) of the ICA.  Plaintiff seeks to recover, for and on behalf of the Fund, hundreds of millions of dollars in 12b-1 fees and rescission of the 12b-1 plans under ICA § 47(b) and hundreds of millions of dollars in advisory fees and rescission of the investment advisory agreement under ICA § 47(b).

Defendants incorrectly describe plaintiff's standard of proof here as a "difficult burden."  DBr. at 2.  As with almost all civil litigation in the federal courts, plaintiff's claims are governed by Rule 8 of the Federal Rules of Civil Procedure, which requires notice pleading.  To be sure, the AC meticulously alleges the facts supporting both the 12b-1 fee claim and the advisory fee claim under the applicable law, including the six factor analysis in *Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*, 694 F.2d 923 (2d Cir. 1982), *cert. denied*, 461 U.S. 906 (1983).  Defendants ignore most of the *Gartenberg* factors and do not address virtually any of the AC's factual allegations.  One additional reason defendants fail to conduct a traditional analysis is that another action that defendants have conceded is very similar to this one (*Corbi*, discussed in detail below) has proceeded to trial after surviving motions to dismiss.  That case is now under advisement after a bench trial.

While completely ignoring the well-pled allegations of the AC,[2] defendants' motion offers a series of straw man arguments, including that ICA section 36(b) does not even govern this action and that the advisory fee claim is barred by the statute of limitations.  As to the former issue, the courts that have ruled on this issue have held to

---

[2] To further deflect attention from their failure to address the *Gartenberg* analysis, and also additional SEC criteria, defendants argue that the initial complaint alleged merely a *per se* violation of the ICA and did not address the *Gartenberg* factors.  This is incorrect.  The original complaint alleged both a *per se* violation (for those activities which "were not primarily intended to result in the sale of Fund shares"), Dkt. 1, Compl. ¶¶74-85, and it extensively discussed the *Gartenberg* factors.  Compl.  ¶¶98-175.  The AC extensively addresses the *Gartenberg* factors (yet preserves the per se argument with respect to a defined category of activities financed by 12b-1 fees.  See AC ¶332 n.3).

1    the contrary.  Concerning the latter, section 36(b) governs the relevant period for the

2    advisory fee claim, not the Fed. R. Civ. P.  Moreover, if the relation back doctrine is

3    applicable here, it saves the advisory fee claim because that claim and the 12b-1 claim

4    arise out of a common core of operative facts.  On the other hand, even if the relation

5    back doctrine does not save the advisory fee claim, that simply means the advisory fee

6    claim damage period begins one year prior to the filing of the AC (which first contained

7    the advisory fee claim) while the 12b-1 fee claim damage period begins earlier, one year

8    prior to the filing of the original complaint, which contained only the 12b-1 claim.  In

9    addition, contrary to defendants' illogical argument, damages on both claims continue to

10   the close of the action including trial.

11          Finally, defendants assert that the "control person" and rescission claims under

12   ICA Sections 48(a) and 47(b) fail as a matter of law.  That, too, is incorrect.  Under what

13   plaintiff submits respectfully is better reasoned case law, a §48(a) claim survives when a

14   primary claim under §36(b) is properly alleged.  With respect to the 47(b) rescission

15   claim, defendants raise a straw man, asserting that such claim may be enforced only by a

16   mutual fund itself (and not a shareholder of the fund), but then incorrectly claim that this

17   action, brought by a shareholder of the Fund on behalf of the Fund itself (not brought, as

18   is a class action, on behalf of the individual shareholders), may not assert rescission.

19   **III.    ARGUMENT**

20          **A.    Plaintiff Has Sufficiently Pled that Defendants' 12b-1 Fees and Advisory
21                  Fees Each Were Excessive and Disproportionate Under ICA § 36(b)**

22          Before the SEC's adoption of Rule 12b-1 in 1980, it was unlawful under Section

23   12(b) of the ICA for a mutual fund to "to act as a distributor of securities of which it

24   [wa]s the issuer."  This prohibition was premised on the inherent conflicts in the

25   operation of a mutual fund.  The SEC had recognized these conflicts, stating that

26   "[m]utual funds are unique . . . in that they are 'organized and operated by people whose

27   primary loyalty and pecuniary interest lie outside the enterprise.'"  AC ¶¶81-84.

28

1    In 1978, the SEC announced an "advance notice of proposed rulemaking"

2  concerning whether mutual funds should be permitted to use shareholder "assets to pay

3  expenses incurred in connection with the distribution of their shares."  The SEC proposed

4  the Rule 12b-1 exception for a number of reasons:  a decrease in the net dollars invested

5  and lack of growth in the mutual fund industry,[3] as well as the desire to increase sales of

6  mutual fund shares to achieve perceived benefits to investors, including that there might

7  be economies of scale as the size of funds increased.  AC ¶¶85-88.

8    Rule 12b-1(a)(1) states in relevant part that, "it shall be unlawful for any registered

9  open-end management investment company … to act as a distributor of securities of

10  which it is the issuer, except through an underwriter."  Subsection (2) provides a limited

11  exception "if [the company] engages directly or indirectly in financing any activity which

12  is *primarily intended to result in the sale of shares issued by such company,* including,

13  but not necessarily limited to, advertising, compensation of underwriters, dealers, and

14  sales personnel, the printing and mailing of prospectuses to other than current

15  shareholders, and the printing and mailing of sales literature."  (Emphasis added.)

16    Subsection (e) of Rule 12b-1 provides that the approval or continuation of a 12b-1

17  plan is subject to the fiduciary duties set forth in ICA Section 36(b).  Section 36(b) of the

18  ICA states, in part, that "the investment adviser of a registered investment company shall

19  be deemed to have a fiduciary duty with respect to the receipt of compensation for

20  services, or of payments of a material nature, paid by such registered investment

21  company, or by the security holders thereof, to such investment adviser or any affiliated

22  person of such investment adviser."  The provision further states explicitly that a security

23  holder of such registered investment company may bring an action on behalf of such

24

25  _____

    [3] At the time Rule 12b-1 was adopted in 1980, the mutual fund industry had experienced
26  net redemptions from 1973 – 1979, inclusive, in equity, hybrid and bond mutual funds.  In
    1972, the industry had $60 *billion* in assets, and in 1979 it had $49 *billion* in assets, in
27  equity, hybrid and bond funds.  AC ¶¶86-88.

28

- 4 -

1    company, against such investment adviser, or any affiliated person of such investment

2    adviser, for breach of fiduciary duty in respect of such compensation.  As shown below,

3    the AC clearly states a claim under Section 36(b) for the defendants' 12b-1 fees.

4           Defendants in their motion ignore the *Gartenberg*, 694 F.2d 923 (2d Cir. 1982),

5    *cert. denied*, 461 U.S. 906 (1983), and *Gallus v. Ameriprise Fin., Inc.*, 561 F.3d 816 (8th

6    Cir. 2009), decisions and their progeny.  These decisions clearly hold that ICA section

7    36(b) is the applicable statute under which to assess 12b-1 fees and that defendants'

8    contention that the 12b-1 fees in question here are *per se* lawful under other regulations is

9    wholly incorrect.  Indeed, despite the fact that the AC contains allegations with respect to

10    all six *Gartenberg* factors, in the section of their brief concerning defendants' 12b-1 fees,

11    defendants do not analyze *any* of the six *Gartenberg* factors or the *Gallus* decision.

12           Likewise, virtually all of the AC's factual allegations and analysis concerning the

13    12b-1 fee claim are equally applicable to the advisory fee claim.  Therefore, the AC

14    expressly incorporates by reference all of the factual allegations concerning the 12b-1

15    claim into its advisory fee section, and then in the advisory fee section itself merely

16    summarizes some of the facts from the 12b-1 fee section.  AC ¶¶345-48.  Nevertheless,

17    concerning the advisory fee claim, defendants' brief completely ignores the facts detailed

18    in the 12b-1 section of the AC and pretends those facts do not exist and were not

19    expressly incorporated into the advisory fee claim.

20           Thus, defendants are left to concoct new "issues."  Defendants invoke the term

21    "disproportionality" almost as a mantra, and then repeatedly claim that plaintiff has not

22    alleged disproportionality between the Fund's 12b-1 fees and the services provided for

23    those fees – despite the fact that plaintiff expressly has alleged that the 12b-1 fees were

24    "excessive and disproportionate," and detailed in the AC the facts upon which that

25    allegation was based.

26           The sufficiency of the complaint is nowhere more cogently demonstrated than in a

27    telling omission from defendants' current motion.  Having submitted as supplemental

28    authority in their original motion to dismiss here (Dkt. 30) a decision in one of a series of

related cases concerning the American Funds family of funds proceeding before the United States District Court for the Central District of California, *Korland v. Capital Research and Mgmt. Co.*, CV-08-4020 (C.D. Cal. Feb. 10, 2009) ("*Korland*"), defendants neglect to bring the current status of *Korland* to this Court's attention on this second motion.  This is not surprising, given that the *Korland* complaint has been amended to more closely follow one of the earlier, and more developed, American Funds cases before the same court, *In re American Funds Fees Litigations*, Master File CV 04-5593 (GAF) (RNBx) (C.D. Cal.) (a/k/a *Nicholas J. Corbi et al. v. The Capital Group Companies Inc. et al.*) ("*Corbi*").  In *Corbi*, motions to dismiss were denied, discovery was completed and the case has proceeded through a bench trial (currently submitted to the Court).  Dkt. 47; *Corbi*, 2005 U.S. Dist. LEXIS 41884 (Dec. 16, 2005); *Corbi*, 2007 U.S. Dist. LEXIS 8276 (Jan. 17, 2007); *Corbi* Dkts. 247, 535.  *Corbi* and *Korland*, too, were brought under ICA Section 36(b), both alleging that the 12b-1 fees and advisory fees assessed against those mutual funds in the American Funds family were excessive and disproportionate.

