K&L GATES LLP
1601 K Street, NW
Washington, DC  20006
Telephone 202-778-9000

Stephen G. Topetzes (Admitted *pro hac vice*)
stephen.topetzes@klgates.com
Nicholas G. Terris (Admitted *pro hac vice*)
nicholas.terris@klgates.com
Nicole A. Baker (Admitted *pro hac vice*)
nicole.baker@klgates.com

LAW OFFICE OF SHANNON GILES, PLLC
2205 East Speedway Boulevard
Tucson, AZ  85719
Telephone 520-327-1343

Shannon L. Giles (#018786)
Shannon.Giles@me.com

*Counsel for Defendants Davis Selected Advisers,
L.P. and Davis Distributors, LLC*

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| DONALD TURNER, on behalf of the DAVIS NEW YORK VENTURE FUND,<br><br>Plaintiff,<br><br>-against-<br><br>DAVIS SELECTED ADVISERS, L.P. and DAVIS DISTRIBUTORS, LLC,<br><br>Defendants. | NO. CV-08-421-TUC-JMR<br><br>**DEFENDANTS' SUPPLEMENTAL BRIEF PURSUANT TO THE COURT'S SEPTEMBER 7 ORDER ADDRESSING <u>JONES v. HARRIS</u>**<br><br>ORAL ARGUMENT REQUESTED |

Pursuant to this Court's order entered September 7, 2010, defendants respectfully submit this supplemental brief addressing the effect of <u>Jones v. Harris</u>, --- U.S. ---. 130 S. Ct. 1418 (Mar. 30, 2010) on defendants' pending motion to dismiss the Amended Complaint ("Complaint" or "Compl.").

Defendants' Motion to Dismiss the Amended Complaint (dckt. no. 43, filed June 23, 2009) is referred to hereinafter as the "Motion." Defendants' Reply to Plaintiffs' Memorandum of Points and Authorities in Opposition to the Motion (dckt. no. 58, filed November 3, 2009) is referred to hereinafter as the "Reply." This Supplemental Brief uses the same abbreviations and defined terms as the Motion.

## **PRELIMINARY STATEMENT**

The Supreme Court's opinion in Jones eliminates any semblance of support for this lawsuit.

Jones compels dismissal of plaintiff's belated excessive advisory fee claim. It elevates to the status of controlling law the Gartenberg test upon which defendants' Motion is based. Jones also makes clear that Section 36(b) is narrowly focused on excessive fees and thus confirms that plaintiff cannot state a Section 36(b) claim by alleging broad disagreements with the structure of mutual fund boards or generalized disputes regarding the board's exercise of its business judgment. In addition, Jones establishes beyond reasonable dispute that plaintiff's excessive advisory fee claim is untenable in light of the Complaint's allegations demonstrating that the Fund's advisory fee is within the range of arm's-length bargaining.

Jones involved a challenge to advisory fees, not Rule 12b-1 fees, and there is no mention of Rule 12b-1 fees in the decision of the Supreme Court. Nonetheless, Jones validates defendants' arguments and authorities demonstrating that, even assuming *arguendo* that Section 36(b) generally applied to 12b-1 fees, Section 36(b) requires allegations that the challenged fee is excessive and disproportionate to the services rendered (in this instance, distribution services). Jones thus forecloses plaintiff's attempt to shoehorn into Section 36(b) his misguided allegations regarding the Fund's 12b-1 plans.

Moreover, nothing in Jones undermines defendant's position that Section 36(b) does not contemplate claims directed at Rule 12b-1 fees. This position also finds support in the SEC's recent proposal to overhaul mutual fund distribution arrangements, Mutual Fund Distribution Fees; Confirmations (proposed rule), Release Nos. 33-9128, 34-62544, IC-29367, File No. S7-15-10 (July 21, 2010) (hereinafter, the "12b-1 Release"). The 12b-1 Release supports defendants' contentions that 12b-1 fees offer shareholders significant benefits and are categorically outside the ambit of Section 36(b), which expressly excludes "sales loads" and "payment made in connection with transactions subject to [ICA §17] or [the] rules . . . thereunder." 15 U.S.C. § 80a-35(b)(4).[1]

## ARGUMENT

**I.  THE SECTION 36(b) ADVISORY FEE CLAIM MUST BE DISMISSED**

The basic formulation of the Section 36(b) liability standard upon which defendants' Motion relies is now controlling law in this Circuit:

> [W]e conclude that [Gartenberg v. Merrill Lynch Asset Mgmt., Inc., 694 F.2d 923, 928 (2d Cir. 1982)] was correct in its basic formulation of what § 36(b) requires: to face liability under § 36(b), an investment adviser must charge a fee that is so disproportionately large that it bears no reasonable relationship to the services rendered **and** could not have been the product of arm's length bargaining.

