Daniel W. Krasner  (*Admitted Pro Hac Vice*)
Krasner@whafh.com
Robert B. Weintraub  (*Admitted Pro Hac Vice*)
Weintraub@whafh.com
WOLF HALDENSTEIN ADLER
  FREEMAN & HERZ LLP
270 Madison Avenue
New York, New York 10016
Telephone:  212/545-4600
Facsimile:   212/545-4653
*Lead Counsel for Plaintiff on behalf of*
*the Davis New York Venture Fund*

Francis J. Balint, Jr.  (007669)
BONNETT FAIRBOURN FRIEDMAN
 & BALINT, P.C.
2901 North Central Avenue, Suite 1000
Phoenix, Arizona 85012
Telephone:  602/274-1100
Facsimile:   602/274-1199
*Local Counsel for Plaintiff*

UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA
TUCSON DIVISION

| | |
|---|---|
| DONALD TURNER, on behalf of the DAVIS NEW YORK VENTURE FUND<br><br>Plaintiff,<br><br>-against-<br><br>DAVIS SELECTED ADVISERS, L.P. and DAVIS DISTRIBUTORS, LLC,<br><br>Defendants. | NO. CV-08-421-TUC-AWT<br><br>**PLAINTIFF'S RULE 59 MOTION TO ALTER OR AMEND JUDGMENT AND RULE 15 MOTION FOR LEAVE TO AMEND THE SHAREHOLDER'S AMENDED COMPLAINT** |

# **TABLE OF CONTENTS**

**Page(s)**

TABLE OF AUTHORITIES ................................................................................. ii

INTRODUCTION ...................................................................................... - 1 -

MEMORANDUM OF POINTS AND AUTHORITIES ................................................. - 2 -

ARGUMENT .......................................................................................... - 3 -

I.    THE COURT SHOULD AMEND THE JUDGMENT UNDER RULE 59(e) AND
      GRANT PLAINTIFF LEAVE TO AMEND THE AC ........................................ - 3 -

      A.    Standards Under Federal Rule 59(e) and Federal Rule 15(a) ................... - 3 -

      B.    The Theory of the Action ......................................................... - 6 -

      C.    The SAC Corrects the Defects in the AC Identified in the June 1 MO ..... - 8 -

            **1.** The Nature and Quality of the Services Provided By Defendants
                 Demonstrates that They Provided Fewer Services and Inferior
                 Services Than Comparable Funds (SAC ¶¶89-127) ..................... - 8 -

                 a)    The Nature of the Services Provided By Defendants (SAC
                       ¶¶89-103) ............................................................. - 9 -

                 b)    The Quality of the Services Provided By Defendants (SAC
                       ¶¶104-27) ............................................................ - 10 -

            **2.** The Fund Was Excessively Profitable to the Advisor-Manager
                 (SAC ¶¶128-57) ....................................................... - 12 -

            **3.** A Comparison of the Fund to Other Funds (SAC ¶¶190-217) .. - 13 -

            **4.** Fall-Out Benefits (SAC ¶¶158-65) ................................... - 15 -

            **5.** Economies of Scale (SAC ¶¶166-89) ............................... - 16 -

            **6.** The Independent Decision of the Directors (SAC ¶¶218-36) .... - 16 -

CONCLUSION ....................................................................................... - 17 -

i

1

**TABLE OF AUTHORITIES**

2

**CASES**                                                                   **Page(s)**

3

4

*Allstate Insurance Co. v. Herron,*
    634 F.3d 1101 (9th Cir. 2011) ...................................................................... 3, 5

5

6

*Blakely v. Wells,*
    209 Fed. Appx. 18 (2d Cir. 2006)....................................................................... 5

7

8

9

*Certain Approval Programs, LLC v. Xcentric Ventures LLC,*
    No. CV-08-1608-PHX-NVW, 2009 U.S. Dist. LEXIS 22318
    (D. Ariz. Mar. 9, 2009)........................................................................................ 4

10

11

*Chappel v. Laboratory Corp. of America,*
    232 F.3d 719 (9th Cir. 2000) .............................................................................. 4

12

13

*Crown Castle USA Inc. v. Fred A. Nudd Corp.,*
    No. 05-CV-6163T, 2008 WL 3841298 (W.D.N.Y. Aug. 13, 2008) ................... 4

14

15

*Eminence Capital, LLC v. Aspeon, Inc.,*
    316 F.3d 1048 (9th Cir. 2003) ................................................................. 2, 3, 4, 5

16

17

*Foman v. Davis,*
    371 U.S. 178 (1962)............................................................................................. 4

18

19

*Harris v. Amgen,*
    573 F.3d 728 (9th Cir. 2009) .............................................................................. 4

20

21

*In re Hypercom Corp. Securities Litigation,*
    No. CV-05-0455-PHX-NVW, 2006 U.S. Dist. LEXIS 2669
    (D. Ariz. Jan. 24, 2006) ...................................................................................... 5