The *Korland* court had granted a motion to dismiss concerning the EuroPacific Growth Fund, Dkt. 30-2, but the plaintiff amended to more closely follow the complaint in *Corbi*.  *Korland* Dkt. 52.  The AC here is essentially identical to *Corbi,* which just went to trial.  Defendants acknowledge that the "principal claims [here] are similar" to those in *Corbi*.  Dkt. 47.  *Korland* similarly was a related case to *Corbi*, was transferred to the same judge assigned to *Corbi* (*Korland* Dkt. 8, Unopposed Notice of Related Case and Request for Transfer), and is now awaiting a decision in the *Corbi* bench trial.

Consequently, since *Corbi*, the *Korland* amended complaint and the AC all have very similar claims under the same statute, and *Corbi* proceeded to trial, this motion to dismiss the AC should be in all respects denied and discovery should proceed so that this case as well may proceed to trial.

**B.**      **The Amended Complaint's Allegations Are Adequate under *Gartenberg***

       **1.**      **The Amended Complaint Expressly Alleges "Disproportionality"**

Defendants assert that a plaintiff must allege "disproportionality:"  that the 12b-1

1   fees (and advisory fees) must be disproportionate to the services rendered.  DBr. at 21-22.

2   Defendants then incorrectly define "disproportionality" by stating that "plaintiff does not

3   claim that the Fund's 12b-1 fees were not actually used to distribute the Fund or to

4   provide services to the Fund's shareholders." *Id*.  Defendants then make the absolutely

5   ridiculous assertion that "plaintiff does not allege disproportionality." *Id*.

6          The issue is not whether the 12b-1 fees and advisory fees defendants charged the

7   Fund and its shareholders were used to distribute the Fund or to provide services to the

8   Fund and its shareholders (which, literally, was the case).  Rather, as detailed below, the

9   issue is whether those fees – almost $200 million dollars per year each in 12b-1 and

10  advisory fees -- were disproportionately large in relation to the services rendered as to

11  constitute a breach of fiduciary duty.  Plaintiff has sufficiently alleged in great detail why

12  the 12b-1 and advisory fees are "excessive and disproportionate" and, hence, unlawful.

13         Defendants falsely assert that plaintiff does not allege disproportionality.  The AC

14  contains the threshold allegation (AC ¶3) that [t]his action seeks to recover for the Fund

15  "excessive and disproportionate" 12b-1 fees and investment advisory fees paid by the

16  Fund.  It repeats that allegation in at least 26 additional paragraphs (not counting more

17  than a half dozen headings).  AC ¶¶16-18, 95, 117, 127, 197, 203, 220-21, 276, 288, 331,

18  332, 345, 357-58, 380, 382, 384, 389, 394, 397-98, 406-07.  In every instance, the

19  "excessive and disproportionate" allegation is either preceded by or followed by

20  extensive, multiple paragraphs alleging facts supporting the claim that the fees were

21  "excessive and disproportionate."  Defendants ignore these factual allegations and put the

22  burden on plaintiff to address the detailed facts, ignored by defendants, within the page

23  limit.

24         To cite just one example, paragraph 16 of the AC summarizes the

25  disproportionality allegations of the AC concerning 12b-1 fees as follows:

26              The 12b-1 fees which defendants charged the Fund and its shareholders
27          were excessive and disproportionate because, among other things: (1) the fees
            financed shareholder services provided by broker-dealers, but which the broker-
28          dealers were legally obligated to provide to Fund shareholders without payment;

(2) the fees grew the Fund, which created economies of scale for defendants, but those economies of scale were not (or were not in material part) passed on to the Fund and its shareholders; (3) the fees grew the Fund, but given the already very large size of the Fund, the Fund's growth inhibited its performance and eventually converted the Fund into an index fund with excessively high fees and expenses; (4) the fees were higher than those of comparable funds, in both absolute terms and with regard to the fact that the Fund acted more as an index fund; (5) defendants had the Fund pay broker-dealers multiple times for providing the same service to a customer when the broker provided the service only once for that customer (based upon charging each Fund class for a service which is performed only once for all classes combined or charging customers who own multiple funds in the Davis Funds family multiple times for one monthly account statement); and (6) the fees financed commissions to brokers which were materially larger than necessary to act as an incentive to sell Fund shares.  AC ¶16.

Similarly, AC paragraphs 18 and 20 summarize the claim that the advisory fees were "excessive and disproportionate" (although defendants do not contend that plaintiff has failed to allege disproportionality concerning the advisory fee claim).

Each of the above allegations, among others, is addressed at length under the following headings in the AC, which are applicable to both the 12b-1 and advisory fee claims and which correspond to the six *Gartenberg* criteria:

A.  The Nature and Quality of the Services Provided By the Adviser to the Shareholders, including:  (1) The Fund Paid For the Maintenance of Mutual Fund Supermarkets on Broker-Dealer Websites When the Brokerage Firms Had a Material Incentive to Maintain the Websites at Their Own Expense, AC ¶¶108-17; (2) The 12b-1 Fees Charged By Defendants Were Almost as Large as the Advisory Fees Charged By Defendants, AC ¶¶118-22; (3) The Fund Paid For Services Which the Broker-Dealers Were Legally Obligated to Provide in Any Event, AC ¶¶123-27.

B.  The Fund Was Excessively Profitable to the Advisor-Manager, including:  (1) The Size of the 12b-1 Fees and the Advisory Fees Increased at A Rate Which Was Out of Proportion to the Increase in Fund Assets, AC ¶¶129-38; (2) The Amount of the 12b-1 Fees and Advisory Fees Charged By Defendants Were Disproportionate and Excessive in Comparison to the Fees Charged By Other Funds, AC ¶¶139-97.

C.  The Defendants Received Substantial Fall-Out Benefits, including:  (1) The Marginal Annual Increase in Advisory Fees Constituted Disproportionate and Excessive Fall-Out Benefits Based Upon the Excessive and Unlawful 12b-1 Fees,

AC ¶¶198-206; (2) Fund Shareholders Paid Excessive and Disproportionate 12b-1 Fees Based Upon the Existence of Multiple Classes of the Fund and Multiple Funds Within the Davis Funds Family, Each of Which Paid for the Same Service Although the Service Was Undivided and Performed Only Once, AC ¶¶207-222; (3) Transfer Agent Fees Also Constitute Fall-out Benefits, AC ¶¶223-26.

D.   There Were Economies of Scale Achieved and Such Savings Were Not Passed on to Shareholders, including:  (1) Economies of Scale Were Not Passed on to the Fund and Its Shareholders, AC ¶¶227-33; (2) The Fund's 12b-1 Fees and Advisory Fees Increased at the Same Rate or Faster Than Its Net Assets, AC ¶¶234-43; (3) The Fund's Investment Advisory Fee Breakpoints Did Not Confer a Material Benefit Upon Shareholders With Respect to the 12b-1 Fees Paid By Them, AC ¶¶244-55; (4) The Extraordinary Increase in the Size Of The Fund Through the Use of 12b-1 Fees Created Diseconomies of Scale Which Undermined Defendants Ability to Obtain Above-Average Returns, AC ¶¶256-74; (5) The Fund Performed Like an Index Fund, Which Should Have Decreased Costs and Generated Economies of Scale, AC ¶¶275-79.

E.   The Fund's Fee Structure Is Excessive and Disproportionate in Comparison With Other Similar Funds, including:  (1) The 12b-1 Fees Charged By Defendants Were Excessive and Disproportionate in Comparison to the 12b-1 Fees Charged By Other Comparable Funds Which Were Not Index Funds, AC ¶¶280-95; (2) The Fund Acted Like an Index Fund, But Defendants Charged 12b-1 Fees as if the Fund Were Actively Managed, and Those 12b-1 Fees Were Excessive in Comparison to Index Funds, AC ¶¶296-313.

F.   The Independence and Conscientiousness of the Mutual Fund's Outside Directors, including:  (1) The Fund's Board Breached Its Fiduciary Duty By Continually Approving the Fund's 12b-1 Plans With Virtually No Time Given to Their Consideration and Because There Is No Reasonable Likelihood That the Millions of Dollars of 12b-1 Fees Paid By the Fund and Its Shareholders Will Benefit The Fund and Its Shareholders, AC ¶¶318-28; (2) The Fund's Board Did Not Fulfill Its Fiduciary Duty When It Failed to Engage in Arms-Length Bargaining, AC ¶¶329-33.

G.   There Are No Problems or Circumstances Which Make the Continuation of the 12b-1 Plan Necessary or Appropriate, AC ¶¶334-41.

H.   For a Number of Years, the Plan Has Not Produced Benefits for the Fund and Its Shareholders, AC ¶¶342-44.

Thus, defendants' argument that the AC does not allege disproportionality is patently false.

- 9 -

**2.      The Amended Complaint Sufficiently Articulates the *Gartenberg* Factors**

The "*Gartenberg* factors," discussed in detail below, are:  (1) the nature and quality of the services provided by the advisers to the shareholders; (2) the profitability of the mutual fund to the adviser-manager; (3) "fall-out" benefits; (4) the economies of scale achieved by the mutual fund and whether such savings were passed on to the shareholders; (5) comparative fee structures with other similar funds; and (6) the independence and conscientiousness of the mutual fund's outside directors.  694 F.2d at 928-29.  These factors are applicable to both the 12b-1 and advisory fee claims.

As noted above, defendants' assertion that the AC contains essentially no factual allegations whatsoever on the *Gartenberg* factors, but just conclusory statements, is likewise false.[4]  Defendants do exactly what they wrongfully accuse plaintiffs of doing: they proffer a conclusory *one paragraph* statement, containing no factual basis, entitled "plaintiff and the funds received a legally sufficient benefit" for the more than $150 *million* in 12b-1 fees they paid annually.  DBr. at 24.  Asserting plaintiff received a "legally sufficient benefit" is a conclusion, but one based upon a mixed question of fact and law appropriate for trial.  At this stage of the litigation, defendants' conclusory assertions deserve a conclusory denial of their motion to dismiss the 12b-1 fee claim.[5]

Similarly, to an overwhelming extent, the same core of factual allegations in the

_____

[4] Defendants nevertheless concede that the claims herein are governed by Rule 8 of the Fed. R. Civ. P., which requires merely "a short and plain statement of the claim showing that the pleader is entitled to relief."  *Erickson v. Pardus*, 551 U.S. 89, 93 (2007).