Jones, 130 S. Ct. at 1426 (emphasis added). The Supreme Court also cited with favor the so-called Gartenberg factors relied upon in defendants' Motion and recognized that all pertinent facts should be considered. See id. at 1426 & n.5.[2]

---

[1] In the context of this brief regarding the impact of Jones, defendants make reference to two other recent authorities that they respectfully present for the Court's consideration as part of this supplement: the SEC's 12b-1 Release and the recent decision of the Ninth Circuit in Northstar Fin. Advisers, Inc. v. Schwab Inv., – F. 3d. –, 2010 WL 3169400, at *10 (9th Cir. Aug. 12, 2010). Defendants respectfully submit that these new materials are relevant to the Motion and that no prejudice to plaintiff will arise from the references to these additional materials contained in this opening supplemental brief.

[2] Jones v. Harris does not address and has no impact on defendants' arguments and authorities demonstrating that the Section 36(b) excessive advisory fee claim that plaintiff initially disavowed is almost entirely time barred. See Motion at 6-9; Reply at 6-7 & n.7.

Further, as discussed below, Jones rejected some of the same arguments regarding the Gartenberg standard that plaintiff seeks to pursue in this case.

### A. Nature and Quality of Services Provided

As demonstrated in defendants' Motion, plaintiff's allegations regarding the Fund's performance over the course of a few years not only ignore the Fund's extraordinary longer-term track record, but they simply fail to address the services rendered to the Fund. See Motion at 9-10 (citing In re Franklin Mut. Funds Fee Litig., 478 F. Supp. 2d 677, 687 (D.N.J. 2007) (rejecting allegations that a fund "grew so large that it began to function more like an index fund"; and "the allegations pertaining to these Funds' resemblance to index funds do[] not address the actual services rendered to those Funds")).

Jones confirms the necessity of alleging that a fee is "so disproportionately large that it bears no reasonable relationship to the services rendered," Jones 130 S. Ct. at 1426, and it specifically cites Franklin as exemplifying the "consensus" standard endorsed by the Supreme Court. Id. at 1425 n.4.

### B. Profitability

The Complaint simply fails to address profitability. See Motion at 10.

### C. "Fall-Out Benefits"

Apart from 12b-1 fees (addressed separately in Section II), plaintiff's only effort to plead "fall-out" benefits consists of his allegations about transfer agency fees, "the overwhelming majority," Compl. ¶ 72, of which were received by an unaffiliated third party. See Motion at 10-11 & nn.9-10. Nothing in the Complaint suggests that these fees are excessive in relation to the services provided as required by Jones. See Motion at 11. And Jones is entirely consistent with defendants' position that fees received by third parties cannot possibly count as fall-out benefits. See Jones, 130 S. Ct. at 1426 n.5 (citing Gartenberg as defining "fall-out financial benefits" as "those collateral benefits that

accrue ***to the adviser*** because of its relationship with the mutual fund") (emphasis added). See also Motion at 11 & n.10.

### D. Economies of Scale

Jones quotes Gartenberg for the proposition that the relevant inquiry regarding economies of scale is not the absolute size of the fund or the advisory fee but "the extent to which the adviser-manager realizes economies of scale as the fund grows larger." Jones 130 S. Ct. at 1426 (quoting Gartenberg, 694 F.2d at 930). Accord Motion at 12-14.

Jones also cites to cases previously relied upon by defendants as demonstrating that, especially in light of the undisputed fact that the Fund shares economies of scale via its advisory fee breakpoints, see Motion at 12-13, plaintiff's generic "large fund" allegations are patently inadequate. In re Franklin Mut. Funds Fee Litig., 478 F. Supp. 2d at 687 (dismissing complaint alleging that fund "ranked 18[th] out of 50 in terms of total fees charged to the Funds, taking in over $251.3 million in fees"); Amron v. Morgan Stanley Inv. Advisors, Inc., 464 F.3d 338, 345 (2d Cir. 2006) (complaint alleged "no facts" and made "no showing" "regarding the question of economies of scale" where plaintiffs merely "point[ed] to the size of the 12b-1 and advisory fees") (both cited at page 1425 n.4 of Jones).