22

23

24

*Jakemer v. Romano,*
    No. CV-06-2583-PHX-SMM, 2007 U.S. Dist. LEXIS 15831
    (D. Ariz. Mar. 5, 2007) .................................................................................... 4, 5

25

26

*Jones v. Harris Associates L.P.,*
    559 U.S. ___, 130 S. Ct. 1418 (2010) ................................................................ 6

27

28

*In re Lehman Brothers ERISA Litigation,*
    M.D.L. No. 09-2017 (LAK), N. 08 Civ. 5598 (LAK) (S.D.N.Y. Sept. 8, 2010)
    (Pretrial Order No. 17)..................................................................................... 5, 6

*Nordyke v. King,*
   No. 07-15733, 2011 U.S. App. LEXIS 8906 (9th Cir. May 2, 2011) ............................ 6

*Olsen v. Pratt & Whitney Aircraft,*
   136 F.3d 273 (2d Cir. 1998) ................................................................................ 5

*Ramirez v. Deutsche Bank National Trust Co.,*
   No. 09-cv-1431 (JAH), 2010 U.S. Dist. LEXIS 95524
   (S.D. Cal. Sept. 10, 2010) ................................................................................ 4

*Rhino Sports v. Sport Court, Inc.,*
   No. CV-02-1815-PHX-JAT, 2007 U.S. Dist. LEXIS 25687
   (D. Ariz. Apr. 5, 2007) ................................................................................ 4

*Ross v. A.H. Robins Co.,*
   607 F.2d 545 (2d Cir. 1979) ................................................................... 3, 4

*Sanluis Developments, L.L.C. v. CCP Sanluis, L.L.C.,*
   556 F. Supp. 2d 329 (S.D.N.Y. 2008) .................................................... 3, 4

*S.E.C. v. Burns,*
   614 F. Supp. 1360 (S.D. Cal. 1985) ........................................................... 5

*St. George v. Home Depot USA, Inc.,*
   No. CV-05-0711-PCT-JAT, 2005 U.S. Dist. LEXIS 28062
   (D. Ariz. Nov. 15, 2005) ................................................................................ 5

*Vincent v. Trend Western Technical Corp.,*
   828 F.2d 563 (9th Cir. 1987) ........................................................................ 4, 5


**STATUTES AND RULES**

District of Arizona, Local Civil Rule 7 .............................................................. 1
District of Arizona, Local Civil Rule 15 ........................................................... 1

Federal Rules of Civil Procedure
   7 ................................................................................................................ 1
   12(b)(6) .................................................................................................... 3
   15 ....................................................................................................... 1, 3, 4
   15(a) .................................................................................................... 3, 4

iii

59 ............................................................................................................................. 1
59(e) ............................................................................................................ 3, 5, 17
60(b) ........................................................................................................................ 3

Investment Company Act of 1940
§ 36(b) .............................................................................................. 1, 2, 5, 17
§ 47(a) ................................................................................................................ 17
§ 48(a) ........................................................................................................... 5, 17

## **OTHER AUTHORITIES**

12 James Wm. Moore et al., *Moore's Federal Practice* (3d ed. 1997)
¶ 59.05(1)(c) ................................................................................................... 3

iv

1

**INTRODUCTION**

2      Plaintiff Donald Turner ("plaintiff"), on behalf of the Davis New York Venture

3

4  Fund ("Fund"), respectfully moves the Court for an order, pursuant to, *inter alia*, Rules 7,

5  15 and 59 of the Federal Rules of Civil Procedure (and Local Rules 7 and 15) amending

6  under Rule 59 the Judgment (Dkt. 81; sometimes "Judg.")) that dismissed this action to

7  permit plaintiff to file under Rule 15 a Second Amended Complaint.

8

9      Both the Judgment and this Court's Memorandum and Order (Dkt. 80; "MO") held

10  that "[b]ecause plaintiff has not indicated how he could amend his Amended Complaint

11  [Dkt. 33] to state a claim, leave to further amend is denied, and this dismissal is with

12

13  prejudice."  MO at 19; Judg. at 1.

14      Plaintiff respectfully submits that he could not know the deficiencies the Court

15  found in his pleading until the Court decided his motion to dismiss and set forth the

16  deficiencies in its MO.  This proposed amendment would be the first time plaintiff would

17  have an opportunity to amend his pleading to correct the deficiencies this Court noted.

18

19  The proposed Shareholder's Second Amended Complaint Under Section 36(b) of the

20  Investment Company Act of 1940 (sometimes "SAC") and proposed order are attached

21  hereto as Exhibits 1 and 2, respectively.