[5] The choice is not, as defendants would have it, DBr. at 24, between paying distribution and service charges up front or spreading them out over a number of years.  In either case, the issue is whether those charges are permitted by Rule 12b-1 and Section 36(b) of the ICA and whether those fees are excessive and disproportionate.  Defendants are swimming upstream.  For example, it is difficult to defend as "legally sufficient" scores of millions of dollars in 12b-1 fees which pay for services that brokers are legally obligated to provide in any event and which are not "primarily intended" to result in the sale of fund shares.  Thus, under the express language of Rule 12b-1, there cannot be "a reasonable likelihood that the [12b-1 fees] will benefit the [Fund] and its shareholders."  See discussion *passim*, *infra*.

1  AC support the advisory fee claim, demonstrating that the motion to dismiss the advisory

2  fee claim also should be denied.  Plaintiffs, in the Advisory Fee section of the AC,

3  expressly incorporate by reference scores of factual allegations concerning the 12b-1 fee

4  claim into the allegations concerning the advisory fee claim, AC ¶¶345-48, and then

5  summarized only a few dozen paragraphs from the 12b-1 fee section of the AC.  AC

6  ¶¶349-84.  Similarly, herein, unless expressly stated otherwise, each of the factual

7  allegations addressed below in the *Gartenberg* analysis are applicable to both the 12b-1

8  and advisory fee claims.  Defendants pretend that these facts are not alleged, ignoring

9  their express incorporation by reference.  Defendants' motion to dismiss the advisory fee

10  claim consequently should also be given short shrift because it disregards, with respect to

11  the advisory fee, virtually every fact alleged with respect to the 12b-1 fee claim,

12  essentially all of which are applicable to the advisory fee claim, too.[6]

13  **a)      The Nature and Quality of the Services Provided**

14          The AC alleges that, for a substantial number of years, defendants have charged

15  the Fund and its shareholders hundreds of millions of dollars in both yearly 12b-1 and

16  advisory fees.  The Fund charges the maximum amount permitted by law for shareholder

17  services, whether pre-sale or post-sale – 0.25%.  The Fund similarly charges the

18  maximum amount permitted by law for the distribution fee (principally used to pay

19  commissions) for all but one of the remaining classes of Fund shares, 0.75%.  AC ¶¶101,

---

[6] The case law is clear that the short and plain statement of the claim under Rule 8 does not require that each and every *Gartenberg* factor be addressed at all, let alone addressed in detail.  Defendants ignore that the *Gartenberg* decision itself was the appeal of a judgment entered after a non-jury trial.  694 F.2d at 925, 929-31.  *E.g.*, *Wicks v. Putnam Inv. Mgmt., LLP*, 04 Civ. 10988, 2005 U.S. Dist. LEXIS 4892, at *12-13 (D. Mass. Mar. 28, 2005) ("I agree with the plaintiffs that *Gartenberg* -- should it be the appropriate standard--does not establish a heightened pleading requirement for *§ 36(b)* excessive fee claims"); *Pfeiffer v. Bjurman, Barry & Assocs.*, 03 Civ. 9741, 2004 U.S. Dist. LEXIS 16924 at *15, *18 (S.D.N.Y. Aug. 27, 2004) (same); *Millenco L.P. v. meVC Advisors, Inc.*, 02 Civ. 142, 2002 U.S. Dist. LEXIS 19512, at *9 n.3 (D. Del. Aug. 21, 2002) (same); *see Siemers v. Wells Fargo & Co.*, 05 Civ. 04518, 2006 U.S. Dist LEXIS 60858 at *51-52 (N.D. Cal. Aug. 14, 2006); *Forsythe v. Sun Life Fin., Inc.*, 417 F. Supp. 2d 100, 113-16 (D. Mass. 2006).

1   106, 285-86.  This reflexive adoption of the maximum fee permitted illustrates that

2   despite the immense size of the Fund, defendants did not seek to and did not obtain any

3   benefits for the Fund and its shareholders, such as a reduction in the amount paid to

4   broker-dealers to finance services nor a limitation on the types of activities to be financed

5   by the 12b-1 fees.  AC ¶¶329.

6       Defendants have admitted that a material portion of the Fund's hundreds of

7   millions of dollars in 12b-1 fees paid to defendants are used to finance post-sale

8   shareholder services.  AC ¶103-04.  These services included, among other activities,

9   operational and compliance functions with respect to the shareholder's brokerage

10   account, such as providing monthly or quarterly account statements, confirmations of

11   transactions, and suitability analyses of the client's account.  But, this portion of the 12b-

12   1 fee finances activities that the broker-dealer was already legally obligated to provide to

13   account holders at the broker-dealer's own expense.  AC ¶¶16, 123-27, 329.  The broker-

14   dealers do not have to be compensated to provide services already required by law.

15       Defendants also charged the Fund the maximum 12b-1 fee for commissions,

16   0.75%.  Similar to its arrangement on shareholder services, defendants did not obtain

17   from the broker-dealers any limitation on commissions.  *Id*. ¶¶106, 286, 329.  Moreover,

18   defendants also charged the Fund multiple times for the same distribution or service

19   expense which was performed only once.  See subsection (b), *infra*.

20       Thus, defendants, despite the huge size of the Fund and its sister funds, charged

21   the Fund and its shareholders such fees for particular services and paid the fees sought by

22   the broker-dealers without even attempting to negotiate a better deal for the Fund and its

23   shareholders.  AC ¶¶280-81 (General Accounting Office Report), 327-31.  Under the

24   express language of Rule 12b-1, there cannot be "a reasonable likelihood that the [12b-1

25   fees] will benefit the [Fund] and its shareholders;" nor are these fees the product of any

26   arms-length bargaining.

27       Significantly, during this time period, the Fund and its shareholders have been

28   paying almost as much to have Fund shares sold to others as to have it managed by the

1   defendants.  During its fiscal years 2004-08 inclusive, the Fund and its shareholders paid

2   $859.8 million in 12b-1 fees.  Above these enormous amounts, there are additional,

3   cumulative carryover amounts owed by the Fund and its shareholders to defendants for

4   distribution fees, of more than $900 *million*.  AC ¶¶118-22, 129 (chart), 248.

5        In the same period, the Fund and its shareholders paid $933.5 million in advisory

6   fees.  In its 2007 fiscal year, the Fund's 12b-1 fees were 85.2% of its advisory fees for

7   that year ($179.9 million in 12b-1 fees versus $211.1 million in advisory fees).  In its

8   2008 fiscal year, the Fund's 12b-1 fees were 77.9% of its advisory fees ($174.2 million in

9   12b-1 fees versus $223.5 million in advisory fees).  AC ¶¶118-22, 129.  The Fund's ratio

10   was much higher than that of other funds.  AC ¶¶288-307.  Since the amount of the

11   advisory fees paid by the Fund was a percentage of assets under management, and

12   increased as the size of the Fund increased, the material beneficiaries of the increase in

13   the size of the Fund were the defendants and not "the [Fund] and its shareholders."

14        Concerning advisory fees, the Fund underperformed the S&P Total Return Index

15   during each calendar year beginning January 1, 2006.  And, on an annualized basis, the

16   Fund has underperformed that S&P Index for at least the last five years.  In addition, the

17   Fund has acted as an Index Fund, with an R-Squared measure of at least 98 for the past

18   three years.  Nevertheless, the Fund has charged advisory fees as if it were an actively

19   managed fund, charging approximately $200 *million* per year in the last three fiscal years.

20   In 2007 and 2008, the Fund's total net asset weighted expense ratio was 13.5 times and

21   24.4 times that of a benchmark of index funds, respectively.  AC ¶¶129, 194-95, 349-58.[7]

22

23   [7] The two decisions cited by defendants at pages 9-10 of their brief are inapposite.  In both

24   *In re Franklin Mut. Funds Fee Litig.*, 478 F. Supp. 2d 677, 687 (D.N.J. 2007), and *Migdal v. Rowe Price-Fleming Int'l, Inc.*, 248 F.3d 321, 327 (4th Cir. 2001), plaintiffs made "only

25   one allegation" concerning the services rendered by defendants (that it functioned more like an index fund) or "did not address in any way the relationship between the fees . . .

26   received and the services . . . provided."  Plaintiff here, by contrast, has made scores of allegations concerning the services rendered.  AC, *e.g.*, ¶¶97-127, 207-22.  Further, in

27   *Migdal*, 248 F.3d at 327, the court suggested that fund underperformance for short periods

28   of time was of limited usefulness.  Here, defendants state that the Fund outperformed the (continued…)

1         Thus, defendants have been charging the Fund and its shareholders:  (1) the

2   maximum 12b-1 fee for commissions and for services; (2) for services which the broker-

3   dealer is legally obligated to provide to account holders at the broker's own expense; (3)

4   for post-sale shareholder services which are "not primarily intended to result in the sale

5   of [Fund] shares;" (4) multiple times for some services which are performed only once,

6   and (5) for advisory fees at a high rate as if the Fund was actively managed, when it acted

7   like an index fund and, indeed, was underperforming its indices.