### E. Fee Structures of Comparable Funds

Jones underscores that plaintiff's attempt to compare the Fund's fee for active portfolio management to the fees charged passively managed index funds, see Motion at 14, is frivolous. "If the services rendered are sufficiently different that a comparison is not probative, then courts must reject such a comparison." Jones, 130 S. Ct. at 1429.

Jones similarly validates defendants' arguments and authorities demonstrating that plaintiff's comparison between the Fund's advisory fee and those of four other actively-managed funds actually undermines his case. See Motion at 14. Jones explains that "courts should not rely too heavily on comparisons with fees charged to mutual funds by

1   other advisers." Jones, 130 S. Ct. at 1429.  To the extent that (as the Complaint suggests)
2   the fees charged by other mutual funds are relevant, plaintiff's own allegations indicate
3   that the Fund's advisory fee is lower than those of two of the allegedly comparable funds.
4   See Motion at 15.  This independently defeats a claim for excessive advisory fees because
5   "plaintiffs bear the burden in showing that fees are beyond the range of arm's length
6   bargaining." Jones, 130 S. Ct. at 1429 n.8.

7   Jones also held that Section 36(b) "does not necessarily ensure fee parity between
8   mutual funds and institutional clients" and that "[o]nly where plaintiffs have shown a
9   large disparity in fees that cannot be explained by the different services in addition to
10  other evidence that the fee is outside the arm's-length range will trial be appropriate."
11  Jones, 130 S. Ct. at 1429 n.8.  These observations eliminate plaintiff's advisory fee claim.
12  The Complaint concedes that the Fund charges ***retail investors and sophisticated***
13  ***accredited investors exactly the same advisory fee***.  See Motion at 16.

### F. Independence and Conscientiousness of the Directors

15  Consistent with the Motion (at pp. 16-18), Jones squarely rejected any suggestion
16  that a flaw in board process is an independent basis for liability.  Emphasizing that Section
17  36(b) "is sharply focused on the question of whether the fees themselves were excessive,"
18  130 S. Ct. at 1430, Jones reasoned that an adviser's disclosure or nondisclosure, while
19  relevant, is merely "a factor that must be considered in calibrating the degree of deference
20  that is due a board's decision to approve an adviser's fees." Id.[3]

---

[3] Accord S. Rep. No. 91-184, at 15 (1969), as reprinted in 1970 U.S.C.C.A.N. 4897, 4901 (defect in director deliberation is not "controlling in determining whether or not the fee encompassed a breach of fiduciary duty").  Where directors' process in approving adviser compensation "is robust" and they consider "the relevant factors, their decision to approve a particular fee arrangement is entitled to considerable weight, even if a court might weigh the factors differently." Jones, 130 S. Ct. at 1429.  Where that "process [is] deficient or the adviser withheld important information, the court must take a more rigorous look."  Id. at 1430.  At all times, however, the focus remains on whether the fees were "so disproportionately large" in comparison to the services provided. Id. at 1429-30.

1    Against this backdrop, because plaintiff clearly has failed to plausibly allege
2    excessive fees, it is unnecessary to consider whether deference to the directors' approval
3    of the fees provides an independent basis for dismissal. See Motion at 16.

4    Jones also undermines plaintiff's attacks on the directors in another respect. As
5    with other Section 36(b) lawsuits that courts have dismissed,[4] plaintiff's non-conclusory
6    allegations concerning the board of directors consist almost entirely of broad challenges to
7    the structure of mutual fund boards. See Motion at 16-18. Jones closes the door on
8    allegations of this type. It reiterated that "Congress consciously chose to address the
9    conflict-of-interest problem through the [ICA's] independent-directors section, rather than
10   through more drastic remedies." Jones, 130 S. Ct. at 1430. Accordingly, Section 36(b)
11   "does not call for judicial second-guessing of informed board decisions." Jones, 130 S.
12   Ct. at 1430.

13   To the extent that the Complaint addresses the issue at all, it affirmatively pleads
14   that the board was informed. See Compl. ¶¶ 330 ("The Board had available to it the data
15   necessary to determine" whether the Fund's 12b-1 plans should be continued); 381 (board
16   had "knowledge of the facts concerning the size of the 12b-1 fees and the purposes for
17   which they [were] used"; board also had similar "knowledge and involvement concerning
18   advisory fees"); 382 ("The Board had available to it the data necessary to determine
19   whether the advisory fees were excessive and disproportionate.").