22

23      As detailed below, the SAC adds numerous fact allegations demonstrating the

24  nature and quality of the services provided by Defendants for the Fund deteriorated and

25  became more and more like the lesser services provided to index funds which charge much

26  lower fees; even managed funds comparable in size to the Fund charged much lower fees

27  and provided superior services than those provided here; and demonstrated in great detail

28

that the advisory fees charged by the Fund in comparison to the fees charged other

comparable managed funds (even if the Fund's services were not inferior) were

excessively high.

### MEMORANDUM OF POINTS AND AUTHORITIES

On June 1, 2011, this Court issued the MO that granted defendants'[1] motion to

dismiss the Shareholder's Amended Complaint Under Section 36(b) of the Investment

Company Act of 1940 (Dkt. 33, "AC").  The dismissal was with prejudice and denied

leave to amend.  The Court directed the Clerk "to enter judgment accordingly and to close

the case."  Judgment implementing the June 1, 2011 MO was entered on the same date.[2]

The new allegations in the SAC address, and we submit cure, all the deficiencies

found by the Court in its MO and apply the six *Gartenberg* Factors to the facts of the case.

Because the Federal Rules favor resolving cases on their merits, courts should not preclude

the prosecution of a possibly meritorious claim because of defects in the pleadings.

*Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003) ("Dismissal

---

[1] Defendants are the Investment Adviser and Distributor of the Fund.  Plaintiff is a Fund shareholder.  Plaintiff also submits herewith the Declaration of Robert B. Weintraub with exhibit.  Plaintiff also has pending a Motion for "Reconsideration and/or Clarification of Memorandum Order Concerning Section 36(b)'s Damages Period."  Dkts. 82-83.

[2] The SAC is considerably shorter than the AC, cut from 79 to 61 pages.  In addition, the SAC adds many factual allegations comparing the Fund to other similar funds, and demonstrates why the fees charged here are excessive and could not possibly be the product of arms length bargaining.  The redlined version made from Microsoft Word, Exhibit 3 hereto, overstates the substantive changes to the SAC because some parts of the AC have simply been moved, and a MS Word redline includes both a deletion and reinsertion even though the material is not new.  Accordingly, plaintiff also encloses a second redline which by hand attempts to bracket only new material.  Exhibit 4 hereto.

with prejudice and without leave to amend is not appropriate unless it is clear on de novo review that the complaint could not be saved by amendment.") (citing *Chang v. Chen*, 80 F.3d 1293, 1296 (9th Cir. 1996)).  *Accord, e.g., Ross v. A.H. Robins Co.*, 607 F.2d 545, 547 (2d Cir. 1979) (reversing dismissal with prejudice).  *See* Fed. R. Civ. P. 15(a) (leave to amend or replead a complaint is to be "freely given when justice so requires.").  Under this liberal standard for amending a complaint, and since the SAC addresses the deficiencies identified in the MO, plaintiff respectfully submits that the Judgment should be amended under Rule 59(e) to permit plaintiff to file the SAC under Rule 15.

## ARGUMENT

### I.   THE COURT SHOULD AMEND THE JUDGMENT UNDER RULE 59(e) AND GRANT PLAINTIFF LEAVE TO AMEND THE AC

#### A.   Standards Under Federal Rule 59(e) and Federal Rule 15(a)

A party seeking leave pursuant to Rule 15(a) to amend a complaint that has been dismissed under Rule 12(b)(6) without leave to amend -- as is the case here -- must first have the judgment amended under either Rule 59(e) or Rule 60(b):  "A party may seek leave to amend a complaint following the entry of judgment under Rule 15(a).  However, the party must first have the judgment reopened under Rule 59(e) or 60(b)."  12 James Wm. Moore et al., *Moore's Federal Practice* ¶ 59.05(1)(c) (3d ed. 1997).

There "are four basic grounds upon which a Rule 59(e) motion may be granted," the relevant one here being "if such motion is necessary to prevent manifest injustice."  *Allstate Ins. Co. v. Herron*, 634 F.3d 1101, 1111 (9th Cir. 2011).  *Accord Sanluis Devs., L.L.C. v. CCP Sanluis, L.L.C.*, 556 F. Supp. 2d 329, 331 (S.D.N.Y. 2008) (quoting *Griffin*

*Indus. v. Petrojam, Ltd.*, 72 F. Supp. 2d 365, 368 (S.D.N.Y. 1999); *Crown Castle USA Inc. v. Fred A. Nudd Corp.*, No. 05-CV-6163T, 2008 WL 3841298 (W.D.N.Y. Aug. 13, 2008) (judgment should be altered or amended if "it becomes necessary to . . . prevent obvious injustice"); *see Vincent v. Trend West. Tech. Corp.*, 828 F.2d 563, 570 (9ᵗʰ Cir. 1987).