8             **b)**     **The Profitability of the Mutual Fund to the Advisor –**

9                   **Manager**

10        Defendants' 12b-1 and Advisory Fees totaled more than $1 ***billion*** over three

11  years.  In its fiscal year 2006, the 12b-1 fees paid by the Fund were approximately $155

12  *million* and the advisory fees paid were approximately $166 *million*, for a total for 2006

13  of approximately $321 *million*.  In its 2007 fiscal year, the 12b-1 fees paid by the Fund

14  were at least $180 *million* and the advisory fees paid were approximately $211 *million*,

15  for a total for 2007 of at least $391 *million*.  Similarly, for its 2008 fiscal year, 12b-1 fees

16  were approximately $174 *million* and advisory fees were approximately $223 *million*, for

17  a total for 2008 of $397 *million*.  AC ¶129.  In addition, there are cumulative carryover

18  payments of amounts owed by the Fund to the defendant Distributor which total over

19  $900 *million*.  AC ¶248.  Thus, in just the last three fiscal years, the Fund paid more than

20  $1.1 ***billion*** combined in 12b-1 fees and advisory fees, of which at least $509 *million* was

21  12b-1 fees, despite the fact that much of this amount was for post-sale shareholder

22

23  _____

   (…continued)

24  S&P 500 over ten year periods, DBr. at 10 n.8, while the AC states that the Fund
   underperformed the S&P TR Index during the last three calendar years beginning January

25  1, 2006 and that, as a result, on an annualized basis the Fund has underperformed that S&P
   Index for at least the last five years.  AC ¶¶349-50.  As with many of defendants' factual

26  contentions, which of these proffered facts is accurate and which is more probative

27  concerning whether defendants' conduct is lawful or unlawful are questions appropriate
   only for trial, and not a motion to dismiss.

28

services and/or services that the broker-dealer already was legally obligated to provide. The Fund is approximately the 25th largest mutual fund in the nation, but the 12b-1 fees charged by defendants were approximately the ninth largest in the nation.  AC ¶283.

Concerning advisory fees, as discussed in the subsection above, the Fund has underperformed the S&P Total Return Index since before the beginning of the damages period of this action.  Despite acting as an index fund (with a 98 R-Square measure), the Fund has charged advisory fees as if it were an actively managed fund, charging approximately $200 *million* per year in the last three fiscal years.  In 2007 and 2008, the Fund's total net asset weighted expense ratio was 13.5 times and 24.4 times that of a benchmark of index funds, respectively.  AC ¶¶129, 194-95, 349-58.  These facts demonstrate excessive and disproportionate profitability under *Gartenberg*.

### c)   Defendants Received Substantial Fall-Out Benefits

Fall-out benefits are those benefits other than the particular fee whose legality is being analyzed that flow to the investment advisor and its affiliates as a result of the relationship between the advisor/affiliates and the Fund, including indirect profits to the defendants attributable in some way to the existence of the Fund.  AC ¶198.

As to the 12b-1 fee, the advisory and transfer agent fees (the amount of which in each case is based upon Fund size) are excessive fall-out benefits because their annual increases, each in the millions of dollars, are based upon the unlawful use of the 12b-1 fee to increase Fund assets so as to increase the advisory fee, even though there was no reasonable likelihood of a benefit to the Fund and its shareholders from an increase in the size of the Fund.  Concomitantly, as to the advisory fee, the 12b-1 and transfer agent fees are excessive fall-out benefits for parallel reasons.  AC ¶¶199-203, 359-67.

The AC also alleges that Fund shareholders, when they own more than one fund within the Davis Funds family, are charged multiple times for the same service or distribution expense, even though the service is undivided and performed only once. These activities include account maintenance activities (such as monthly statements),

operational functions, suitability activities, fund supermarket websites and advertising expenses.  Where the service or distribution expense is performed only once, and performance simultaneously covers multiple funds within the Davis Funds family, the Fund is paying an excessive and disproportionate 12b-1 fee.  AC ¶¶207-22.[8]

### d) Any Economies of Scale Benefitted Only Defendants and Not the Fund and Its Shareholders

The AC alleges that Congress enacted Section 36(b) because it believed that, as mutual funds became ever-larger, economies of scale were not being shared with the funds and their shareholders.  The AC alleges that there are economies of scale in a fund the size of the Fund (the 25th largest mutual fund in the nation) (AC, *e.g.*, ¶¶227-33, 269) and that those economies have not been shared in any material amounts.  AC ¶¶234-79.

Economies of scale occurred as the Fund grew larger and because many shareholder services substantially decreased in cost to defendants because of the significant increases in computerization and telecommunications in the securities industry in the last quarter-century and the concomitant increase in productivity in the industry.  This substantial cost decrease has affected back office operations, information technologies and front office trading and sales platforms.  These services include virtually every operational and compliance issue, obtaining prospectuses on the Internet, the creation of account statements and trade confirmations, computerized telephone records, analyzing suitability issues and concerns, and securities research.  Another substantial cost savings concerns a decrease in the "Investor Services" that the defendant

---

[8] Defendants make the conclusory statement that plaintiff merely alleges as boilerplate that transfer agent fees increase as the size of the Fund increases and that the AC also should be dismissed because most, but not all, of the transfer agent fees are paid to non-affiliates.  DBr. at 11.  But, as defendants concede, if, for example, the 12b-1 fees, which caused the increase in the size of the Fund, were unlawful, since the transfer agent fees were a percentage of assets under management and increased as the Fund grew, then the increase in transfer agent fees would be unlawful, too.  DBr. at 11.  This is what plaintiff alleges.  AC ¶¶198-226, 359-67.  In addition, at the least, transfer agent fees paid to defendants' affiliates are actionable.  AC ¶72.

1  Adviser had to perform on behalf of the Fund.  For example, in the past, one of the

2  principal functions of the Adviser was to separately qualify, with every state and

3  territorial agency, the shares of all of its mutual funds, including the Fund, for sale in

4  each such jurisdiction.  A federal law enacted in the last decade eliminated this

5  requirement.  AC ¶¶228-33, 374-76.

6      The AC alleges that these economies of scale were not being passed on to the

7  Fund and its shareholders because the Fund's 12b-1 fees and advisory fees, as well as its

8  total expenses, increased at the same rate or faster than its net assets.  During its two

9  fiscal years July 2006 through July 2008, the Fund's net assets increased by 12.2%, its

10  12b-1 fees increased by 12.2%, its advisory fees increased by 34.7%, and its total

11  expenses increased by 25.4%.  Thus, there were no material decreases in the proportional

12  amount of Fund expenses, even as the Fund grew substantially larger.  AC ¶¶234-43.

13      Further, the Fund performed like an index fund, as if it was passively managed,

14  which should have decreased costs and generated further economies of scale.  The Fund

15  essentially tracked the S&P 500 Total Return Index, with a trailing R-Squared measure of

16  98, meaning its performance was almost identical to the index (albeit somewhat less, see

17  *supra*).  Nevertheless, as set forth in subsection (e) below, the Fund charged advisory and

18  12b-1 fees as if it was actively managed, and those fees were excessive and

19  disproportionate in comparison to both index and actively managed funds.  AC ¶¶275-79.

20      Although defendants used breakpoints[9] in calculating the advisory fee, the

21  breakpoint savings to the Fund were *de minimis* – only about $7.15 million in 2007.  In

22  fiscal year 2007 alone, the 12b-1 fees paid by the Fund to defendants (or accrued against

23  the Fund) were more than $180 million and the advisory fee was $211 million, for a total

24  of $391 million.  The breakpoint savings for the three years ending with fiscal 2007

25  inclusive were less than $21 million.  In essentially the same three year period, the 12b-1

26

27

28

---

[9] The advisory fee is calculated as a percentage of the Fund's net assets.  The percentage sliding scale contained "breakpoints," decreases in the marginal percentage charged for the advisory fee as the Fund's net assets increase.  AC ¶249.

fees paid by the Fund to defendants (or accrued) were approximately $500 million and the advisory fees were $600 million, for a total of more than **$1.1 *billion***.  AC ¶¶244-55. The less than $21 million in savings is immaterial when compared to the approximately $500 million in 12b-1 fees and $600 million in advisory fees paid by the Fund to defendants during that same period.  Defendants completely ignore this explicit disparity in dollars when discussing the breakpoint issue.  DBr. at 13-14.

Thus, even if all activities financed by the plans herein were deemed primarily intended to result in the sale of fund shares, the 12b-1 plans have not produced material economies of scale benefits for the Fund and its shareholders.  The only beneficiaries of this huge increase in fund assets under management, which resulted from using part of the 12b-1 fee to increase distribution of the shares, were defendants. They reaped a materially larger advisory fee – at least $40 million to $60 million more per year (and materially increased Transfer Agent fees) -- merely based upon the increase in the size of the Fund, an increase in size which the Fund and its shareholders consistently paid over $150 million per year to finance but received no benefit therefrom.  AC ¶¶259-60.[10]

### e) The Fund's Fee Structure Is Excessive and Disproportionate in Comparison With Other Similar Funds

The Fund paid 0.25% for shareholder services, which is the same percentage charged by most non-index funds.  The same holds true for commissions, where the Fund paid the maximum 12b-1 fee, 0.75%.  AC ¶¶97-106.  Mutual funds generally do not attempt to compete on the basis of fees.  AC ¶¶280-81.

---

[10] Defendants' citations are inapposite.  DBr. at 12-13.  In *Salomon Smith Barney Mut. Fund Fees Litig.*, 528 F. Supp. 2d 332, 339 (S.D.N.Y. 2007), *Franklin*, 478 F. Supp. 2d at 687, and *Amron v. Morgan Stanley Inv. Advisors, Inc.*, 464 F.3d 338, 345 (2d. Cir. 2006), the only allegation was that fees increased as the size of the Fund increased.  The AC alleges that the fees increased either in the same or greater proportion than the increase in the size of the Fund, combined with allegations describing the decreasing costs over time in the securities industry.  AC ¶¶227-43.

1    In fact, plaintiff alleges, AC ¶¶280-87, and decisional law holds, that similar

2    market pricing does not support an inference that competition exists but instead suggests

3    a lack of competition between advisers for fund business given the "unseverable

4    relationship between the adviser-manager and the fund it services." *Gartenberg*, 694

5    F.2d at 929 ("We disagree with the district court's suggestions that … a fee is fair if it 'is

6    in harmony with the broad and prevailing market choice available to the investor.' …

7    [T]he existence in most cases of an unseverable relationship between the adviser-

8    manager and the fund it services tends to weaken the weight to be given to rates charged

9    by advisers of other similar funds").  Particularly given the Fund's large size, similar

10   pricing illustrates the lack of competition.