20   **II.    THE SECTION 36(b) 12b-1 FEE CLAIM MUST BE DISMISSED**

21   As noted, Jones does not address directly the application of Section 36(b) to Rule
22   12b-1 fees. However, taken together, Jones and the SEC's subsequent 12b-1 Release

---

[4] See, e.g., Migdal v. Rowe-Price Fleming Int'l, Inc., 248 F.3d 321, 328-31 (4th Cir. 2001); Krantz v. Prudential Invs. Fund Mgmt Servs., 305 F.3d 140, 145 (3d Cir. 2002); Amron v. Morgan Stanley Inv. Advisors, Inc., 464 F.3d at 345-46.

validate every major aspect of defendants' arguments for 12(b)(6) dismissal of plaintiff's Section 36(b) claim regarding 12b-1 fees.[5]

### A. Plaintiff Has Not Alleged Disproportionality Between the Fund's 12b-1 Fees and the Services Provided for Those Fees

As already noted, Jones holds that Section 36(b) "is sharply focused on the question of whether the fees themselves were excessive," Jones, 130 S. Ct. at 1430, and the relevant inquiry in a Section 36(b) case is always whether the fees were "so disproportionately large" in comparison to the services provided (in this instance, distribution and shareholder services). See id. at 1429-30. In the wake of Jones, it is indisputable that where, as here, a plaintiff fails to allege disproportionality, a purported Section 36(b) claim must be dismissed. See Motion at 20-24; Reply at 10-12. Indeed, Jones cites one of defendants' key cases on this issue, Yameen v. Eaton Vance Distribs., Inc., 394 F. Supp. 2d 350, 358 (D. Mass. 2005) (dismissing complaint that failed to allege that "the distribution fees are disproportionate and unrelated to the sales-related services actually provided") (internal citation omitted). See Jones 130 S. Ct. 1425 at n.4.

### B. Plaintiff's Disagreement with the Directors' Decision to Approve the 12b-1 Plans Does Not State a Section 36(b) Claim

As established above, under Jones, Section 36(b) is focused solely on the level of the fee as it relates to the services provided.

Plaintiff's speculative theories – that 12b-1 plans were not needed to deal with net redemptions and that the Fund would have performed better if it were smaller. Compl. ¶¶

---

[5] Neither Jones nor the 12b-1 Release impacts defendants' standing argument, i.e., that plaintiff has no Article III standing to assert an excessive fee claim with respect to 12b-1 distribution fees that were never assessed on his Class A shares. See Motion at 19-20; Defendants' Reply at 9-10; Defendants' Supplemental Briefs on Standing (dckt. nos. 63, 65, filed February 9, 2010 and March 2, 2010, respectively).

262-74 – are completely disconnected from the nature and quality of the services provided in exchange for the 12b-1 fees. Indeed, the SEC has recognized that the fees are not paid in exchange for investment results and services – they are paid for marketing, distribution, and ongoing shareholder services. See 12b-1 Release at 126 (relevant issue is "whether the sales charges imposed by a particular fund are appropriate in light of the services provided by the intermediary"). Moreover, consistent with defendants' prior arguments, see Motion at 24; Reply at 12-13, the 12b-1 Release repeatedly recognizes that investors receive significant benefits from 12b-1 fees given that they are used as a substitute for a traditional front-end sales load and/or ensure that investors receive post-sale services from their broker-dealers.[6] Thus, the Complaint simply fails to engage in the inquiry required under Section 36(b) as confirmed by Jones. Accord Motion at 24-25; Defendants' Reply at 13.

### E.  Rule 12b-1 Fees Are Outside the Ambit of Section 36(b)

As noted, the Supreme Court's decision in Jones does not address distribution fees or other broker-dealer charges imposed on mutual funds or their shareholders, nor does it

---

[6] See, e.g., 12b-1 Release at 7 (current 12b-1 system provides investors "choices as to how they pay for [brokerage] services"); 12b-1 Release at 171 (proposed new rule "would benefit investors by permitting funds to continue to pay for … follow-up services provided to investors by brokers and other intermediaries after the sale has been made"); 12b-1 Release at 66 ("ongoing sales charges provide an alternative to a front-end sales load and, in that sense, benefit shareholders who choose to invest in a share class that has an ongoing sales charge"). See also 12b-1 Release at 1, 26, 170-71. In light of these benefits, the SEC has proposed to eliminate the requirements of current Rule 12b-1 that mandate various special board findings. See 12b-1 Release at 62-66, 137. Further, although plaintiff attacks the use of 12b-1 distribution fees to compensate mutual fund "supermarkets," see, e.g., Compl. ¶¶ 108-17, the 12b-1 Release also speaks approvingly of this very practice. See, e.g., 12b-1 Release at 26, 27 & n.96 (payments to supermarkets are "a common use of 12b-1 fees" that offer various benefits to investors); 12b-1 Release at 171 (new proposed rule would "benefit investors" by continuing to allow funds to pay for supermarkets); id. at 41 & n.153; id. at 127.