Under Rule 15(a), leave to amend or replead a complaint is to be "freely given when justice so requires." *See Foman v. Davis,* 371 U.S. 178, 182 (1962). Courts should not "preclude the prosecution of a possibly meritorious claim because of defects in the pleadings." *Ross*, 607 F.2d at 547. Thus, when a motion to dismiss is granted, "the usual practice is to grant leave to amend the complaint." *Chappel v. Lab. Corp. of Am.*, 232 F.3d 719, 726 (9th Cir. 2000) (holding district court abused its discretion in denying an ERISA plaintiff leave to amend because "amendment would allow [the plaintiff] to state a legally cognizable claim for breach of fiduciary duty"); *Eminence Capital, LLC*, 316 F.3d at 1052; *Ramirez v. Deutsche Bank Nat'l Trust Co.*, No. 09-cv-1431(JAH), 2010 U.S. Dist. LEXIS 95524 at *1 (S.D. Cal. Sept. 10, 2010) (motion to amend granted, noting "strong federal policy favoring the disposition of cases on the merits").[3]

---

[3] *Accord, e.g., Harris v. Amgen*, 573 F.3d 728, 736-37 (9th Cir. 2009) (reversing district court and holding that dismissal without leave to amend is improper unless it is clear that complaint could not be saved by any amendment). *See Certain Approval Prog., LLC v. Xcentric Ventures LLC*, No. CV-08-1608-PHX-NVW, 2009 U.S. Dist. LEXIS 22318 at *4 (D. Ariz. Mar. 9, 2009) (granting leave to amend when amending would not be futile); *Rhino Sports v. Sport Court, Inc.*, No. CV-02-1815-PHX-JAT, 2007 U.S. Dist. LEXIS 25687 at *4 (D. Ariz. Apr. 5, 2007) (granting leave for defendants to amend answer to add defenses and counterclaims when plaintiffs could not show futility, undue delay, or bad faith, insofar as the purpose of Rule 15 is "to facilitate decision on the merits rather than on the pleadings or technicalities"): *Jakemer v. Romano*, No. CV-06-2583-PHX-SMM, 2007 U.S. Dist. LEXIS 15831 at *6 (D. Ariz. Mar. 5, 2007) ("Dismissal without leave to amend (continued…)

1

2   The SAC now answers the Court's question in the Judg. and MO.   The SAC

3   addresses the deficiencies in the AC identified by the Court and states claims for relief

4   under ICA Sections 36(b) and 48(a).   Therefore, the Court should grant plaintiff's

5   Rule 59(e) motion and permit him to file the SAC in order to prevent "manifest injustice."

6   *E.g.*, *Allstate Ins.*, 634 F.3d at 1111; *see Vincent*, 828 F.2d at 570; *S.E.C. v. Burns*, 614 F.

7   Supp. 1360, 1367 (S.D. Cal. 1985) (granting motion to amend complaint after summary

8   judgment under Rule 59(e): "absent compelling reasons, the court should exercise its

9   discretion to allow leave to amend); *Eminence Capital*, 316 F.3d at 1052 (district court

10   erred in denying plaintiffs' motion to file a fourth amended complaint); *Blakely v. Wells*,

11   209 Fed. Appx. 18 (2d Cir. 2006) (vacating judgment that did not allow plaintiffs to file a

12   third amended complaint); *Olsen v. Pratt & Whitney Aircraft*, 136 F.3d 273, 276 (2d Cir.

13   1998) (same); Pretrial Order No. 17, *In re Lehman Bros. ERISA Litig.*, M.D.L. No. 09-

14   2017 (LAK), N. 08 Civ. 5598 (LAK) (S.D.N.Y. Sept. 8, 2010) (granting plaintiffs' motion

15   to alter or amend the judgment and for leave to amend the operating complaint -- over

16   defendants' argument that the plaintiffs failed to satisfy Rule 59(e) and that the proposed

17   second consolidated amended complaint failed to state a claim.   Court stated that "[i]n all

18

19

20

21

22   _____

(…continued)

23   is improper unless it is clear, upon *de novo* review, that the complaint could not be saved

24   by any amendment," allowing plaintiffs to proceed with a claim of fraudulent investment

25   scheme) (quoting *Polich v. Burlington N., Inc.*, 942 F.2d 1467, 1472 (9th Cir. 1991)); *In re*

26   *Hypercom Corp. Sec. Litig.*, No. CV-05-0455-PHX-NVW, 2006 U.S. Dist. LEXIS 2669 at

27   *33-34 (D. Ariz. Jan. 24, 2006) (dismissing securities fraud class action without prejudice

28   and with leave to amend complaint to comply with PSLRA); *St. George v. Home Depot*

   *USA, Inc.*, No. CV-05-0711-PCT-JAT, 2005 U.S. Dist. LEXIS 28026 at *5-6 (D. Ariz.

   Nov. 15, 2005) (granting plaintiffs leave to amend class action complaint).