11   The Fund's 12b-1 fee per million dollars under management was between 1700%

12   and 3500% more than comparable Vanguard Index Funds and a benchmark of index

13   funds.  AC ¶¶296-313.  Similarly, the Fund's 12b-1 fees were approximately 2000%

14   more than the 12b-1 fees of comparable non-index funds, the Windsor II Fund and the

15   Wellington Fund.  The Fund's ratio of 12b-1 fees to advisory/management fees was

16   approximately 1100% more than the ratio for the Windsor II Fund and approximately

17   800% more than the ratio for the Wellington Fund.  AC ¶¶288-95, 308.

18   Concerning advisory fees, the AC compares the Fund to six other large size funds,

19   both index funds and non-index funds.  The dollar amount of the Fund's advisory fees

20   (either alone or when combined with other fees) ranged between 52% and 174% *more*

21   *than* the advisory fee of other comparable funds, even though the other funds were

22   substantially larger than the Fund.  AC ¶¶139-97.  That allegation clearly shows that the

23   advisory fees were excessive and disproportionate under *Gartenberg* and *Gallus*.

**f)      The Fund's Directors Were Not Independent or Conscientious**

26   The Fund's Board of Directors did not fulfill its responsibilities of overseeing, on

27   a yearly basis, whether the Fund's 12b-1 plans should be continued.  After initial

28   adoption, a 12b-1 plan must be reapproved yearly.  In order to continue a plan, the Fund's

Board must conclude, "in light of their fiduciary duties under" Section 36(b) of the ICA, that "there is a reasonable likelihood that the plan will benefit the company [the Fund] and its shareholders."  Rule 12b-1(e), AC ¶¶15, 89, 318-28, 395.

The AC makes the following detailed allegations about the Board's lack of independence and conscientiousness concerning both the 12b-1 and advisory fees:

●  The Fund has a Board of Directors who have not been elected by the shareholders in many years, who rarely meet, whose focus is spread over many different funds in the Davis family of funds, and who receive material compensation from the Davis family of funds.

●  Each so-called independent Director of the Fund sits on approximately nine boards of directors of mutual funds within the Davis Funds family.  Each of these Davis mutual funds has approximately four classes of shares which charge a 12b-1 fee.  The Board of Directors of the Fund meets no more than four times per year and does not address the Plans of Distribution at most of its meetings.  The common board members of the Fund and the other Davis funds, upon information and belief, meet simultaneously as the boards of those funds.

●  Given the number of Boards which were meeting during one day, the Board of the Fund must have, during 2007 and prior years, spent an immaterial amount of time considering the Fund's Plans of Distribution (because approximately 36 Plans of Distribution were being considered at any one time).  In this limited amount of time, the Board of the Fund could not possibly have examined in any meaningful way, as required by their fiduciary duty, the factors for continuing a 12b-1 Plan, and were limited simply to acting year after year as a rubber stamp for the proposals of defendants regarding 12b-1 fees.  Hence, the Fund's Board gave the Fund's 12b-1 Plans only a perfunctory and not a material review in its consideration of whether they should be continued.

●  The shareholder service fee and distribution fee for broker commissions each are at or near the maximum percentage permitted by law.

●  The Fund current pays 12b-1 fees for services that:  (a) the broker-dealer is legally obligated to provide in any event and (b) are not "primarily intended" to result in the sale of Fund shares.

●  The 12b-1 fee distribution fee benefits only a mutual fund which does not yet have a foot-hold in the marketplace.  The fee does not benefit a mutual fund, such as the Fund, which already is established in the marketplace, according to Richard Phillips, a former SEC official, who participated in the SEC "Roundtable"

discussion on 12b-1 fees, June 19, 2007.

● The size of the Fund as well as of the Davis Funds family of funds gives the Board the ability to seek and obtain materially lower costs from the broker-dealers which should be passed on to the Fund and its shareholders.

● The Fund and its shareholders pay very high 12b-1 fees for a performance record which essentially is that of an index fund.

● Economies of scale were present, but the Board failed to pass along those economies to the Fund and its shareholders.

● The Board had available to it the data necessary to determine whether, with respect to the continuation of the 12b-1 fees, the 12b-1 plans were reasonably like to result in material benefits to the Fund and its shareholders.

● The allegations here demonstrate that the 12b-1 fees have been so disproportionately large that they bear no reasonable relationship to the services rendered and could not have been the product of arm's length bargaining (both between the defendants and the Fund's board and between broker-dealers and the Fund's board). The very fact that the Fund's shareholders for a number of years have been paying between $100 million and $180 million a year in 12b-1 fees, on top of paying approximately $100 million to $211 million a year in investment advisory fees, while receiving a benefit of less than $7 million per year in breakpoints, in itself demonstrates the Board's failure to give the legally required consideration to its annual approval for continuation of the Fund's 12b-1 Plans.

AC  ¶¶51-66, 314-33. Defendants' brief ignores virtually all of these quite specific allegations.  DBr. at 16-18, 24-25. These allegations, taken as a whole, are sufficient for pleading lack of independence under *Gartenberg* and *Gallus*.[11]

_____

[11] *Corbi*, 2005 U.S. Dist. LEXIS 41884 (motion to dismiss denied); *Corbi*, 2007 U.S. Dist. LEXIS 8276 (same). In *Dumond v. Mass. Fin. Servs. Co.*, 2006 U.S. Dist. LEXIS 1933, at *12 (D. Mass. Jan. 19, 2006), the Court denied the motion to dismiss the §36(b) claim even though the complaint alleged the need for discovery ("a review of Defendants' full costs of providing advisory serves will also demonstrate the enormous profitability to Defendants of managing the Funds"). The *Dumond* complaint also alleged, as here, that advances in communications and computer technologies had not benefitted plaintiffs. *Id.* at *8. *Compare* AC ¶¶229-33.

(continued...)

### C.   Plaintiff May Assert Claims With Respect to the 12b-1 Fees Paid By All Classes of the Fund

Defendants argue that plaintiff may assert claims only for 12b-1 fees assessed against the Class A shares of the Fund because plaintiff owns only Class A shares.  DBr. at 19-20.  Defendants' argument is incorrect.

As a threshold matter, Section 36(b) provides that "an action may be brought under this subsection by . . . a security holder of such registered investment company on behalf of such company, against such investment adviser, or any affiliated person of such investment adviser, or any other person enumerated in subsection (a) of this section who has a fiduciary duty concerning such compensation or payments, for breach of fiduciary duty in respect of such compensation or payments paid by such registered investment company or by the security holders thereof to such investment adviser or person."  The statute does limit the cause of action to the holder of a particular class of Fund shares.

Second, the AC alleges that there are activities undertaken "jointly" that are not divided by the class of shares.  There is only one portfolio of securities purchased by the Fund for all classes of the Fund combined and there are "[s]ervices not divided by [share] class . . . [that] include (without limitation) account maintenance activities, operational functions, suitability activities, fund supermarket websites and advertising expenses." AC¶¶207-14.  Thus, certain aspects of the alleged unlawful conduct effect all Fund shareholders jointly regardless of which share class they own (from the issue of the impact of economies of scale on the portfolio, to using 12b-1 fees to pay for activities such as advertising, and to using 12b-1 fees to pay for shareholder services such as operational and suitability functions which the broker-dealers are legally obligated to

_____

(…continued)

In addition to the *Gartenberg* factors, the AC cites SEC criteria with respect to approving Rule 12b-1 fees that further support plaintiff's allegations that the fees are unlawful.  Rule 12b-1 expressly refers to the SEC Release that published the rule as adopted, ICA Release No. 11414, for "the factors enumerated in rule 12b-1 [that] would normally be relevant to a determination of whether to use fund assets for distribution."  These SEC criteria provide further support to plaintiff's legal analysis.  AC ¶¶92, 333-44.

provide to Fund shares in any event and to pay for broker supermarket websites).

The AC also alleges that some shareholders are charged 12b-1 fees multiple times for a service that is performed only once, such as a shareholder who has an account at one brokerage house that contains either more than one Davis Fund in that account or contains multiple classes of Fund shares in that account.  In such a case, the shareholder will receive only one account statement for all his Davis Funds/classes of Fund shares or receive only one suitability analysis for all his holdings.  Yet, each Davis Fund charges separate Class A service fees and each share class of every Davis Fund (other than Class A) charges a separate distribution fee.  AC ¶¶207-22.  This is neither "nonsensical," "hypothetical," nor "baffling," as claimed by defendants.  DBr. at 19 n. 22.  It is a series of factual allegations where the claims of the individual classes of Fund shareholders overlap and are entwined.