address whether such charges are within the ambit of the private right of action created by Section 36(b). However, the 12b-1 Release explains once again that, apart from the service fee component, 12b-1 fees are the functional equivalent of a front-end sales load and all 12b-1 fees are subject to comprehensive SEC and FINRA regulation pursuant to §§ 12(b), 22(b) and 17(d) of the ICA. <u>See, e.g.,</u> 12b-1 Release at 37 & n.141 ("We acknowledged … at least implicitly, when we approved the NASD sales charge rule amendments in 1992 … that a portion of asset-based distribution fees (<u>i.e.</u>, asset-based sales charges) functions like a sales load that is paid over time and thus should be subject to the requirements and limitations that apply to traditional sales loads."); 12b-1 Release at 44 (the SEC approved NASD service fee caps "as an appropriate exercise of the NASD's congressional mandate to prevent excessive sales charges on mutual fund shares"); 12b-1 Release at 114-15 (Rule 17d-3 "grants an exemption [from Section 17(d) and Rule 17d-1] for funds to enter into agreements with certain affiliated persons and the fund's principal underwriter in connection with the distribution of its shares, provided that such an agreement is in compliance with rule 12b-1, among other requirements").[7]

As defendants have demonstrated, this comprehensive regulatory scheme compels dismissal of the Complaint. Section 36(b)(4) expressly removes from the scope of § 36(b) "sales loads" and "payment made in connection with transactions subject to [ICA § 17] or

---

[7] <u>See also</u> 12b-1 Release at 7 (12b-1 fees "are governed by a combination of statutory provisions and rules adopted by the [SEC] and [FINRA]"); 12b-1 Release at 20 & n.66 (in 1992, NASD caps were imposed on 12b-1 fees in recognition of the fact that they were "a substitute for a front-end sales load" and that the NASD, which "derives … authority to regulate the level of mutual fund sales charges from section 22(b)(1)" should regulate "*all* forms of mutual fund sales compensation, including these asset-based sales charges") (internal quotation marks omitted); 12b-1 Release at 10 ("Section 12(b) was designed to protect funds from being charged excessive sales and promotional expenses."); 12b-1 Release at 226 (12b-1 distribution fees "have evolved into a substitute for front-end loads"); 12b-1 Release at 16, 29 (similar); 12b-1 Release at 51 ("[w]e view our proposal in many respects as the further development of the NASD sales charge rule, which was intended to bring total 12b-1 fees into 'approximate economic equivalency' with traditional loads, although this equivalency would not be exact . . ."); 12b-1 Release at 56 (SEC in 1992 approved NASD sales charge limits "as not being excessive").

[the] rules … thereunder." 15 U.S.C. § 80a-35(b)(4).  See Motion at 25-27; Defendants' Reply at 13-15.

### III. THE SECTION 47(b) AND SECTION 48(a) CLAIMS MUST BE DISMISSED

Jones does not address Sections 47(b) or 48(a) of the ICA.  However, the Ninth Circuit recently confirmed that the "structure of the ICA does not indicate that Congress intended to create an implied private right to enforce the individual provisions of the Act." Northstar Fin. Advisers, Inc. v. Schwab Inv., – F.3d – , 2010 WL 3169400, at *10 (9th Cir. Aug. 12, 2010).  Plaintiff's ICA Section 48(a) implied private right of action claim is no longer even colorable.

### CONCLUSION

The Complaint should be dismissed with prejudice.

RESPECTFULLY SUBMITTED this 27th day of September 2010.

LAW OFFICE OF SHANNON GILES, PLLC
2205 East Speedway Boulevard
Tucson, AZ 85719

By:   /s/ Shannon L. Giles

- and -

Stephen G. Topetzes
Nicholas G. Terris
Nicole A. Baker
K&L GATES, LLP
1601 K Street, NW
Washington, D.C. 20006

*Counsel for Defendants Davis Selected Advisers, L.P. and Davis Distributors, LLC*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 27th day of September 2010, I electronically submitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing for the following CM/ECF registrants: Francis J. Balint, Jr., fbalint@bffb.com; Daniel W. Krasner, Krasner@whafh.com; and Robert B. Weintraub, Weintraub@whafh.com.

/s/ Shannon L. Giles
LAW OFFICE OF SHANNON GILES, PLLC
2205 East Speedway Boulevard
Tucson, AZ 85719