- 5 -

circumstances, plaintiffs should be permitted to amend their complaint, and defendants'

objections to the [proposed newly amended complaint] are more appropriately considered

on a motion to dismiss.") (Weintraub Decl. Ex. 1).[4]

## B.    The Theory of the Action

The theory of this action was contained in a number of sections in the AC and

expressly articulated in oral argument before this Court.  The theory of the action has now

been elaborated upon, supported by additional fact allegations, and combined into one

section of the SAC (SAC ¶¶75-88):

> Since no later than January 1, 2006, when the Fund had passed $30
> billion in assets, the investment advisory services provided by DSA to the
> Fund have been limited (as well as *inferior*), and the huge fees paid by the
> Fund and its shareholders for such services have been excessive and
> disproportionate to the services provided.  Between 2006 and 2010,
> inclusive, the Fund has paid DSA a total of over $900 million in advisory
> fees for reduced and inferior services.

> As set forth in the chart immediately below and in the allegations
> throughout this pleading, the Fund's net assets grew from 18.7 billion in its
> fiscal year ended July 31, 2003 to approximately $23.4 billion on July 31,
> 2004 and then to $30.3 billion at its fiscal year end July 31, 2005.  During
> this time period, the Fund outperformed the S&P 500.

> From August 1, 2005 to July 31, 2006, the Fund's net assets grew to
> $37.7 billion.  As the size of the Fund grew to and beyond $30 billion in net
> assets, the Fund began to *underperform* its peer groups of funds and the
> S&P 500, its "benchmark."

---

[4] Moreover, AC was filed in April 2009, before the United States Supreme Court's March
30, 2010 decision in *Jones v. Harris Associates L.P.*, 559 U.S. ___ , 130 S. Ct. 1418
(2010).  In view of that decision, permission to file the SAC should be granted.  *See*
*Nordyke v. King*, No. 07-15733, 2011 U.S. App. LEXIS 8906 at *28-30 (9th Cir. May 2,
2011) (Supreme Court decisions over multi-year period prior to the proposed amendment
warranted grant of motion to file amended complaint)

For the five year cumulative period beginning January 1, 2006, the Fund has underperformed its peer categories of funds -- Large Funds, Large Blend Funds and the S&P 500, as detailed below.

The Fund underperformed the S&P 500 during four of the five calendar years from 2006 through 2010, inclusive (every year except 2009), and the Fund continued to underperform the S&P 500 during the first calendar quarter of 2011.

The Fund underperformed the S&P 500 in almost every individual calendar year beginning with 2006:  by 0.67% in year 2006; 0.52% in 2007; 3.03% in 2008; 2.95% in 2010, and 1.32% in the first quarter of 2011.

Beginning approximately January 1, 2006 through at least July 31, 2010, because of the growth in the size of the Fund, the Fund became essentially an index fund with excessive and disproportionate fees.  The investment adviser of a fund which is being managed like an index fund need provide fewer investment advisory services to such a fund.  Here, the Adviser, which managed the Fund like an index fund, has provided fewer investment advisory services to the Fund and its shareholders since all the Fund is doing is essentially mimicking the index.

During this time period, and as a result of the Fund's investment strategy which in part resulted from its very massive size, the Fund:  has underperformed all its peer groups of funds; narrowed its focus of potential investments to very large, well-known companies (market capitalization of at least $10 billion), almost entirely in the S&P 500 Index or which mimic companies in that Index, which consequently required little or no research to analyze; and limited its purchases to large blocks of a security which negatively effect the Fund's ability to purchase or sell its portfolio securities without materially impacting the market for such securities.

The only beneficiaries of the Fund's massive growth were Defendants, who materially benefitted because they received significantly increased advisory fees and 12b-1 fees while providing materially diminished services in return for such fees.

The Fund's advisory fees and 12b-1 fees each became and have continued to be excessive and disproportionate and, hence, unlawful, beginning no later than January 1, 2006, although due to the one year limitations period plaintiff's claims start with July 28, 2007.

The increase in fees charged the Fund by Defendants – while

providing fewer and inferior services is striking.  During the Fund's three fiscal years July 2003 – July 2005, inclusive, the Fund's advisory fees never exceeded $133 million per year and averaged $111 million per year. Thereafter, for its three fiscal years beginning August, 2005 through July 31, 2008, when the Fund underperformed the S&P 500, the Fund's advisory fees were no less than $165.9 million per year and averaged $200.2 million per year, 80.4% more annually.  (Even if this latter calculation is extended by two years to include the two years of market downturn, 2009 and 2010, the Fund's advisory fees for the five year period 2006-2010 averaged $180.96 million per year, 63% more annually than the 2003-05 period).

During the Fund's three fiscal years July 2003 – July 2005, inclusive, the Fund's 12b-1 fees never exceeded $135 million per year and averaged $116.8 million per year.  Thereafter, for its three fiscal years beginning August, 2005 through July 31, 2008, when the Fund underperformed the S&P 500, the Fund's 12b-1 fees were no less than $155 million per year and averaged $169.8 million per year.  SAC ¶¶75-86.