Plaintiff is not bringing a class action for a defined group of class members.  He is bringing this action on behalf of the Fund, as required by §36(b).  Accordingly, he is not barred from bringing one action, asserting claims under one statute, for essentially identical conduct that caused damages to be suffered by all shareholders of the Fund.[12]

---

[12] Even so, courts have consistently applied the same or similar reasoning to class actions in which the class includes those who purchased through different prospectuses or documents than the class representatives, consistently granting class certification.  *See, e.g., In re Prudential Secs. Inc. Ltd. P'ships Litig.*, MDL No. 1005, 1995 U.S. Dist. LEXIS 22103, at *49 (S.D.N.Y. Nov. 20, 1995) (700 different limited partnerships); *In re Painewebber Ltd. P'ships Litig.*, 171 F.R.D. 104, 123, 134 (S.D.N.Y. 1997) (plaintiffs, who invested in only 20 of the 70 different partnerships of the same defendant, were adequate class representatives for all 70 partnerships); *Diehl v. Twin Disc, Inc.,* No. 94-C-50031, 1995 U.S. Dist. LEXIS 7569, at **9-11 (N.D. Ill. May 30, 1995) (two individuals who purchased insurance under two insurance agreements permitted to represent a class of persons who purchased insurance under six different agreements); *Maywalt v. Parker & Parsley Petroleum Co.*, 147 F.R.D. 51, 56 (S.D.N.Y. 1993) (class representatives may represent a class of purchasers of five different oil and gas limited partnerships even though they only purchased interests in three of the entities); *Tedesco v. Mishkin*, 689 F. Supp. 1327, 1335-36 (S.D.N.Y. 1988) (plaintiffs, who collectively invested in 8 of 15 entities, were typical of a class of purchasers of all 15 trusts); *Hoxworth v. Blinder, Robinson & Co., Inc.*, 980 F.2d 912, 923 (3d Cir. 1992) (plaintiffs, who purchased fewer (continued…)

### D.     ICA Section 36(b) Applies to Violations of ICA §12 and Rule 12b-1

Without support from even one court decision, defendants make the ridiculous argument that ICA Section 36(b) does not apply to Rule 12b-1 fees.  DBr. at 25-27. Defendants gloss over the express limitations on the use of 12b-1 fees and argue that, in essence, such distribution payments are *per se* lawful and cannot be challenged under Section 36(b) of the ICA because they do not exceed the regulatory fee cap.  In so arguing, defendants mischaracterize various regulatory pronouncements.  Accordingly, defendants' argument is completely erroneous.

None of the statutory or regulatory regimes cited by defendants states or even suggests that all sales charges within these cap limits are lawful *per se* under Rule 12b-1. ICA Section 22 merely establishes the general authority of the NASD to propose rules

_____

(…continued)

than all of the affected securities, can proceed with a class action on behalf of the purchasers of all the securities in a case alleging that the defendants engaged in a common scheme to charge inflated mark-ups on penny stocks); *Eisenberg v. Gagnon*, 766 F.2d 770, 786 (3d Cir. 1985) (plaintiffs' claims were typical of other class members even though they may have all invested in different partnerships, where investments were prepared by the same defendants and contained the same standard omissions and misrepresentations); *Frietsch v. Refco Inc.*, No. 92 C 6844, 1994 U.S. Dist. LEXIS 312, at **16-22 (N.D. Ill. Jan. 12, 1994) (rejecting defendants' assertion that plaintiffs could not adequately represent a class of individuals who invested in eight investment pools because the proposed class representatives were not members of all eight such pools, stating that "whether the prospectuses were promoted by different entities does not matter, so long as the representations were similar"); *Schneider v. Traweek*, 88 Civ. 0905, 1990 U.S. Dist. LEXIS 15596 (C.D. Cal. Aug. 7, 1990) (plaintiffs could represent a class of purchasers of securities in all eight of the limited partnerships, even though they had not purchased interests in each of the entities); *Londgen v. Sunderman*, 123 F.R.D. 547, 552-53, 556-57 (N.D. Tex. 1988) (class involving 121 limited partnerships certified even though six representatives invested in only seven of them); *Roberts v. Heim*, 670 F. Supp. 1466, 1490-91 (N.D. Cal. 1987) (plaintiffs, who had purchased units in only 4 of 40 limited partnerships, were held to be typical of a class of investors in all 40 entities); *Olesen v. Union Bank*, No. 73-418-T, 1976 U.S. Dist. LEXIS 15783 (S.D. Cal. Apr. 1, 1976) (class involving 100 limited partnerships certified even though plaintiffs purchased units of only a small minority of the entities).

1   concerning the price paid by captive underwriters to their issuers for the mutual fund

2   shares.  SEC Release 30,897 concerns an amendment to NASD Rule 26 which imposes a

3   maximum sales charge on fund shares.  Similarly, NASD Rule 2830 addresses fee caps

4   for broker-dealers generally.

5        Indeed, the SEC and the courts have expressly rejected defendants' narrow view

6   and instead have broadly interpreted the scope of Section 36(b).  It is applicable

7   whenever one of the statutorily designated recipients benefits from a breach of fiduciary

8   duty.  *E.g.*, *Meyer v. Oppenheimer Mgmt. Corp. ("Meyer I")*, 764 F.2d 76, 82 (2d Cir.

9   1985), *citing* SEC Report, Public Policy Implications of Investment Company Growth,

10  H.R. Rep. No. 2337, 89th Cong., 2d Sess. 144 (1966).  Significantly, in the context of

11  defendants' lawful *per se* argument, in proposing Rule 12b-1, the SEC emphasized that

12  the Rule was not intended "to reduce or limit in any way" the fiduciary duties imposed by

13  section 36(b).  *Meyer I*, at 82-83, *citing* Bearing of Distribution Expenses by Mutual

14  Funds, Investment Company Act Release No. 10,252 [1978 Transfer Binder] Fed. Sec. L.

15  Rep. (CCH) P 81,603, at 80,415.  *See Green v. Nuveen Advisory Corp.*, 186 F.R.D. 486,

16  491 (N.D. Ill. 1999).  NASD rules are subject to the requirements of Rule 12b-1, which

17  does not establish a safe harbor from §36(b) liability.  ICA Release 16431 at 40 n.128.

18       Tellingly, herein, DBr. at 25-27, defendants have not reiterated the citation in their

19  initial motion to dismiss (Dkt. 17 at 8-12) to *Pfeiffer*, 2004 U.S. Dist. LEXIS 16924, at

20  **17-18.  Defendants had argued that the fees disputed here were "expressly authorized"

21  and thus *per se* lawful.   But the *Pfeiffer* court denied the motion to dismiss the ICA 36(b)

22  claim, expressly rejecting defendants' *per se* reasonable analysis:

23       The defendants heavily rely on the argument that, because the Plan caps its *Rule
24       12b-1* fees at 0.25% of the Fund's average daily net assets . . . the maximum asset-
         based charge allowed by the SEC -the fees are *per se* reasonable.  The defendants
25       cite no case law for this proposition.  Should the plaintiff succeed in showing that
         the fees were excessive when measured against the services rendered, the
26       defendant will not be able to defeat that showing by arguing that they could have
         charged even more.
27

28

*Id*.  In other words, the case law demonstrates that defendants' argument is woven out of whole cloth, because a 12b-1 fee must be measured against the services rendered and can be unlawful even if below the fee cap.  In every case cited in this brief where the motion to dismiss the §36(b) claim was denied, the challenged 12b-1 fee did not exceed the regulatory cap.   Thus, defendants' claim (DBr. at 25-27) that Section 36(b) "imposes a judicially enforced outer limit on" fees such that any fee below the percentage fee cap is in effect per se lawful is incorrect.

Many courts have expressly held that Section 36(b) applies to violations of Section 12 and Rule 12b-1 of the ICA, such as the inherently excessive fee claims alleged here.  *Meyer v. Oppenheimer Mgmt. Corp.*, 895 F.2d 861, 866 (2d Cir. 1990); *Meyer I*, 764 F.2d at 82-83 (reversing dismissal of section 36(b) claim); *Siemers*, 2006 U.S. Dist. LEXIS 60858, at *48-*61 (motion to dismiss denied on merits, granted on procedural grounds); *Strigliabotti v. Franklin Res*., Inc., 04 Civ. 00883, 2005 U.S. Dist. LEXIS 9625, at *20 (N.D. Cal. Mar. 7, 2005); *Pfeiffer*, 2004 U.S. Dist. LEXIS 16924 at *12 (same); *Krinsk v. Asset Fund Mgmt.*, 715 F. Supp. 472, 485 (S.D.N.Y. 1988), *aff'd*, 875 F.2d 404 (2d Cir. 1989) (bench trial).  See many other cases cited *infra* under *Gartenberg* analysis.  Defendants' blunderbuss argument wholly misses the mark.

**E.**     **Plaintiff's Advisory Fee Claim Is Not Almost Entirely Time Barred By the Statute of Limitations**

Plaintiff filed the initial complaint herein on July 28, 2008, and at that time alleged only a claim for unlawful 12b-1 fees.  Dkt. 1.  The AC, which was filed on April 23, 2009, added a claim alleging excessive advisory fees.

Defendants contend that plaintiff's advisory fee claim is almost entirely time barred by the statute of limitations.  Defendants assert the damage period for the advisory fee is limited to the three-month period beginning April 23, 2008 (one year prior to the filing of the AC which added the advisory fee claim) through July 28, 2008, the date of the filing of the original complaint, because:  (a) ICA section 36(b) bars a claim for damages with respect to the period more than one year prior to the filing of suit; (b) the relation back

1   doctrine is applicable, but does not save the advisory fee claim "given that the [advisory]

2   fees are paid pursuant to different contractual arrangements and are for separate and

3   distinct services" than the 12b-1 fees, DBr. at 8; and (c) a damage claim is cut off at the

4   time of filing of suit and does not continue during the course of the litigation through trial.

5   DBr. at 7.  As shown below, these arguments are untenable.

6       First, the statutory language of ICA §36(b) itself sets the damages period for both

7   the 12b-1 and advisory fee claims.  Under the statute, the damage period for both claims

8   begins on July 28, 2007, one year prior to the filing of the original complaint.

9       Second, if the relation back doctrine is applicable, the doctrine saves the advisory

10  fee claim because that claim and the 12b-1 fee claim share a common core of operative

11  facts.  As if only §36(b) set the damage period, the damage periods for both claims

12  similarly begin on July 28, 2007, one year before the filing of the original complaint.

13      Third, the damage periods for both the 12b-1 and advisory fee claims continue past

14  the filing of the complaint/AC and continue through the close of the case including trial.

### 1.   The Statutory Language of Section 36(b) Itself Governs the Beginning of the Damages Period

17      Defendants first contend that the AC's advisory fee claim does not "relate back to

18  the initial complaint" because "relation back is categorically unavailable to resuscitate

19  otherwise untimely § 36(b) claims because § 36(b)(3) is not an ordinary statute of

20  limitations, but is instead a substantive limit on damages."  DBr. at 8.  Defendants'

21  analysis is incorrect.  As an initial matter, the language of Section 36(b) itself governs the

22  damages period of the advisory fee claim herein.