The SAC contains many new factual allegations addressing the deficiencies found by this Court and demonstrates that the fees charged the Fund by Defendants exceeded by tens and even hundreds of millions of dollars the fees charged other comparable funds (both actively managed and index).  In addition,  the services Defendants provided to the Fund deteriorated and the Fund performed far worse than its peers, both managed and index.

### C.    The SAC Corrects the Defects in the AC Identified in the June 1 MO

####    1.    The Nature and Quality of the Services Provided By Defendants Demonstrates that They Provided Fewer Services and Inferior Services Than Comparable Funds (SAC ¶¶89-127)

The MO states plaintiff alleged only that Defendants charged the maximum 12b-1 fee permitted; unnecessarily paid broker-dealers to include the Fund on their mutual fund "supermarket" websites, and that the 12b-1 fees Defendants charged were nearly as large as the advisory fees charged.  MO at 13-14.  The MO makes little or no reference to the

advisory fee claim.  The SAC divides this issue into two sections, one addressing the nature and the second the quality of the services provided by the Adviser, placing a particular emphasis on the advisory fee.

        a)        **The Nature of the Services Provided By Defendants (SAC ¶¶89-103)**

Plaintiff addresses and cures this deficiency by adding to the SAC extensive allegations concerning the nature of the advisory services Defendants provided to the Fund and alleges that Defendants provided materially fewer services to the Fund than the services provided by the advisers of other comparable actively managed funds.

The Adviser provided fewer investment advisory services than those provided to other actively managed funds because it was managed like an index fund (even though it was not one).[5]  The Fund limited its potential investment universe to companies with at least a $10 billion market capitalization, which is more than the median capitalization of an S&P 500 company.  This means that its investment universe was limited to fewer than 250 companies that were already very large and well-known and consequently required little or no independent research to analyze.  In its 2007 and 2009 annual reports, the Fund reported investments in only 94 and 93 common stocks, respectively, which accounted for 96% of its portfolio each year.  Because these companies were large, well-known and liquid, the Fund required not only less research but less trading expertise because it was able to purchase these securities in large blocks at lower transaction costs on national

---

[5] The Fund's annual reports state that it considers the S&P 500 Index to be its "benchmark."  SAC ¶95.

exchanges.  A claimed actively managed fund that is in fact managed like an index fund has a materially lower cost structure and requires fewer services than a non-index fund which is actively managed.  SAC ¶¶99-102.  These additional facts support the contention that the Fund's fees were excessive and disproportionate, and could not have been the product of arms length bargaining, because Defendants provided fewer services (as if the Fund were an index fund), but charged the much higher fees of an actively managed fund (when the services also were greatly inferior to other managed funds with far lower fees).

### b)      The Quality of the Services Provided By Defendants (SAC ¶¶104-27)

Plaintiff has added to the SAC, in a separate section, extensive allegations concerning the quality of the advisory services Defendants provided to the Fund and why those services provided were inferior to the quality of service provided by other actively managed funds.

The SAC alleges that Morningstar.com, a well-known research site for mutual fund information, categorizes the Fund as a Large Blend fund.  There are few similar sized funds for comparison, according to Morningstar.  There are, in this size range, only two other Large Blend actively managed domestic stock funds, five other "Large" actively managed domestic funds, and four domestic index funds, among the approximately 40 largest funds in the United States.  These eleven other funds are:  the American Fund's Fundamental Investors and Investment Co. of America funds (both Large Blend); the Vanguard Wellington Fund; Fidelity Growth Fund; Dodge & Cox Stock Fund; Vanguard Windsor  and Vanguard Primecap funds ("Large" funds); and the four index funds --

Vanguard's Total Stock Market, Institutional and 500 Index funds, and the Fidelity Spartan 500 Index.  SAC ¶¶109-27.

The MO stated that most of the AC's comparisons were to the Vanguard Funds which it brushed aside as *sui generis*.  *See* MO at 15.  The eleven funds to which the Fund is compared in the SAC are in four different fund families:  American Funds, Fidelity, Dodge & Cox, and Vanguard.  The SAC now contains extensive allegations (see below) comparing the Fund to seven other actively managed funds in four fund families and demonstrates that the fees charged here were excessive and disproportionate when compared to either the other managed funds or index funds (and regardless of whether the Fund provided fewer or inferior services).

Of the seven Large Blend and Large actively managed domestic funds, for the last five years, the Fund ranks last in its Morningstar return/risk rating and next to last in annual return.  This means that the Fund's risk/return percentage was in the bottom of all comparable mutual funds.[6]  SAC ¶¶109-21.  Hence, the Defendants provided inferior service to the Fund.