23      Plaintiff brought one action, brought correctly as a direct action on behalf of the

24  Fund, which asserted only a 12b-1 fee claim, and amended to add an advisory fee claim

25  also brought on behalf of the Fund.  Pursuant to Section 36(b)(3), plaintiff may undeniably

26  recover excessive advisory fees accruing for the one-year period "before the action was

27  instituted," in this case one and the same action.  *See, e.g. Green v. Fund Asset Mgmt.,*

28  *L.P.*, 286 F.3d 682, 685 (3d Cir. 2002) (damages were recoverable for one year period

1    prior to filing of original complaint, though amended complaint filed three years later);

2    *Forsythe*, 417 F. Supp. 2d at 116 (finding that damages period began one year prior to

3    filing of original complaint, although amended complaint filed 11 months later was subject

4    of motion to dismiss).  Since the statute itself sets the damages period, the relevant time

5    period for this claim is not dependent upon relation back principles under Rule 15.[13]

6          Here, plaintiff filed the original Complaint on July 28, 2008, thereby instituting the

7    action on that date in full compliance with Section 36.  The damages period of Section

8    36(b) is governed by when the action is instituted; the damages period for both the 12b-1

9    and advisory fee claims are identical, with each beginning on July 28, 2007 (one year prior

10   to the filing of the original complaint).

11          **2.      Even if the Relation Back Doctrine Is Applicable, the Advisory**
12   **Fee Claim Relates Back to the 12b-1 Fee Claim**

13          Defendants next argue that the new claim does not relate back "given that the fees

14   are paid pursuant to different contractual arrangements and are for separate and distinct

15   services."  DBr. at 8.  This, too, is incorrect.

16          If the "relation back" doctrine is applicable, the advisory fee claim in the AC relates

17   back to the 12b-1 fee claim in the original Complaint.  Rule 15(c)(1) provides that "[a]n

18   amendment of a pleading relates back to the date of the original pleading when . . . the

19   _____

20   [13] The two cases cited by defendants are wholly inapposite.  In *In re Franklin Mut. Funds*
     *Fee Litig.*, 478 F. Supp. 2d 677, 685 (D.N.J. 2007), the court rejected plaintiff's argument
21   that the one-year look back damage period for the 36(b) claim began not from one year
     before the 36(b) case was filed, but began from one year before an earlier, different action,
22   a class action complaint under 36(b) had been filed.  The court had dismissed the 36(b)
     claim from the earlier case because it may not be brought as a class action.  In *ING*
23   *Principal Prot. Funds Derivative Litig.*, 369 F. Supp. 2d 163, 170-71 (D. Mass. 2005), the
     action originally was filed in 2003.  In July 2004, a new "universal demand" statute took
24   effect in the State.  Thereafter, without making pre-suit demand, plaintiffs amended their
25   complaint, adding seven directors as new defendants in a derivative claim under state law.
     The court found that the amended complaint did not relate back because to do so "would
26   yield a result contrary to the purposes underlying statutes of repose."  The AC here merely
27   added a new claim against the *same defendants* based upon the *same facts*.

28

- 28 -

amendment asserts a claim or defense that arose out of the conduct, transaction or occurrence set out – or attempted to be set out – in the original pleading."  Courts must consider "whether the original and amended pleadings share a common core of operative facts so that the adverse party has fair notice of the transaction, occurrence, or conduct called into question."  Rule 15(c) "is to be liberally applied," and a "new claim can be linked when it will likely be proved by the same kind of evidence offered in support of the original pleadings."  "If the evidence tending to support the facts alleged in the amended complaint could have been introduced under the former pleading," relation back will save the new claim in the amended complaint.  *Long v. Ford Motor Co.*, 07 Civ. 2206, 2008 WL 2937751, at *4 (D. Ariz. July 23, 2008) (quoting cases).  *See, e.g.*,  *Bensel v. Allied Pilots Ass'n*, 387 F.3d 298, 310 (3d Cir. 2004) (*citing Clipper Express v. Rocky Mountain Motor Tariff Bureau, Inc.*, 690 F.2d 1240, 1259-60 (9th Cir. 1982)).

Since the additional advisory fee claim includes essentially all the extensive factual allegations pled in the original Complaint with respect to the 12b-1 fee claim, "shar[ing] a common core of operative facts," the AC relates back.  In determining whether the fees defendants charged the Fund and its shareholders were "excessive and disproportionate" 12b-1 fees and investment advisory fees, the same facts "could have been introduced under the former pleading," *Long*, 2008 WL 2937751, at *4, and are analyzed under the same *Gartenberg* factors (AC ¶¶95, 345) and *Gallus*.  For example, the Fund's shareholders did not receive the benefits of economies of scale from either type of fee payment, "which all flowed to the defendants through exorbitant advisory and 12b-1 fees."  AC ¶¶227-79, 368-76.  In both instances, the Fund's directors "breached their fiduciary duty" by failing to account for the disproportionate and excessive advisory and 12b-1 fees in spite of the fact that "any economies of scale passed to shareholders were immaterial."  AC ¶¶254, 371.  Further, both the investment advisory fees and 12b-1 fees "are calculated as a percentage of assets under management.  The dollar amount of such fees increases as the size of the Fund increases."  AC ¶¶69-70.  Further, the 12b-1 claim contained extensive allegations concerning the amount of the advisory fee and that the breakpoint savings from the

advisory fee were immaterial.  Dkt. 1, Compl. ¶¶136-48.  The evidence submitted in support of each claim will be largely identical and defendants cannot genuinely claim to not have been apprised of the conduct at issue.[14]

Accordingly, as with the above analysis predicated upon the language of §36(b) itself, the Court should find that the damages period for which plaintiff may recover on behalf of the Fund excessive and disproportionate advisory fees begins on the same date as the damages period as for the 12b-1 fee claim, July 28, 2007, one year before the original complaint was filed.[15]

Alternatively, even assuming *arguendo* that the relation back doctrine, although applicable, does not save the advisory fee claim, the damages period for the advisory fee

---

[14] Plaintiff's prior statement in the original Complaint initially disavowing an advisory fee claim is of no bearing to the question of relation back.  Following the procedures set-out in Rule 15(a), plaintiff appropriately amended the complaint to include a claim for excessive and disproportionate advisory fees.  Since the factual and legal underpinnings of the new claim are almost completely identical to the original 12b-1 claim, defendants received ample notice of the conduct in dispute and the common core of operative facts giving rise to both claims.  Plaintiff's prior disclaimer should not affect this analysis.  Indeed, that the disavowal was included in the original complaint underscores that the facts underlying both the 12b-1 fee and advisory fee claims were essentially identical and the disavowal was included to clarify, for defendants' understanding, plaintiff's position at that time.

[15] Defendants' citations are, again, wholly inapposite.  *In Brever v. Federated Equity Mgmt. Co. of Pa.*, 233 F.R.D. 429, 432 (W.D. Pa. 2005), plaintiffs sought to substitute in a completely different group of plaintiffs.  This would have expanded the damages period because the new plaintiffs would have sought damages under the original damages period through at least the time of their substitution, which would have expanded the damage period to encompass more than one year prior to their entry into the case.  In addition, the expanded damages period would have included services in the latter part of the damage period that had not been disputed by the original plaintiffs.  Here, the same plaintiff would have been seeking damages for the same damage period, under the same facts.  *Oja v. U.S. Army Corps of Eng'rs*, 440 F.3d 1122, 1134-35 (9th Cir. 2006), is not on point because it concerned a second, separate disclosure on a second website.  Similarly, in *Lapidus v. Hecht*, Civ. No. 98-3130-MMC, 2002 U.S. Dist. LEXIS 14566, at *24-25 (N.D. Cal. May 17, 2002), the amendment adding the new claim did not arise, as it did here, out of the same conduct or occurrences.

claim begins on April 23, 2008, one year before the filing of the AC which first asserted the advisory fee claim (while the damages period for the 12b-1 fee claim starts, as stated above, July 28, 2007).  There is simply no statutory or case law basis for arbitrarily truncating the recovery period to the scant three months defendants proffer.

> **3.      Plaintiff May Recover Damages On Behalf of the Fund Through the End of the Case, Including Through the Time of Trial**

Finally, defendants argue that "plaintiff may not assert claims for any conduct <u>after</u> July 28, 2008" (emphasis in original), the date which the original complaint was filed. This is incorrect as a matter of law.

Section 36(b)(3) places no limit on the damages period going into the future from the time the action is commenced; its only limitation is on how far back a plaintiff may look for damages.  As in all instances of statutory construction, courts "look first to the plain language of the statute."  *Cassirer v. Kingdom of Spain*, 06 Civ. 56325, 2009 WL 2857188, at *7 (9th Cir. Sept. 8, 2009).  Section 36(b) provides that "[n]o award of damages shall be recoverable for any period *prior* to one year before the action was instituted."  15 U.S.C. § 80a-35(b)(3) (emphasis added).  The statute's only temporal restriction on the recovery of damages thus pertains to the one year preceding the filing of the action, rather than any subsequent time period.

Accordingly, under Section 36(b), courts have found that a plaintiff could recover damages for the Fund after the filing of the complaint through the time of trial.  As the Eighth Circuit stated in *Gallus*, 561 F.3d at 825, "[a]s the United States District Court for the District of Massachusetts concluded in a thorough and carefully reasoned opinion, a straightforward reading of the damage limitation yields only a retrospective limitation. . . . [W]here the plaintiffs have continued to suffer damage during the litigation, both the language of the statute and the interests of judicial economy suggest that redress should be available in a single action."  *Accord Dumond v. Mass. Fin. Serv. Co.*, Civ.No. 04-11458, 2007 WL 602589, at *1 (D. Mass. Feb. 22, 2007) (emphasizing that the retroactive restriction "is the only temporal limitation on damages that the statute imposes.").  As the

- 31 -

1   *Dumond* court stated:  "absent some express limitation, proof of damages is not restricted

2   to the time before the filing of the complaint, and damages caused by a defendant's

3   liability-producing conduct ordinarily may be proved through the time of trial and

4   judgment."   *Dumond*, 2007 WL 602589 at *2 ("Silence on the question" [as with the

5   instant statutory language] "is fairly taken as intending no movement from the normal

6   case").  In fact, without continuing damages, courts would be inundated with new Section

7   36(b) claims every year during the pendency of such cases, as plaintiffs would seek to

8   protect their rights against ongoing violations.