The Fund ranked sixth in annual average return among the seven actively managed funds.  The five funds had an annual return of between 14% and 269% more per year than the Fund.  SAC ¶¶121.  Since the Fund's focus is on a limited number of large, potential investments, the comparison with the four domestic index funds also demonstrates that the Fund's return was between 72% and 87% less than the return of any of these index funds.

---

[6] For a full description of the Morningstar Rating™ system see SAC ¶109 n.2.

SAC ¶¶122-27.

### 2. The Fund Was Excessively Profitable to the Advisor-Manager (SAC ¶¶128-57)

The MO states that: the AC emphasized "how large the fees [charged by Defendants] are in "pure dollar amounts;" the statistics cited in the AC emphasize the size of the Fund's fees without a comparison to other funds. MO at 14.

The SAC cures this deficiency in a number of ways. It compares the profitability of the Fund to the eleven funds identified above -- the seven similar Large Blend and Large actively managed domestic stock funds (which are the only meaningfully similar managed funds). It provides four separate charts and narrative allegations containing these comparisons and demonstrates the excessiveness of the Fund's fees when compared to those of the managed comparable funds. SAC ¶¶128-41.

The advisory fee charged by every investment adviser reflects that adviser's costs, and the cost of advising a similarly situated fund should not be materially different. SAC ¶¶136. The charts demonstrate that even assuming *arguendo* the advisory services provided by the Fund's Adviser were of similar quality to those services provided by the adviser's of other actively managed funds (and not fewer and less expensive services, as we have demonstrated is the case), the Fund's advisory fee far exceeded the advisory fee of the comparable funds and their average advisory fee by material amounts. SAC ¶¶132-33.

The charts demonstrate that the Fund's advisory fee was excessive and disproportionate during the 2006-2010 time period when compared to every one of the

seven actively managed funds:  by an amount between $20 million and $95 million per year when compared to each actively managed Large Blend and Large Fund; by $66 million per year when compared to the average advisory fee of the actively managed Large Blend and Large funds; by a total amount over the five year period of at least $330 million dollars when compared to the average advisory fee for these actively managed funds (and by an amount exceeding $150 million per year when compared to the average advisory fee of the four index funds).  SAC ¶¶134-41.  Thus, the Fund's extraordinarily larger advisory fee, when compared to the other seven actively managed funds, is evidence of the fact that the Fund's fees were excessive and disproportionate and could not have been the product of arms length bargaining.

The SAC further alleges that the excessiveness of the Fund's fees is understated because the charts do not take into account the decreased cost of research and other services given the Fund's small universe of potential investments.[7]  SAC ¶137.  The Fund's expense ratio to that of the comparable funds is addressed below.

### 3.   A Comparison of the Fund to Other Funds (SAC ¶¶190-217)

The MO states that the AC compared the Fund to only a few actively managed funds, most of which were Vanguard funds, and that its comparison of the Fund to index funds was invalid.  Mo at 14-15.

The SAC cures these deficiencies.  It now compares the Fund to seven actively

---

[7] The SAC also clarifies that the 12b-1 fee to net asset ratio did not decrease slightly over five years.  MO at 14.  The cumulative carryover 12b-1 payments for Classes B, C and R increased by more than $105 million between 2006 and 2008, meaning the Fund's 12b-1 fees increased by at least the same percentage as the Fund's net assets.  SAC ¶154 n.6.

managed funds, which are the only actively managed funds of comparable size and type. As detailed above, the SAC also adds new allegations that the Fund can be validly compared to an index fund given the nature of the services provided by the Investment Adviser – its limited number of investments, investments in only very large companies, and why such a focus means its cost structure is much lower than a true actively managed fund and is more akin to an index fund.  SAC paras. cited above, ¶¶99-102, 128-57.

The SAC further compares the Fund's expense ratio to the expense ratios of the seven actively managed funds of its size and type over a four year period.  The chart demonstrates that the Fund's fees were excessive and disproportionate because the chart shows that:  (a) the Fund's average expense ratio during this period was between 39.4% and 173% more than the average expense ratio of all but one of these actively managed funds; (b) the Fund's average expense ratio during this period of 0.875 was 62% higher than the average expense ratio of the seven other actively managed funds (which was 0.54%); (c) during the 2006–11 time period, the Fund underperformed the S&P 500 by approximately 1.07% annually; (c) and the Fund's excessive and disproportionate fees thus accounted for at least 31% of the Fund's underperformance of the S&P 500.  The SAC also clarifies that the Fund's total net asset weighted expense ratio for the first nine months of 2008 was 15.1% more than that of a benchmark of the **138 largest** stock funds.  A comparison of the Fund's expense ratio to the four similar index funds shows that the Fund's ratio averaged 636% higher per year over the four year period.  SAC ¶¶190-202.