9         Even though the text of Section 36(b) speaks only to when the damages period

10   begins and does not prohibit continuing damages, defendants advance no reason why

11   plaintiff cannot obtain the full scope of damages other than one case cited by defendants,

12   which is entirely distinguishable.[16]  In other words, the damages period continues through

13   the close of the case, including trial.

14         In sum, if section 36(b) governs the damages period, or the advisory fee claim

15   relates back to the 12b-1 fee claim in the original complaint, the damages period for the

16   12b-1 fee claim and the advisory fee claim are identical, beginning on July 28, 2007 (one

17   year prior to the filing of the original complaint) and continuing through the close of the

18   case including trial.  Alternatively, assuming *arguendo* that the relation back doctrine,

19   _____

20   [16] Defendants argue that plaintiff "may not assert claims for any conduct after July 28,
     2008, given that plaintiff filed an amended pleading without leave of the court and did not
21   request leave to file a supplemental pleading," citing *Young-Henderson v. Spartanburg
     Area Mental Health Ctr.*, 945 F.2d 770, 775 (4th Cir. 1991).  DBr. at 7.  That case found a
22   supplemental pleading was required where defendants had answered the complaint and
     case had proceeded through discovery.  Defendants disingenuously conflate Rule 15(d)
23   with Rule 15(a).  Pursuant to Rule 15(a), "a party may amend its pleading once as a matter
     of course . . . before being served with a responsive pleading." Fed. R. Civ. P. 15.  As the
24   Advisory Committee notes to Rule 15 point out, "[s]erving a motion attacking the pleading
25   did not terminate the right to amend, because a motion is not a 'pleading' as defined in
     Rule 7."  Since defendants never filed a responsive pleading, but rather brought the instant
26   motion to dismiss, plaintiff as a matter of law may amend the original complaint as of right
27   without leave of court.

28

although applicable, does not save the advisory fee claim, the damages period for the advisory fee claim begins on April 23, 2008 (one year before the filing of the AC which first asserted the advisory fee claim) and similarly continues through the close of the case including trial (while the damages period for the 12b-1 fee claim remains as stated above, July 28, 2007 through the close of the case including trial).

### F.       The Sections 48(a) and 47(b) Claims Sufficiently State Causes of Action

The Complaint also contains a claim under Section 48(a) of the ICA against the parent management company, defendant DSA, for what is in effect "control person" liability.  15 U.S.C. § 80a-47(a).  The provision is akin to § 15 of the Securities Act of 1933 and § 20(a) of the Securities Exchange Act of 1934 in that it makes control persons liable for primary violations of underlying acts.  Courts have recognized that § 48(a) "is remedial and is to be construed liberally."  *See Strougo v. Scudder*, 964 F. Supp. 783, 806 (S.D.N.Y. 1997), *dismissed on other grounds*, 27 F. Supp. 2d 442 (S.D.N.Y. 1998), *vacated in part & remanded*, 282 F.3d 162 (2d Cir. 2002).

Defendants rely on a line of cases holding that there is no private right of action under § 48(a).  DBr. at 5-6.  However, there is a contrary line of cases, discussed below, which plaintiff respectfully submits should be followed here, holding that if the underlying claim alleging a primary violation is not dismissed (here, §36(b)), then the 48(a) claim also is sustained.

For example, most of the 48(a) decisions cited in defendants' memorandum also discuss the court decisions holding that there are no private rights of action under ICA Sections 34(b) and 36(a).  Section 34(b) states "[i]t shall be unlawful for any person to make any untrue statement of a material fact in any registration statement," but does not expressly create a private right of action.  ICA section 36(a) expressly states that "[t]he Commission is authorized," but does not identify any other permitted plaintiff.  Concerning both of these sections, the courts note that ICA Section 42 authorizes the SEC to enforce all provisions of the ICA.  Thus, Section 34(b) contains a substantive

- 33 -

1    violation but does not expressly create a private right of action to enforce it.  Section

2    36(a) contains an injunctive provision, but it is expressly limited to actions by the SEC.

3    The difference between these provisions and 36(b) is that unlike these sections, 36(b)

4    expressly creates a private right of action with respect to a substantive provision of the

5    ICA and the Section 48(a) claim is expressly predicated upon a violation of 36(b), and

6    merely adds additional persons who may be named as defendants in such a claim.

7         In other words, plaintiff respectfully submits that the best way to harmonize these

8    cases is to draw a distinction between (1) a plaintiff asserting a claim under an ICA

9    section, such as 34(b), that does not have an express private right of action, where there

10   would be no standalone private right of action under Section 48(a); and (2) a plaintiff

11   asserting a claim under § 36(b), where the Section 48(a) claim is predicated on the

12   express private right of action.  Many courts have sustained the latter such claim,

13   **including a decision cited by defendants**, *In re Evergreen Mut. Funds Fee Litig.*, 423 F.

14   Supp. 2d 249, 259-60 (S.D.N.Y. 2006).  Other cases similarly find a cause of action

15   stated under Section 48(a) when the 36(b) claim is sustained.  *In re Franklin Mutual*

16   *Funds Fee Litig.*, 388 F. Supp. 2d 469 (D. N.J. 2005); *In re Dreyfus Mut. Funds Fee*

17   *Litig.*, 428 F. Supp. 2d 342, 356 (W.D. Pa. 2005), *judgment on the pleadings in*

18   *defendants' favor on other grounds*, 428 F. Supp. 2d 357 (W.D. Pa. 2006).

19        Concerning the claim for rescission under Section 47(b), defendants simply

20   misstate the case law.  DBr. at 6.  Defendants falsely assert that "plaintiff chose not to

21   bring the case as a shareholder derivative action" in order to avoid "comply[ing] with the

22   prerequisites of shareholder litigation set forth in" Fed. R. Civ. P. 23.1, and then

23   misleadingly state that while §36(b) creates a right that may be enforced by a

24   shareholder, §47(b) may be enforced by only the mutual fund itself.  DBr. at 6 n.3, 25.

25        Defendants do not disclose that the United States Supreme Court has expressly

26   held that a section 36(b) claim is a hybrid claim -- a direct claim, but one which may be

27   brought *only* on behalf of the investment company (the Fund) – (and not a class action on

28   behalf of the shareholders) where the plaintiff does not have to comply with Rule 23.1.

- 34 -

1    *Daily Income Fund, Inc. v. Fox*, 464 U.S. 523, 534 n.11, 540 (1984); *Kamen v. Kemper*

2    *Fin. Servs., Inc.*, 500 U.S. 90, 108 (1991).  In *Kamen*, the High Court stated:

3              KFS also ignores the role that the ICA clearly envisions for shareholders in
4         protecting investment companies from conflicts of interest. As we have pointed
         out, § 36(b) of the ICA expressly provides that an individual shareholder may
5         bring an action **on behalf of the investment company** for breach of the
         investment adviser's fiduciary duty.  *15 U. S. C. § 80a-35(b)*. Congress added §
6         36(b) to the ICA in 1970 because it concluded that the shareholders should not
         have to "rely solely on the fund's directors to assure reasonable adviser fees,
7         notwithstanding the increased disinterestedness of the board." *Daily Income Fund,*
         *Inc. v. Fox, 464 U.S. at 540*. This legislative background informed our conclusion
8         in *Fox* that a shareholder action "on behalf of" the company under § 36(b) is direct
9         rather than derivative and can therefore be maintained without *any* precomplaint
         demand on the directors. Under these circumstances, it can hardly be maintained
10        that a shareholder's exercise of his state-created prerogative to initiate a derivative
         suit without the consent of the directors frustrates the broader policy objectives of
11        the ICA. (emph. added).

12        This is exactly what plaintiff has done here, bringing a direct action on behalf of the

13   investment company, as expressly stated in the case caption, as plaintiff "Donald Turner

14   on behalf of the Davis New York Venture Fund" in order, as expressly stated in the

15   complaint's allegations, "to recover for the Fund excessive and disproportionate 12b-1 fees

16   and investment advisory fees."  AC ¶3.  Since it is brought on behalf of the Fund, the

17   complaint similarly seeks rescission on behalf of the Fund.[17]

18

19

20

21

22

23

24

25   _____

26   [17] The cases cited by defendants are inapposite.  DBr. at 6.  The *Lessler* and *Hamilton*
     actions were class actions brought on behalf of the class members and not actions brought
27   on behalf of the Fund.  *Highland Crusader* was an individual action brought on behalf of
     only the named plaintiff.

28

## IV.    CONCLUSION

For the reasons set forth above, defendants' motion to dismiss the AC should be denied in its entirety.[18]

DATED:  September 22, 2009

Respectfully submitted,

WOLF HALDENSTEIN ADLER
  FREEMAN & HERZ LLP

By:  /s/ Robert B. Weintraub
Daniel W. Krasner
Robert B. Weintraub
270 Madison Avenue
New York, New York 10016
Telephone:   (212) 545-4600
Facsimile:   (212) 545-4653
*Lead Counsel for Plaintiff on behalf of*
*the Davis New York Venture Fund*

Andrew S. Friedman
Francis J. Balint, Jr.
BONNETT, FAIRBOURN, FRIEDMAN & BALINT
2901 N. Central Avenue, Suite 1000
Phoenix, AZ 85012
Telephone:  (602) 274-1100
Facsimile:  (602) 274-1199
Local Counsel for Plaintiff

554796v26

---

[18] If this Court should grant the dismissal motion, plaintiff requests leave to file a second amended complaint to cure any perceived deficiency.