The MO also states that the AC alleges underperformance in a down economy, which is "particularly unavailing."  The SAC, however, analyses the Fund against other

- 14 -

1    funds during the time periods 2006-10 and 2007-10, inclusive.  SAC, *e.g.*, ¶¶87, 121, 126,

2    139, 148.  These four and five year periods include up and down markets and flat markets.

3         The SAC also includes new factual allegations concerning the 12b-1 fees.  The AC

4    had compared the Fund's distribution fees per million dollars to only four Vanguard funds

5    (two actively managed and two index funds).  AC ¶308.  The SAC adds to the chart the

6    two other American Funds Large Blend funds, the same category as the Fund, for a three

7    year period.  The Fund had the largest 12b-1 fee per dollars under management in five of

8    the six comparison years for these Large Blend funds.  (The chart now shows that the Fund

9    has the largest 12b-1 fee in percentage terms in ten of the thirteen comparison years for all

10   funds in the chart.)  SAC ¶¶209-15.

### 4.    Fall-Out Benefits (SAC ¶¶158-65)

15        The MO states that plaintiff did not adequately allege that either the advisory fees or

16   12b-1 fees were excessive individually, and thus neither could be fall-out benefits.  That

17   deficiency is cured by the remainder of the new allegations in the SAC discussed herein.

18   The SAC also specifically alleges that the marginal increase in the Fund's advisory fee,

19   using July 2005 as the baseline, was $90 million annually through 2008, $13 million

20   annually through 2009, and $25 million annually through 2010.  SAC¶163.  The SAC

21   specifically alleges that the Adviser benefitted materially by significantly increased

22   advisory fees as a result of the growth in the size of the Fund; that that increase in size was

23   due in significant part to the 12b-1 fees paid by the Fund thus resulting in significant

24   fallout benefits to the Adviser but not the Fund, which paid these excessive fees.  The SAC

25   further alleges that the Fund would have benefitted more if it had been closed to new

- 15 -

investors when it reached the $30 billion size, but that the directors were more concerned with the interests of the Adviser and its profits, and did not close the Fund. SAC ¶¶183-86.

### 5.   Economies of Scale (SAC ¶¶166-89)

The MO similarly finds that plaintiff "points to no facts that show a particular fee was excessive" and "does not state what services were provided" nor "the cost of the services to show that a fee was disproportionate to the service provided."  The SAC cured this deficiency.  As stated above, it adds detailed facts concerning the advisory fee of other managed funds, which relate to those funds' cost structure; the dollar amount by which the Fund's advisory fee exceeds the advisory fee of all other reasonably comparable actively managed funds and thus was clearly excessive by those amounts.  SAC ¶¶128-41.  The SAC adds allegations of how the size of the Fund, its limitation on its potential universe of investments to companies with a capitalization over $10 billion, and the limited number of common stocks (less than 100) in the Fund, all demonstrate that the Fund's cost structure was much less than a true actively managed fund.  SAC ¶¶99-102.

### 6.   The Independent Decision of the Directors (SAC ¶¶218-36)

The MO states that the AC argues that the directors are interested based on where and from whom the directors obtain their information, as well as the frequency with which and the amount of time the directors meet throughout the year.  The SAC clarifies those allegations.  It alleges that the directors address the contract issues for all the Davis funds and their respective classes at one meeting and cannot possibly spend a sufficient amount of time on each contract to fulfill their fiduciary duties, whether or not they are "interested."  The SAC clarifies this point by adding the allegation that the board on

average spent approximately 15 minutes on each of the 36 Plans of Distribution and even less on each advisory contract.  SAC ¶229.

### CONCLUSION

For all of the reasons stated above, plaintiff respectfully requests that the Court grant his motion to alter or amend the Judgment under Rule 59(e) to prevent manifest injustice by permitting him to cure the deficiencies in the AC by the filing of the SAC. Counts One and Two (under Section 36(b)) should be reinstated, and Count Four under Section 48(a) should be reinstated because the predicate claim under section 36(b) is now sufficiently alleged.  (Plaintiff does not seek reinstatement of Count Three, under Section 47(a), which is included in the SAC for appeal purposes only.)

DATED:  June 29, 2011                Respectfully submitted,

WOLF HALDENSTEIN ADLER
    FREEMAN & HERZ LLP

By:  /s/ Robert B. Weintraub
Daniel W. Krasner
Robert B. Weintraub
270 Madison Avenue
New York, New York 10016
Telephone:   (212) 545-4600
Facsimile:   (212) 545-4653
*Lead Counsel for Plaintiff on behalf of*
*the Davis New York Venture Fund*

Francis J. Balint, Jr.
BONNETT, FAIRBOURN, FRIEDMAN & BALINT
2901 N. Central Avenue, Suite 1000
Phoenix, AZ 85012
Telephone:  (602) 274-1100
Facsimile:  (602) 274-1199
*Local Counsel for Plaintiff*

662505v6

- 17 -